## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

─────────────────────────────

FRANK J. POVOSKI, JR.,

                          Plaintiff,          Civil Action No.
                                              9:11-CV-0120 (DNH/DEP)

         v.

DALE ARTUS, *et al.*,

                          Defendants.

─────────────────────────────

APPEARANCES:                              OF COUNSEL:

FOR PLAINTIFF:

Frank J. Povoski, *Pro Se*
05-B-2531
Great Meadow Correctional Facility
Box 51
Comstock, NY 12821

FOR DEFENDANT:

HON. ERIC T. SCHNEIDERMAN          KEVIN P. HICKEY, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224


DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Frank J. Povoski, Jr., a New York State prison inmate, commenced this action in February of 2011, against seventy-three defendants, pursuant to 42 U.S.C. § 1983, alleging the deprivation of his civil rights.   Plaintiff's complaint alleges wrongdoing by those defendants committed at two separate correctional facilities, dating back to 2006. Plaintiff claims that, during the relevant time period, he was subjected to excessive uses of force, denied adequate medical treatment for his injuries, issued false misbehavior reports in retaliation for commencing lawsuits and filing grievances, denied procedural due process during the course of ensuing disciplinary hearings, impeded in his ability to file and pursue grievances, and subjected to interference with his mail and effectively denied court access through that mail interference.   As relief, plaintiff's complaint seeks recovery of $5 million in compensatory damages and $2.5 million in punitive damages.

As a result of the court's initial review of plaintiff's complaint, his claims have been significantly narrowed.   That order directed dismissal of all of plaintiff's claims as frivolous or failing to state a plausible cause of action, with the exception of his causes of action alleging (1) excessive force and failure to protect him from assaults by prison staff; (2) deliberate medical

indifference; and (3) interference with this mail and resulting denial of court access.

Currently pending before the court is a motion by defendants seeking the entry of summary judgment dismissing plaintiff's remaining claims. For the reasons set forth below, I recommend that the motion be granted, in part, but otherwise denied, and that plaintiff's excessive force and certain of his failure to intervene claims remain pending for trial.

I.    BACKGROUND[1]

Plaintiff is a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 1 at 2. At the times relevant to the claims that have survived initial scrutiny by the court, plaintiff was confined in the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. *See generally* Dkt. No. 1.

On January 31, 2008, defendant Randal Smith, a corrections officer stationed at Clinton, together with two other corrections officers, presented themselves at plaintiff's cell for the purpose of searching the cubicle. Dkt. No. 1 at 9; Dkt. No. 88 at 16. Before the search began, plaintiff was placed

---

[1]    In light of the procedural posture of this case, the following recitation is drawn principally from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

in hand restraints and escorted by defendant Smith to the shower cell. *Id.*
As the two approached the shower cell gate, defendant Smith allegedly
shoved plaintiff into the gallery bars of the gate, causing him pain in his right
shoulder and causing aggravation of a pre-existing medical condition. *Id.*
Plaintiff claims that, as a regular officer on plaintiff's cell block, defendant
Smith was aware that he was receiving physical therapy for his right
shoulder due to a pre-existing injury. Dkt. No. 88 at 16.

On February 12, 2008, plaintiff was removed from his housing unit by
defendants Reyell and Strack, two other corrections officers stationed at
Clinton, as well as defendant Wood, a corrections sergeant, and escorted to
the Clinton mental health unit to meet with defendant Bonner, a social
worker employed by the New York State Office of Mental Health ("OMH").
Dkt. No. 1 at 5; Dkt. No. 88 at 21. The purpose of the meeting was to
discuss a piece of plaintiff's outgoing mail intercepted by prison authorities,
in which he allegedly expressed suicidal thoughts. *Id.*; Dkt. No. 74-7 at 3.
During the escort, defendant Reyell threatened plaintiff with physical harm,
saying that "when they 'got [him] [in]to the observation room[,]' the[]
[officers] were going to cause [him] physical harm because of prior
grievances [he] had filed against [prison] staff." Dkt. No. 88 at 21.
According to the plaintiff, during his meeting with defendant Bonner, he

4

informed her of defendant Reyell's threats and that he had previously experienced difficulties with the three officers accompanying him.  [Dkt. No. 1 at 5](); [Dkt. No. 88 at 22]().   Despite the concerns expressed by Povoski, and notwithstanding defendant Bonner's opinion that he was not suicidal, when the interview ended, defendant Bonner directed that he be transferred to an observation cell within the mental health unit for evaluation.  [Dkt. No. 74-7 at 3](); [Dkt. No. 88 at 22]().   Plaintiff was subsequently taken by the three escort officers to an observation room, where defendant Reyell began punching him in the head and face, and defendant Strack poked and punched him in the eye.  [Dkt. No. 1 at 5](); [Dkt. No. 88 at 22-23]().   Defendant Reyell then choked plaintiff until he was unconscious, and the three officers, including defendant Wood, continued to punch and kick him all over his body, including the face, head, groin, back, and legs, causing him to suffer physical injuries including a lacerated ear and eye and contusions to the face and body.  [Dkt. No. 1 at 5-6](); [Dkt. No. 88 at 23]().   Plaintiff requested medical care following this incident from defendants Badger, Bentley, Nurse Waldron,[2] Jane Smith, John Smith,[3] and Mayes.[4]   [Dkt. No. 1 at 6]().   All of

---

[2]      The record is unclear as to the identity of defendant Waldron.   In the caption of plaintiff's complaint, he names "Darlene Waldron" and "J. Waldron" as defendants.   [Dkt. No. 1](). In the section of the complaint in which plaintiff identifies the parties to the action, he represents that "Darlene Waldron " is a civilian employee employed at Clinton, and "N. Woldron [sic]" is a mental healthcare provider at the facility.   *Id.* at 3.   In the body of the complaint, plaintiff alleges that "Nurse Waldron . . . summarily denied" plaintiff

5

those requests were "summarily denied."  *Id.*

On the following day, plaintiff was restrained and escorted from the observation room in the mental health unit to an interview area by defendant Reyell and defendants Cooper and Tyler, both corrections officers stationed at Clinton, for the purpose of meeting with defendant Berggren, a

---

medical attention, and "Darlene Waldron . . . obstructed Plaintiff's mail[.]"  *Id.* at 6. There are no allegations in the complaint against a "J. Waldron."  *See generally* Dkt. No. 1.  On January 20, 2012, the court received a letter from plaintiff in which he attempted to clear up any confusion by stating that "N. Waldron" was an error, and should be "J. Waldron," whose first name is "Joanne."  Dkt. No. 10.  At plaintiff's deposition, plaintiff testified that "Darlene" is an OMH employee, and "J." interfered with plaintiff's mail.  Dkt. No. 74-23 at 65.  It is not clear from the deposition transcript, however, whether "Nurse" and "Darlene" Waldron are the same or different individuals. Compounding the uncertainty surrounding the identity of this defendant is the fact that, in his affidavit submitted in opposition to defendants' motion for summary judgment, plaintiff avers that "OMH clinician Joanne Waldron" ignored his requests for medical attention following the use-of-force incident on February 12, 2008.  Dkt. No. 88 at 25, 34, 35.  This last piece of evidence directly contradicts plaintiff's deposition testimony, *compare* Dkt. No. 74-23 at 65, and the affidavit contains no statements regarding a defendant Waldron that interfered with his mail, *see generally* Dkt. No. 88.  As a result, the court is not certain to whom the parties refer when discussing this defendant.  For the sake of clarity and in deference to plaintiff's *pro se* status, in this report, (1) I assume that there are, in fact, two separate individuals against whom plaintiff has asserted a claim in this case that share the last name "Waldron"; (2) I will refer to the defendant alleged to have denied plaintiff medical treatment as "defendant Nurse Waldron"; and (3) I will refer to the defendant alleged to have interfered with plaintiff's mail as "defendant J. Waldron."

3       Based on plaintiff's indication to the court, in a letter dated January 20, 2012, that he did not intend to serve defendants Jane Smith and John Smith, and the fact that, according to the docket sheet, neither of those defendants were actually served, I recommend that both of them be dismissed from the action. Dkt. No. 10.

4       Paragraph 19 of plaintiff's complaint suggests that his requests for medical attention to those defendants occurred after an incident on February 13, 2008.  Dkt. No. 1 at 6.  In light of the context in which this allegation appears, this is likely a typographical error, and was intended to refer to the alleged assault by corrections officers on February 12, 2008.  *Id.*

psychiatrist employed at Clinton. Dkt. No. 1 at 6; Dkt. No. 74-6 at 2; Dkt. No. 88 at 40. Plaintiff alleges that, during the course of the escort, defendant Reyell stated, "[I]f you say anything to the Doctor about yesterday, you are going to get it again." Dkt. No. 88 at 40. According to the plaintiff, during that interview and despite the warning from defendant Reyell, he informed defendant Berggren of the assault on the part of defendants Reyell, Strack, and Wood from the day before, exhibited his injuries, and requested medical attention.[5] Dkt. No. 1 at 7; Dkt. No. 88 at 41. Plaintiff alleges that, at that point, defendants Reyell, Tyler, and Cooper suspended the interview with defendant Berggren and forcibly removed him from the interview room. Dkt. No. 88 at 41. Once plaintiff and the escorting officers were in the hallway, defendant Reyell allegedly "punched [plaintiff] in the back" and explained that the officers were going to punish him for reporting the incident from the previous day to defendant Berggren. *Id.* Because defendant Berggern was still in plaintiff's line of sight at this point in the incident, plaintiff yelled in her direction, "'[T]hey're doing it again,'" indicating that defendant Reyell was about to assault him again.

---

[5]    In her declaration, defendant Berggren states that plaintiff appeared angry with security staff at the facility "and attempted to engage [her] against them." Dkt. No. 74-6 at 3.

It is uncontested that, once plaintiff was returned to the observation cell, an altercation occurred, although the parties present divergent accounts of the events that followed. Plaintiff alleges that defendant Tyler ordered him to put his hands, which were in restraints, through the feed-up hatch in the cell door, and that he complied with the order. Dkt. No. 88 at 41. Because the feed-up hatch, according to plaintiff, was located approximately two feet from the bottom of the door, he had to bend over to get his hands out of the feed-up hatch far enough that the escort officers could access the handcuffs. *Id.* at 41-42. After defendant Tyler unlocked the handcuff on plaintiff's left hand, Tyler allegedly "yanked on the chain and cuff still attached to [plaintiff's] right hand" with enough force that plaintiff's forearm contacted the upper portion of the hatch. *Id.* at 42. At that time, defendant Tyler ordered plaintiff to place his hand outside the hatch. *Id.* While plaintiff attempted to comply with the order, defendant Cooper opened the locked cell door and the three escorting officers, defendants Cooper, Tyler, and Reyell, "rushed into the cell[,] . . . grabbed [plaintiff] and tackled [him]" while defendant Tyler still had ahold of the waist chain attached to plaintiff's right handcuff. *Id.* Plaintiff alleges that the three officers thereafter assaulted him, striking him with closed fists on the right side of his head, rendering him unconscious. *Id.*

Once plaintiff regained consciousness, defendants restrained both of his hands and escorted him to the medical unit. Dkt. No. 88 at 42. During the escort, plaintiff alleges that he passed through the interview room where defendant Berggren was still located. *Id.* Plaintiff told her he had been assaulted again, but she did not respond. *Id.* The assault on plaintiff allegedly continued when he arrived in the examination room. *Id.* at 43. Plaintiff contends that other individuals, including defendants Giambruno and Rendle, corrections supervisors, and defendants Bushey and D. Trudeau, corrections officers, joined defendants Cooper, Tyler, and Reyell in assaulting plaintiff. Dkt. No. 1 at 7; Dkt. No. 88 at 43. Plaintiff admits that he cannot determine who actually struck him during the assault. Dkt. No. 88 at 43.

In contrast to plaintiff's version of the incident, while defendants concede that defendants Reyell, Cooper, and Tyler used force against plaintiff on February 13, 2008, they allege that it was in an effort to restore order. Dkt. No. 74-3 at 11-12. Relying on the use-of-force reports created following the incident, defendants contend that, after defendant Tyler removed the handcuff on plaintiff's left hand, plaintiff "pulled violently with his right hand, smashing [defendant Tyler's] left thumb and knuckles against the feed-up hatch." Dkt. No. 74-21 at 12; Dkt. No. 74-3 at 11-12.

Defendants Cooper and Reyell then entered the cell, pulled plaintiff to the floor, and reapplied the restraints. Dkt. No. 74-21 at 4, 7, 10-14. According to defendant Giambruno, he was already at plaintiff's observation cell when defendants Reyell, Cooper, and Tyler used force against plaintiff inside the cell. Dkt. No. 74-21 at 10. Once plaintiff was restrained again by defendants Cooper and Reyell, defendant Giambruno "called for escorts," and he and defendants Bushey and D. Trudeau escorted plaintiff to the hospital without further incident. *Id.*; Dkt. No. 74-21 at 15, 16.

Defendant Clemons, a nurse stationed at Clinton, examined plaintiff immediately after the incident with defendants Tyler, Cooper, and Reyell on February 13, 2008. Dkt. No. 74-21 at 9, 18. Defendant Clemons noted the following injuries: (1) a small abrasion in plaintiff's left ear canal; (2) an abrasion to his left eyelid; (3) a small abrasion to his left cheek; (4) an approximately three-centimeter sized ecchymosis on his right inner arm that was at "various stages of healing" and in "scattered circular shapes"; (5) an approximately two-centimeter sized bruise that was dark-brown colored on his left inner-arm; (6) an abrasion on his left elbow; (7) "numerous small circular areas of bruising" colored "blue/dark brown" at "various stages of healing" on his right upper thigh area; (8) a small area of bruising at "various stages of healing" on his left upper thigh; and (9) dried blood under the

fingernails of his left hand. *Id.* Photographs were taken of plaintiff's injuries by Corrections Officer Sears. *Id.* at 23-37; Dkt. No. 88 at 44. According to plaintiff, despite observing his injuries, defendant Clemons failed to offer him any medical treatment. Dkt. No. 88 at 43-44, 48.

Defendant Tyler subsequently issued plaintiff a misbehavior report stemming from the incident on February 13, 2008, accusing him of engaging in violent conduct and disobeying a direct order. Dkt. No. 74-21 at 19; Dkt. No. 88-1 at 87. Following a disciplinary hearing to address those charges, plaintiff was found guilty on both counts. Dkt. No. 88 at 88. That determination, however, was subsequently reversed on appeal to the DOCCS Central Office. *Id.* at 90.

Over the next two weeks, plaintiff submitted sick call notices requesting medical care for his injuries. Dkt. No. 88 at 48-49. Plaintiff was seen for his injuries on February 15, 2008, at which time Tylenol was prescribed and x-rays ordered of plaintiff's right wrist, right ribs, right knee and skull. Dkt. No. 88 at 48. Those x-rays revealed no skull fracture or other gross abnormality; no evidence of acute fracture, dislocation or other boney abnormality of the right wrist; no evidence of fracture, periosteal or abnormal boney lucency to the left ribs; no acute pulmonary parenchymal, plural, cardiomediastinal, or boney abnormalities to the chest; and no

evidence of fracture of acute boney abnormality to the right knee.   Dkt. No. 1 at 8; Dkt. No. 88 at 48; Dkt. No. 75 at 16-17, 45-46.   Subsequent sick call notices, however, submitted by the plaintiff regarding injuries allegedly stemming from the incident of February 13, 2008, went unanswered.   Dkt. No. 1 at 8; Dkt. No. 88 at 48-49.

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action on February 3, 2011.   Dkt. No. 1. Named as defendants in plaintiff's complaint are seventy-one known individuals and two unidentified workers designated as Jane Smith and John Smith.   *Id.* at 2-5.   The defendants named in plaintiff's complaint include Brian Fischer, the DOCCS Commissioner; Dale Artus, the Superintendent at Clinton; and various other corrections employees broken down into categories, including correctional officers and supervisors employed at Clinton; civilian employees at that facility; DOCCS employees assigned to the Elmira Correctional Facility, located in Elmira, New York; OMH employees; and David Anodio, a DOCCS Central Office employee. *Id.*   With the exception of defendant Fischer, who is named in both his individual and official capacities, all of the defendants are sued only in their individual capacities.   *Id.*

Plaintiff's complaint asserts the following causes of action:

| Count 1 | Excessive force, cruel and unusual punishment |
| Count 2 | Assault, battery, and intentional and negligent infliction of emotional distress |
| Count 3 | Deliberate medical indifference |
| Count 4 | Deliberate medical indifference, in retaliation for filing grievances and pursuing lawsuits |
| Count 5 | Retaliation through misuse of the disciplinary reporting process |
| Count 6 | Fourteenth Amendment procedural due process |
| Count 7 | Fourteenth Amendment procedural due process |
| Count 8 | Retaliatory obstruction of grievance process as retaliation |
| Count 9 | Obstruction of grievance process |
| Count 10 | Interference with correspondence |
| Count 11 | Interference with correspondence |
| Count12 | Deliberate indifference to safety of inmate |
| Count 13 | Denial of access to the courts |

*Id.* at 17-24.

By virtue of a decision and order issued by District Judge David N. Hurd on July 13, 2011, plaintiff's claims have been significantly narrowed. Dkt. No. 6. In that decision, after granting plaintiff's IFP application, Judge Hurd (1) dismissed, with prejudice, plaintiff's claim that defendants Brousseau, Artus, LaValley, Garman, and Bisso interfered with his ability to file grievances; (2) dismissed, with leave to replead, all claims that accrued prior to January 25, 2008, on the basis of the expiration of the applicable three-year statute of limitations; (3) dismissed plaintiff's retaliation claims against defendants Randle, Defayette, Tyler, Reyell, R. Trudeau, Allan, Livsey, Pelkey, D. Trudeau, Perry, Florentine, Strack, Young, Cruise, Mahuta, Kelly, and Wood, with leave to replead; and (4) dismissed, with leave to replead, plaintiff's due process claims against defendants Drown,

Drollette, LaMora, John Miller, Facto, Ulher, LaPine, and Lacy, also with leave to replead.[6]  *Id.* at 21-22.   As a result of that decision and plaintiff's subsequent failure to avail himself of the opportunity to file an amended complaint, as authorized by Judge Hurd, the causes of action that remain pending include claims of (1) mail interference/denial of access to the courts; (2) excessive force; (3) deliberate medical indifference; and (4) failure to protect.   Those claims are asserted against defendants Reyell, Strack, Wood, Cooper, Tyler, Giambruno, Bushey, D. Trudeau, Rendle, Randal Smith, Bonner, Berggren, Artus, Fischer, Badger, Bentley, Macey, Darlene Waldron, Lashway, Baker, Lee, Johnson, Gillen, Clemons, Defayette, Allan, Livsey, Bisso, Hicks, Clancy, Ayotte, DuPree, Stuart, Boulrice, J. Waldron, Cayea, Perry, Harden, Terry, and Schutts.

On May 21, 2013, following the close of discovery, defendants moved for the entry of summary judgment dismissing plaintiff's remaining claims.

---

[6]     In the court's initial order, dated July 13, 2011, defendant Scott Drollette was included among the defendants listed as remaining in the action. Dkt. No. 6 at 22. Because defendant Drollette's only involvement in the conduct forming the basis of plaintiff's claims, according to plaintiff's complaint, relates to due process violations arising from a disciplinary hearing conducted by that defendant beginning on February 27, 2008, and based upon the court's determination in that initial order that all of plaintiff's procedural due process claims were subject to dismissal as having been alleged in only conclusory fashion, without supporting facts demonstrating the existence of a plausible due process claim, it appears that defendant Drollette should have been dismissed from the suit but was inadvertently left off the list of dismissed defendants.   I am therefore recommending dismissal of plaintiff's claims defendant Drollette, based upon the court's earlier order.

Dkt. No. 74, 75 and 82.   Responsive papers in opposition to defendants'

motion were received by the court from the plaintiff on September 9, 2013.

Dkt. No. 88.   Defendants' motion, which is now fully briefed and ripe for

determination, has been referred to me for the issuance of a report and

recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B).

III.    DISCUSSION

  A.    Summary Judgment Standard

  Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.   Under that provision, the entry of summary

judgment is warranted "if the movant shows that there is no genuine dispute

as to any material facts and the movant is entitled to judgment as a matter of

law."   Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins.

Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d

Cir. 2004).   A fact is "material" for purposes of this inquiry, if it "might affect

the outcome of the suit under the governing law."   *Anderson*, 477 U.S. at

248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)

(citing *Anderson*).   A material fact is genuinely in dispute "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.  Plaintiff's Claims of Denial of Access to the Court and Interference with Mail Against Defendants Defayette, Allan, Livsey, Bisso, Hicks, Clancy, Ayotte, DuPree, Stuart, Boulrice, J. Waldron, Cayea, Perry, Rendle, Harden, Terry, Randal Smith and Shutts

In his complaint, plaintiff alleges that defendants Defayette, Allan and Livsey unlawfully interfered with his mail, in retaliation for having filed previous grievances and lawsuits.   Dkt. No. 1 at 8, 10, 22-23.   In addition, he alleges that defendants Bisso, Hicks, Clancy, Allan, Ayotte, DuPree, Stuart, Boulrice, J. Waldron, Cayea, Livsey, Perry, Rendle, Defayette, Harden, Terry, Randal Smith, and Shutts obstructed his legal mail and caused him to miss court deadlines and suffer prejudice.   *Id.* at 17, 22-23. In their motion, defendants assert that defendants Defayette, Allan, and Livsey were authorized to open and read plaintiff's outgoing mail based upon the existence of an active mail watch that was in place at the relevant times.   Dkt. No. 74-3 at 25.   Defendants also argue that no reasonable factfinder could conclude, based on the record evidence, that defendants Bisso, Hicks, Clancy, Ayotte, DuPree, Stuart, Boulrice, J. Waldron, Cayea, Perry, Rendle, Harden, Terry, Randal Smith or Shutts interfered with plaintiff's legal mail resulting in prejudice to him.   *Id.* at 36-27.

Undoubtedly, prisoners have a constitutional right to meaningfully access the courts.   *Bounds v. Smith*, 430 U.S. 817, 824 (1977); *accord*,

*Lewis v. Casey*, 518 U.S. 343, 350 (1996) ("The right that *Bounds* acknowledged was the (already well-established) right of *access to the courts.*" (emphasis in original)).   This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents, or file them[.]"   *Lewis*, 518 U.S. at 350 (citations omitted).   A plaintiff asserting a denial of access to courts claim must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim."   *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (quotation marks omitted).   To establish a denial of access to courts claim, a plaintiff must satisfy two prongs.   First, a plaintiff must show that the defendant acted deliberately and maliciously.   *Davis*, 320 F.3d at 351.   Second, plaintiff must demonstrate that he suffered an actual injury.   *Id.*

In addition, "a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment."   *Davis*, 320 F.3d at 351. Restrictions on a prisoner's mail, however, "are justified . . . if they further one or more of the substantial governmental interests of security, order, and rehabilitation and must be no greater than is necessary or essential to the protection of the particular governmental interest involved."   *Id.* (quotation marks and alterations omitted).   For obvious reasons, greater protections

are afforded to legal mail than non-legal mail, and to outgoing as opposed to

incoming. *Id.* (citing *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989)).

In this case, as an initial matter, plaintiff has not responded in

opposition to defendants' request for dismissal of his denial of access to the

court and interference with mail claims against defendants Allan, Livsey,

Defayette, Bisso, Hicks, Clancy, Allan, Ayotte, DuPree, Stuart, Boulrice, J.

Waldron, Cayea, Livsey, Perry, Rendle, Defayette, Harden, Terry, Randal

Smith, and Shutts. *See* Dkt. No. 88 at 51 ("Due to loss of my legal papers

on May 29, 2012 by NYSDOCCS, especially those that support my

'interference with mail and access to the courts', [sic] and limited time and

resources to reconstruct the legal papers where replaceable, I am not

furthering that claim herein.").[7]  Thus, defendants' burden with respect to

those claims "has been lightened such that, in order to succeed on [their]

argument, [they] need only show that the argument possesses facial merit,

which has been appropriately been characterized as a 'modest' burden."

*Taedger v. New York*, No. 12-CV-0549, 2013 WL 5652488, at *4 (N.D.N.Y.

Oct. 15, 2013) (Suddaby, J.) (citing N.D.N.Y. L.R. 7.1(b)(3); *Rusyniak v.*

---

[7] Out of caution, and mindful of my obligation to extend special solicitude to *pro se* litigants, I have not construed plaintiff's failure to respond to defendants' request to dismiss those claims as a voluntary withdrawal of them.

*Gensini*, No. 07-CV-0279, at *1 n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases)).[8]

Turning first to plaintiff's denial of access to the court claim against defendants Bisso, Hicks, Clancy, Allan, Ayotte, DuPree, Stuart, Boulrice, J. Waldron, Cayea, Livsey, Perry, Rendle, Defayette, Harden, Terry, Randal Smith, and Shutts, I find that no reasonable factfinder could conclude, based on the record evidence, that any of these defendants interfered with plaintiff's legal mail deliberately or maliciously, or that plaintiff suffered an actual injury as a result of the alleged interference. After carefully reviewing the record, I agree with defendants that there is no evidence, aside from plaintiff's unsupported testimony and grievances filed while confined at Clinton, that any of the defendants implicated in this claim in fact interfered with plaintiff's mail or that, as plaintiff alleges, any of his lawsuits were dismissed as a result of the interference. By way of example, at plaintiff's deposition, he testified that his denial of access to the courts claim asserted against defendant Defayette is based on his belief that "legal mail associated with actions [he] was pursuing [pursuant to] Article 78" was discarded by defendant Defayette. Dkt. No. 74-23 at 42. Plaintiff was

---

[8]  Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

unable, however, to testify regarding which particular cases were dismissed, and he has not provided any documentary evidence to support this testimony. *Id.* Moreover, although plaintiff based his belief that defendant Defayette threw out his legal mail because another inmate allegedly witnessed it, plaintiff could not identify that inmate at his deposition. *Id.* at 43-44. At his deposition, plaintiff indicated to counsel that he would provide additional discovery material to support his testimony following the deposition, *id.* at 44, but the record does not reflect any evidence to support those allegations.

In sum, it appears that plaintiff's denial of access to the court claim is based solely upon his allegations, which are supported only by speculation. Accordingly, I find that defendants have satisfied at least their lightened burden on summary judgment with respect to this claim, and I therefore recommend dismissal of the denial of access to the court claim against defendants Defayette, Allan, Livsey, Bisso, Hicks, Clancy, Ayotte, DuPree, Stuart, Boulrice, J. Waldron, Cayea, Perry, Randal, Harden, Terry, Randal Smith, and Shutts.

Turning next to plaintiff's interference with mail claim against defendants Allan, Livsey, and Defayette, I similarly conclude that defendants have satisfied their burden on summary judgment regarding this

claim. The cause of action arises from plaintiff's allegations that defendant Allan and Livsey opened plaintiff's outgoing mail without authorization. Dkt. No. 1 at 10; Dkt. No. 74-23 at 45, 48, 54-58. To the contrary, however, in support of their motion for summary judgment, defendants submitted proof that, during the time relevant to plaintiff's interference of mail claim against defendants Allan, Livsey, and Defayette, plaintiff was on mail watch pursuant to DOCCS Directive No. 4422, Part III, Sections A and B. Dkt. No. 74-19 at 5. At his deposition, plaintiff admitted that, if defendants had permission to monitor his mail, then he cannot assert a cognizable claim against defendants Allan and Livsey.[9] Dkt. No. 74-23 at 48. In light of this admission, the proof that plaintiff was on mail watch in accordance with DOCCS regulations, and the fact that plaintiff does not oppose the portion of defendants' motion with regard to this claim, I find that defendants have satisfied at least their lightened burden regarding the interference of mail claim. Accordingly, I recommend that this claim against defendants Allan, Livsey, and Defayette be dismissed.

---

[9] In addition, it is worth noting that it appears plaintiff acknowledges he has no claim against defendant Allan because (1) he has no evidence that defendant Allan actually opened his mail, and (2) he was not served in the action. Dkt. No. 74-23 at 56-57. Indeed, on January 20, 2012, plaintiff submitted a letter to the court indicating that he did not intend to serve defendant Allan, and there is no indication in the court's records that this defendant was ever properly served in the action. Dkt. No. 10. Accordingly, defendant Allan should be dismissed from the action on this basis, as well.

C.  <u>Plaintiff's Excessive Force Claims Against Defendants Randal Smith, Reyell, Strack, Wood, Cooper, Tyler, Giambruno, Rendle, Bushey, and D. Trudeau</u>

Plaintiff's complaint alleges that he was subjected to the use of excessive force during a series of three events occurring on January 31, 2008, February 12, 2008, and February 13, 2008.  Dkt. No. 1 at 5-9.  In their motion, defendants seek dismissal of all three claims, arguing that two of the three "are completely fabricated and implausible as a matter of law," and that the degree of force applied in connection with the third was objectively reasonable.  Dkt. No. 74-3 at 4-13.

Plaintiff's excessive force claims are grounded in the Eighth Amendment, which prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or 'involve[s] the unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (citations omitted)).  While the Eighth Amendment "'does not mandate comfortable prisons,' neither does it permit inhumane ones."  *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment

is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319 (quotation marks omitted); *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir. 1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components – one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson,* 503 U.S. at 7-8; *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6 (1992) (quotation marks omitted); *accord*, *Blyden*, 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases – not "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the

governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness. *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9.

Additionally, courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (quotation marks omitted); *see also Griffin*, 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quotation marks omitted).

"The objective component [of the excessive force analysis] . . . focuses on the harm done, in light of 'contemporary standards of decency.'" *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also Blyden*, 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency'"). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *accord Hudson*, 503 U.S. at 8; *see also Wright*, 554

F.3d at 268.  "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident.'"  *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9) (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force . . . are imperfectly correlated[.]"  *Wilkins*, 559 U.S. at 38.  In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105. Finally, on a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate.  *See Wright*, 554 F.3d at 269 (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the . . . incident with [that officer]

indicated only a slight injury") (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)).

With the foregoing principles in mind, I have separately analyzed each of the incidents giving rise to plaintiff's excessive force claims below.

### 1.    January 31, 2008

Plaintiff alleges that, on January 31, 2008, defendant Randal Smith, who at the time was cognizant of the fact that Povoski had previously injured his right shoulder and was undergoing physical therapy, "slammed" him into a shower cell gate, causing further physical injury to his right shoulder. Dkt. No 1. at 9; Dkt. No. 74-23 at 15-16, 19-20; Dkt. No. 88 at 16.   The assault is alleged to have occurred while plaintiff was handcuffed with his arms behind his back and in retaliation for a previous incident that had occurred between plaintiff and defendant Smith "in 2007 or . . . early 2008." Dkt. No. 88 at 16, 19-20, 22.   Plaintiff maintains that, as a result of the incident, his pre-existing shoulder injury was aggravated, and his subsequent requests for medical attention were denied.   Dkt. No. 74-23 at 17-18.

On February 25, 2008, plaintiff filed a grievance, No. CL-56635-08, concerning the incident on January 31, 2008.   Dkt. No. 74-8 at 2; Dkt. No. 74-9 at 2.   In that grievance, plaintiff was unable to name the officer who

assaulted him, but described him as having brown, short-crop hair, being

five-feet ten-inches tall, and weighing two hundred pounds.   Dkt. No. 74-9

at 2.   According to Jeffrey Hale, the Assistant Director of the DOCCS

Inmate Grievance Program ("IGP"), that grievance was consolidated with

another of plaintiff's grievances, No. CL-56582-08, which also alleged

excessive force.   Dkt. No. 74-5 at 4 n.2.   According to defendants,

following an investigation regarding those two consolidated grievances,

Sergeant J. Ludwig concluded that "no cell search of Povoski's cell [was]

conducted" on January 31, 2008.   Dkt. No. 74-9 at 4.   The consolidated

grievances were subsequently denied at the facility level, and that

determination was upheld on appeal to the DOCCS Central Office Review

Committee ("CORC").   Dkt. No. 74-9 at 1, 3-6.

In light of the fact that the allegations contained in grievance No.

CL-56635-08 do not specifically identify defendant Smith as the corrections

officer who allegedly assaulted plaintiff, and the fact that Sergeant Ludwig

concluded that plaintiff's cell was not searched on January 31, 2008,

defendants contend that the record evidence concerning this incident is so

inconsistent as to warrant summary judgment in their favor.   Dkt. No. 74-3

at 5-6.   In support of this argument, defendants urge that, although

excessive force causes of action cannot generally be resolved on motion for

summary judgment because they typically involve matters of credibility requiring resolution of conflicting accounts, the court should nevertheless apply the limited exception to this rule carved out by the Second Circuit Court of Appeals in *Jeffreys v. New York*, 426 F.3d 549 (2d Cir. 2005), and determine that no reasonable factfinder could credit any of the plaintiff's versions of the relevant events. [Dkt. No. 74-3 at 5-6](#).

On a motion for summary judgment, where the record evidence, including an inmate-plaintiff's allegations, if credited, could reasonably permit a rational factfinder to conclude in plaintiff's favor, it is improper for the court to dismiss an excessive force claim. *Wright*, 554 F.3d at 269 (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003); *Griffin*, 193 F.3d at 91); *see also Rule v. Brine, Inc.* 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). The Second Circuit, however, has recognized a narrow exception to this general rule in *Jeffreys*. In that case, the court held that summary judgment may be entered in the rare circumstance where there is nothing in the record to support the plaintiff's allegations of the defendants' use of excessive force, aside from his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable

to the plaintiff, the court determines that "no reasonable person" could credit the his testimony.   *Jeffreys*, 426 F.3d at 54-55.

To apply the *Jeffreys* exception, a defendant must satisfy each of the following three requirements: (1) "the plaintiff must rely 'almost exclusively on his own testimony,'" (2) the plaintiff's "testimony must be 'contradictory or incomplete,'" and (3) the plaintiff's testimony must be contradicted by evidence adduced by the defense.   *Benitez v. Ham*, No. 04-CV-1159, 2009 WL 3486379, at *20-21 (N.D.N.Y. Oct. 21, 2009) (Mordue, J., *adopting report and recommendation by* Lowe, M.J.) (quoting *Jeffreys*, 426 F.3d at 554).

In this instance, I recommend against application of the *Jeffreys*' exception.   The inconsistencies identified by defendants are not so contradictory or incomplete as to warrant a finding that no reasonable factfinder could conclude that the incident as alleged by plaintiff did not occur.   It is true that plaintiff testified at his deposition that he was previously acquainted with defendant Smith prior to January 31, 2008, due to an incident that occurred some time in 2007 or early 2008.   Dkt. No. 74-23 at 20.   This does, as defendants suggest, call into question plaintiff's inability to identify defendant Smith by name in his grievance, and plaintiff has left this question unanswered in his response to the pending motion.

Dkt. No. 88 at 17.   The absence of an explanation alone, however, is not so significant to warrant the entry of summary judgment at this juncture in light of the record as a whole.   Plaintiff's medical records, for example, reflect that he received on-going treatment for his right shoulder following January 31, 2008, which gives rise to the possibility that, as plaintiff alleges, his pre-existing injury had been aggravated by defendant Smith.   Dkt. No. 75 at 18, 34, 36, 38, 41, 42, 48, 54.   Moreover, while it is also true that defendants have adduced evidence by way of an unsworn memorandum from a DOCCS corrections sergeant stating that the cell search did not occur on the date of the incident, Dkt. No. 74-9, plaintiff, in response, continues to allege the contrary, Dkt. No. 88 at 18-19.   Although not necessarily dispositive, I also note that defendants have not adduced any declaration or affidavit from defendant Smith denying that he was involved in the alleged incident.

Mindful that a court should not resolve credibility determinations when deciding a motion for summary judgment, I conclude that dismissal is not appropriate at this time.   Accordingly, I recommend that defendants' motion be denied with respect to plaintiff's excessive force claim against defendant Smith arising on January 31, 2008.

2. February 12, 2008

According to plaintiff, a second assault occurred on February 12, 2008. It is alleged that, on that date, defendants Reyell, Strack, and Wood escorted plaintiff to the facility mental health unit for the purpose of meeting with defendant Bonner. Dkt. No. 1 at 5; Dkt. No. 74-23 at 73; Dkt. No. 88 at 21. Plaintiff alleges that, following his meeting with defendant Bonner, he was escorted to an observation cell in the mental health unit by the same officers. Dkt. No. 1 at 5-6; Dkt. No. 88 at 22. Upon being placed in the cell, the officers allegedly assaulted him. Dkt. No. 1 at 5-6; Dkt. No. 74-23 at 73; Dkt. No. 88 at 22-23. Specifically, defendant Reyell punched plaintiff in the head and face and choked him, defendant Strack poked him the eye, and all three defendants punched and kicked plaintiff in the face, head, groin, back, and legs. Dkt. No. 1 at 5-6; Dkt. No. 74-23 at 74-78; Dkt. No. 88 at 23. After the assault ended, plaintiff alleges defendant Wood warned him against filing a grievance regarding the incident and threatened plaintiff with additional physical abuse if he reported the incident. Dkt. No. 88 at 23. According to plaintiff, he suffered multiple injuries as a result of this incident, including lacerations to his eye and ear, contusions to the face and body, and internal bleeding. Dkt. No. 1 at 6; Dkt. No. 74-23 at 78-81; Dkt. No. 88 at 23. His requests for medical care immediately following the incident,

and again the next morning, were all allegedly denied.   Dkt. No. 1 at 6;

Dkt. No. 74-23 at 84, 86-87; Dkt. No. 88 at 23-24.

Following the incident, plaintiff filed a grievance, No. CL-56609-08,

dated February 15, 2008, alleging that he was assaulted by defendants

Reyell and Wood, as well as an individual identified as "CO Krosch."   Dkt.

No. 74-10 at 2.   That grievance was denied at the facility level, and the

denial was affirmed on appeal to the CORC.   *Id.* at 1, 3.   Notably, the

CORC's decision concerning the grievance includes the following

statement:

> For clarification, CORC notes that the grievant
> alleged that he was assaulted on 2/13/08, not
> 2/12/08 as stated in his complaint.

*Id.* at 1.   There is no indication in the record now before the court, however,

that shows plaintiff agrees with that statement, and defendants have not

provided the court with the information or evidence upon which CORC relied

in arriving at that conclusion.

In support of their motion, defendants contend that no reasonable

factfinder could credit plaintiff's version of the events of February 12, 2008.

Dkt. No. 74-3 at 6-7.   Defendants rely, in part, on the discrepancy between

plaintiff's grievance, in which he identified one of the three participants of the

alleged assault as "CO Krosch," and his complaint, which lists the third

33

participant as defendant Strack.  *Id.* at 7.   In response to defendants'
motion, plaintiff explains this discrepancy by noting that he had only a brief
opportunity to observe the third corrections officer's name tag during the
alleged assault, and thus developed only an initial belief that the third
officer's name was Krosch.   Dkt. No. 88 at 22-23.   Defendants also argue
that defendant Wood was not on duty at the date and time in question, citing
a memorandum he provided to a DOCCS corrections captain regarding
plaintiff's allegations in grievance No. CL-566009-08.   Dkt. No. 74-10 at 7.
That statement, however, refers to February 13, 2008, and not February 12,
2008.  *Id.*  Defendants have not provided the court with an affidavit or
declaration from defendant Wood, and there is no evidence in the record to
suggest that he was not working on February 12, 2008.

Simply stated, while the matters cited by defendants in their motion
certainly cast some doubt upon plaintiff's claims, they are insufficient to
warrant the resolution of sharply disputed issues of material fact and the
entry of summary judgment dismissing the excessive force claim arising
from this incident.   Accordingly, I recommend that the court deny
defendants' motion for summary judgment with respect to the excessive
force claim against defendant Reyell, Strack, and Wood on February 12,
2008.

3.    February 13, 2008

As was noted above, plaintiff claims to have again been assaulted by defendants Reyell, Tyler, and Cooper on February 13, 2008, following a brief meeting with defendant Berggren in the mental health unit at Clinton. Dkt. No. 1 at 6-7; Dkt. No. 74-23 at 88-89; Dkt. No. 88 at 40.    More specifically, plaintiff alleges that, during the escort by defendants Reyell, Tyler, and Cooper in the afternoon of February 13, 2008, to the mental health unit, defendant Reyell threatened plaintiff with physical harm if he told defendant Berggren about the alleged assault on February 12, 2008. Dkt. No. 74-23 at 89; Dkt. No. 88 at 40.    Despite that warning, plaintiff informed defendant Berggern during the meeting that corrections officers, including specifically defendant Reyell, assaulted him the prior day.    Dkt. No. 1 at 7; Dkt. No. 74-23 at 89; Dkt. No. 88 at 42.    According to plaintiff, the escorting officers immediately terminated his meeting with defendant Berggern and escorted him back to the observation cell.    Dkt. No. 1 at 7; Dkt. No. 74-23 at 91-92; Dkt. No. 88 at 41.    Upon entering the cell, plaintiff was instructed to place his hands, which were in restraints, out of the feed-up hatch so the restraints could be removed.    Dkt. No. 74-23 at 95; Dkt. No. 88 at 41-42.    Plaintiff alleges that, once one or both of the restraints were removed, defendants Reyell, Tyler, and Cooper rushed into

the cell and began physically assaulting him.    Dkt. No. 1 at 7; Dkt. No. 74-23 at 96; Dkt. No. 88 at 42.

Defendants, on the other hand, contend that defendants Reyell, Tyler, and Cooper used force against plaintiff on this date because, after defendants removed plaintiff's first hand restraint, plaintiff pulled back with his other hand, which remained attached to the restraint around his waist. *See generally* Dkt. No. 74-21.   As a result, defendant Tyler's hand was pulled through the feed-up hatch, prompting defendants Reyell and Cooper to enter plaintiff's cell and restrain him with physical force.   *See, e.g.,* Dkt. No. 74-21 at 7.

Once plaintiff was again placed in restraints, he was escorted by defendants Giambruno, Rendle, Bushey, and D. Trudeau to the medical unit, at which time, according to plaintiff, those defendants physically assaulted him again.   Dkt. No. 1 at 7; Dkt. No. 74-23 at 102; Dkt. No. 88 at 43.   In their motion, defendants do not contend that this use of force did not occur.[10]   Rather, they seek dismissal of the claim against defendants Giambruno, Rendle, Bushey, and D. Trudeau because there is no record evidence establishing their personal involvement in the alleged assault.

---

[10]     Defendants do, however, provide the court with the use-of-force report generated following the incident on February 13, 2008, which includes unsworn statements from defendants Bushey and D. Trudeau indicating the escort to the medical unit occurred without further incident.   Dkt. No. 74-21 at 15, 16.

[Dkt. No. 74-3 at 11](#).

Although it is true that a defendant's personal involvement in conduct giving rise to a constitutional deprivation is required to support a finding of liability under section 1983, defendants have not satisfied their burden of establishing that no reasonable factfinder could conclude that defendants Rendle, Bushey, D. Trudeau, and Giambruno used force against plaintiff maliciously and sadistically after they escorted plaintiff to the medical unit. Plaintiff's deposition testimony and affidavit submitted in response to the pending motion allege that defendants Rendle, Bushey, D. Trudeau, and Giambruno continued the unprovoked assault on him in the medical unit, flatly contradicting the memoranda filed by defendants Bushey and Trudeau in connection with the use-of-force report, indicating that no force was used by them at all. Moreover, even if those defendants did not strike plaintiff but were present for the alleged assault, they could be held accountable by a reasonable factfinder for failing to intervene.[11]

In their motion, defendants again invite the court to decide an issue of disputed fact based exclusively upon a use-of-force report containing unsworn correspondence between DOCCS corrections employees. Defendants have not adduced any supporting affidavits from the defendants

---

[11] See part III.E. of this report, *post*, for the legal standard governing claims for failure to intervene.

allegedly involved in the uses of force denying plaintiff's allegations or explaining the necessity of applying force in order to maintain discipline. Accordingly, I find that, in the event that plaintiff's version of the incidents is credited, a reasonable factfinder could conclude that defendants used force against plaintiff on February 13, 2008, maliciously and sadistically and not in an effort to maintain or restore discipline. For that reason, I recommend that plaintiff's motion for summary judgment concerning this claim also be denied.

     D.    <u>Deliberate Indifference to Plaintiff's Serious Medical Needs Against Defendants Berggren, Badger, Bentley, Macey, Darlene Waldron, Lashway, Baker, Lee, Johnson, Clemons, and Gillen</u>

Plaintiff's complaint asserts deliberate medical indifference claims against several defendants based on allegations that, following the three use-of-force incidents in January and February 2008, his requests for medical care were either denied or he was provided inadequate medical care for his injuries. Dkt. No. 1 at 6, 8, 10. In their motion, defendants maintain that plaintiff's medical indifference claims are subject to dismissal in light of the insufficient record evidence to support his allegations. Dkt. No. 74-3 at 18-23.

Like his excessive force claims, plaintiff's claims regarding deliberate medical indifference implicate the Eighth Amendment's prohibition on cruel

38

and unusual punishment.  *See Estelle,* 429 U.S. at 103 ("The[] elementary principles [governing the Eighth Amendment] establish the government's obligation to provide medical care for those whom it is punishing by incarceration.").  Failure to provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious cases, . . . may result in pain and suffering no one suggests would serve any penological purpose."  *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements.  *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010).  To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries.  The first inquiry is whether the prisoner was actually deprived of adequate medical care.  As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care . . . . Second, the objective test asks whether the inadequacy in medical care is sufficiently serious.  This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (citations

omitted).

The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith*, 316 F.3d at 185) (quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40).

Plaintiff's medical indifference claims arise from his efforts to obtain medical treatment, without success, following the alleged assault on February 12, 2008, against defendants Berggren, Badger, Bentley, Macey,

and Darlene Waldron. [12] [Dkt. No. 1 at 6](), 7.   He also alleges that, after the incident on February 13, 2008, defendant Lashway did nothing except order x-rays.   *Id.* at 8.   Finally, plaintiff alleges that, following several incidents dating back to May 18, 2007, defendants Badger, Bentley, Baker, Lee, Johnson, Gillen, and Clemons denied him medical treatment in an effort to conceal uses of force by corrections officers.   *Id.* at 10.

Plaintiff's medical records, which are included in the record now before the court, bely his medical indifference claims, and specifically the existence of a serious medical need of constitutional proportions.   *See Nance v.* Kelly, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) ("The 'serious medical need' requirement contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain."); *accord, Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).   Those records reveal that plaintiff suffered primarily from scrapes and bruises alleged to have resulted from the three assaults on January 31, 2008, February 12, 2008, and February 13, 2008.   [Dkt. No. 75 at 44](), 45, 47.   As a

---

[12]      In the court's initial order, defendant Berggren was not included among the defendants listed as implicated in the denial of medical care following the alleged assault on February 12, 2008.   *See generally* [Dkt. No. 6]().   It is clear from his complaint, however, that plaintiff alleges he informed defendant Berggren on February 13, 2008, that he had been assaulted the day before, specifically identified defendant Reyell has one of the officers involved in the assault, and requested medical attention due to the resulting injuries.   [Dkt. No. 1 at 7]().   Accordingly, I have included defendant Berggren among the defendants implicated by Povoski in this cause of action.

precautionary measure, on February 15, 2008, plaintiff was subjected to x-rays of his right wrist, ribs, knee and skull, revealing no fractures or other abnormalities. *Id.* at 16, 45. It is well-established that such minor injuries do not normally rise to the level of seriousness required to support a viable claim of medical indifference under the Eighth Amendment. *See, e.g., Tafari v. McCarthy*, 714 F. Supp. 2d 317, 354 (N.D.N.Y. 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (finding that the plaintiff's injuries, which consisted of "two bruises and a superficial laceration on his body," were "not significant enough to satisfy the objective element [of an Eighth Amendment claim]"); *Jones v. Furman*, No. 02-CV-0939, 2007 WL 894218, at *10 (W.D.N.Y. Mar. 21, 2007) ("[A]ssuming, *arguendo*, that on April 26, 2002, Plaintiff did in fact suffer the alleged injuries, including soreness, pain in and a lump behind his right ear, lump on the back of his head, small abrasions on his nose and knuckle, and bruising to his back, ribs and legs, such injuries do not constitute the requisite 'serious medical condition' necessary to establish an Eighth Amendment deliberate indifference claim." (citation omitted)).

Moreover, to the extent that plaintiff alleges that the incident involving defendant Smith on January 31, 2008, aggravated his pre-existing shoulder injury, the medical records do not support a finding that he received

constitutionally inadequate medical treatment for that condition. The medical records now before the court demonstrate that, following the incident with defendant Smith, plaintiff was seen by medical staff at Clinton for complaints regarding his shoulder on at least six occasions beginning on February 8, 2008.[13] Dkt. No. 75 at 34, 36, 38, 41, 42, 48. Those records reflect that plaintiff's condition continued to be treated and monitored by medical staff. *Id.* By way of example, on May 30, 2008, additional x-rays of plaintiff's shoulders and a consultation with an orthopedic doctor were ordered. *Id.* at 36. In June 2008, plaintiff was treated again for his shoulder, at which time the shoulder separation was characterized as a "grade IV," and medical staff recommended surgery be held until the "AC joint" could be stabilized. *Id.* at 18, 34. Although plaintiff may disagree with the course of treatment he received for his shoulder while at Clinton, I find that, based on the record evidence, no reasonable factfinder could conclude that any of the medical providers at Clinton knew of and disregarded his shoulder injury. *See Chance*, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is

---

[13] It is worth noting that there is no record evidence to support plaintiff's allegation that he requested medical attention immediately after the incident on January 31, 2008, and plaintiff admits that he that he did not follow up after the first request. Dkt. No. 74-23 at 17-18.

adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

Finally, with respect to the subjective element of the deliberate indifference analysis, there is no record evidence, aside from plaintiff's self-serving statements, to support the allegation that any of the defendants denied plaintiff medical treatment for a serious medical need with a "sufficiently culpable state of mind." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Specifically, there is little, if any, record evidence now before the court demonstrating the mental states of defendants Badger, Bentley, Macey, Darlene Waldron, Lashway, Baker, Lee, Johnson, Gillen, or Clemons at any of the relevant times. Plaintiff testified at his deposition that either defendant Badger or Bentley (or both) learned of plaintiff's injuries on February 12, 2008, after the use-of-force incident, but neither of them responded. Dkt. No. 74-23 at 84-87; *see also* Dkt. No. 88 at 23-24. Plaintiff's medical records from that date, however, reflect that plaintiff refused to answer defendant Badger or Bentley[14] when she asked him whether he had any injuries, and no injuries were noted. Dkt. No. 75 at 47. Plaintiff argues that the fact that defendant Badger or Bentley asked if he had any injuries implicitly suggests that she knew of the alleged assault

---

[14] The medical record from this date does not clearly reflect who authored it. Dkt. No. 75 at 47.

from earlier in the day and thus supports his deliberate medical indifference claim. Dkt. No. 88 at 23-24. Even assuming this is true, the record reflects that defendant Badger or Bentley explored the possibility that plaintiff sustained an injury and examined him thoroughly enough to conclude that he had none. Dkt. No. 75 at 47. Such conduct belies an allegation that defendant Badger knew of and disregarded a risk to plaintiff's health and safety.

Turning to the allegations against defendant Berggren, she avers in her declaration submitted in support of defendants' motion that she did not note any obvious injuries on plaintiff when she met with him on February 13, 2008, and if she had, she would have directed he be seen by medical staff. Dkt. No. 74-6 at 3. Based on the record evidence, I find that no reasonable factfinder could conclude that defendant Berggren acted with deliberate indifference to plaintiff's serious medical needs on February 13, 2008.

With respect to the defendants Macey and Darlene Waldron, plaintiff alleges that they ignored him on February 13, 2008, when he informed them that he had been assaulted the day prior and needed medical attention. Dkt. No. 88 at 25. Even assuming this is true, it is not enough to give rise to a genuine dispute of material fact regarding whether those defendants knew of a serious medical condition. Indeed, plaintiff only alleges that he told

them that he needed medical attention, and did not specify the nature of his injuries. Accordingly, I find that no reasonable factfinder could conclude that either defendant Macey or Darlene Waldron acted with the requisite mental state to support a cognizable Eighth Amendment medical indifference claim.

Lastly, regarding the remaining defendants accused of ignoring plaintiff's serious medical needs, there is no record of either their specific conduct in this action, or their state of mind. Plaintiff merely asserts a deliberate medical indifference claim against defendants Bentley, Lashway, Baker, Lee, Johnson, Gillen, and Clemons in his complaint, and neither his deposition testimony nor his response in opposition to the pending motion contain any evidence that supports a finding that they ignored any of his serious medical needs. Dkt. 74-23 at 116-18; *see generally* Dkt. No. 88.

Under these circumstances, there is insufficient evidence to demonstrate the existence of a genuine dispute of fact concerning whether, objectively, the medical deprivation of which he now complains was sufficiently serious. In addition, the evidence is lacking to satisfy the subjective requirement that any of the defendants were aware of a serious medical condition suffered by plaintiff and purposely withheld treatment in deliberate indifference to plaintiff's health and safety. Accordingly, I

recommend dismissal of plaintiff's medical indifference claims against all of the defendants implicated in that cause of action.

### E. Plaintiff's Failure to Protect/Intervene Claims Against Defendants Fischer, Artus, Bonner, and Berggren

In their motion, defendants contend that Povoski's failure to intervene claims against defendants Fischer, Artus, Bonner, and Berggren should be dismissed. Dkt. No. 74-3 at 13-18. Plaintiff's claims arise from allegations that each of those defendants failed to protect him from the assaults on January 31, 2008, February 12, 2008, and February 13, 2008. Dkt. No. 1 at 5, 7, 8. In addition, defendants argue that, because neither defendants Bonner nor Berggren were present for the alleged assaults on February 12 and 13, 2008, plaintiff's failure to intervene claim must be dismissed. *Id.* at 16-18.

Prison officials have a duty to intervene and prevent a cruel and unusual punishment, prohibited by the Eighth Amendment, from occurring or continuing. *Farmer*, 511 U.S. at 836; *Hayes v. New York City Dep't of Corrs*, 84 F.3d 614, 620 (2d Cir. 1996); *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."). A plaintiff asserting a failure to protect claim must prove that the defendant

actually knew of and disregarded an excessive risk of harm to his health and safety. *Hayes*, 84 F.3d at 620. This "reckless disregard" to a plaintiff's health and safety can be proven by evidence establishing "a pervasive risk of harm to inmates . . . and a failure by prison officials to reasonably respond to that risk." *Knowles v. New York City Dep't of Corrs.*, 904 F. Supp. 217, 222 (S.D.N.Y. 1995) (quotation marks omitted). Said differently, to establish liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle*, No. 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)); *see also Farmer*, 511 U.S. at 842 ("[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."); *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988) (finding no realistic opportunity to intervene where "three blows were struck in . . . rapid succession"); *accord*, *Henry*, 2011 WL 5975027, at *4.

1. <u>Defendants Fischer and Artus</u>

Defendants maintain that dismissal of this claim is appropriate because the record evidence does not give rise to a genuine dispute of material fact regarding the personal involvement of defendants Fischer and Artus as supervisory employees for the DOCCS. Dkt. No. 74-3 at 13-16. In his opposition papers, plaintiff does not address this argument. *See generally* Dkt. No. 88.

It is well-established that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor, "and [liability] cannot rest on *respondeat superior*." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 554 (2009); *see also Richardson*, 347

F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

Plaintiff makes reference to defendants Fischer and Artus in his complaint, alleging that the attacks against him were reasonably foreseeable and that both he and his family "numerous times through numerous channels and methods of communication have informed them of prior assaults against staff by the plaintiff and threats of continued harm." Dkt. No. 1 at 8.   No other evidence now before the court, however, supports those allegations.   Even in the face of defendants' motion for summary judgment contending that there is no record evidence that defendants Fischer or Artus were personally involved in the alleged assaults, plaintiff has failed to set forth any additional evidence supporting his claims against them.   *See generally* Dkt. No. 88.   The conclusory allegations in the complaint, while perhaps sufficient to pass muster and survive a dismissal motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure, are insufficient to support a finding that a reasonable factfinder, based on the record now before the court, could conclude that either defendant Fischer or Artus actually learned of a real threat to plaintiff and failed to intervene prior to any of the alleged assaults on January 31, 2008,

February 12, 2008, or February 13, 2008.   Accordingly, I recommend dismissal of plaintiff's claims against those two defendants.

        2.    <u>Defendant Bonner</u>

In his complaint, plaintiff alleges that, on February 12, 2008, he informed defendant Bonner of having had prior difficulties with the three officers that escorted him to the meeting with her, and that they threatened him with physical harm.   <u>Dkt. No. 1 at 5</u>.   He further alleges that the threats were carried out, and he was in fact assaulted when placed in the observation cell located in the mental health unit at Clinton.   *Id.* at 5-6.   In support of their motion, defendants have submitted a declaration from defendant Bonner, in which she denies having been told, on that or any other occasion, that plaintiff was in danger of being subjected to excessive force or assault by staff members at Clinton.   <u>Dkt. No. 74-7 at 3</u>.   An issue of fact therefore exists involving a credibility determination that can only be made by a factfinder.   A reasonable factfinder, if crediting plaintiff's version, could conclude that defendant Bonner was in a position to take measures that could have avoided the alleged assault upon Povolski on February 12, 2008.   I therefore recommend against the entry of summary judgment dismissing plaintiff's claims against that defendant for failure to intervene.

3. Defendant Berggren

As is the case with respect to defendant Bonner, plaintiff alleges that, on February 13, 2008, when he informed defendant Berggren that defendant Reyell had threatened to use force against him, she failed to offer him any protection. Dkt. No. 1 at 8. Plaintiff also claims that, shortly after defendant Reyell terminated the meeting between him and defendant Berggren, he yelled, loudly enough for defendant Berggren to hear, that an assault was occurring. Dkt. No. 88 at 41. In contrast to those allegations, defendant Berggren avers that "[a]lthough [she] noted that Povoski was combative towards the officers escorting him from the interview [on February 13, 2008,] [she] saw no reason to anticipate any use of excessive force or anything else that would warrant [her] intervention." Dkt. No. 74-6 at 4. Under these circumstances, I conclude that there exists a genuine dispute of fact regarding whether defendant Berggren knew of a serious risk to plaintiff's health and safety but failed to intervene. I therefore recommend against the entry of summary judgment dismissing plaintiff's failure to intervene claims against that defendant.

IV. SUMMARY AND RECOMMENDATION

The record now before the court reflects the existence of genuine issues of material fact, turning upon credibility determinations, precluding

the entry of summary judgment with respect to the constitutional claims associated with the three alleged assaults occurring in January and February 2008, including his failure to intervene claims stemming from those incidents.[15]   While plaintiff did not respond to defendants' request for dismissal of his mail interference and court access claims, I conclude that they are subject to dismissal.   Based upon my review of the record, I further conclude that no reasonable factfinder could determine that the defendants were deliberately indifferent to plaintiff's serious medical needs.   Finally, I conclude that plaintiff's failure to intervene claims against defendants Fischer and Artus should be dismissed based upon lack of personal involvement, but that those same claims should survive as asserted against defendants Bonner and Berggren.   Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 74) be GRANTED, in part, and that plaintiff's deliberate medical indifference, mail interference, and denial of access to the court causes of action, as well as his failure to intervene claims against defendants Fischer and Artus, be dismissed, leaving plaintiff's (1) excessive force and pendent common law claims arising out of the alleged assaults on January 31, 2008,

---

[15]     Count 2 of plaintiff's complaint asserts pendent common law claims of assault, battery, and intentional and negligent infliction of emotional distress.   Dkt. No. 1 at 18. Because defendants' motion does not address the sufficiency of those claims, I have not addressed those claims, and they remain pending for trial.

February 12, 2008, and February 13, 2008, as against defendants Randal

Smith, Reyell, Strack, Wood, Cooper, Tyler, Giambruno, Bushey, D.

Trudeau, and Rendle; and (2) plaintiff's failure to intervene claims as

against defendants Bonner and Berggren pending for trial; and it is further

RECOMMENDED that defendant Drollette be dismissed from the

action based upon the court's prior decision.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.   Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this report.

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.   28 U.S.C. § 636(b)(1); Fed. R. Civ. P.   6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this court's

local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     February 11, 2014
           Syracuse, New York



Slip Copy, 2013 WL 5652488 (N.D.N.Y.), 97 Empl. Prac. Dec. P 44,932
**(Cite as: 2013 WL 5652488 (N.D.N.Y.))**

United States District Court,
N.D. New York.
Susan T. TAEDGER, Plaintiff,
v.
NEW YORK State; New York State Dep't of Corr.
Servs.; Brian Fischer, in his capacity as Comm'r of
New York State Dep't of Corr. Servs.; Peter Horan,
individually and in his capacity as Senior Counselor
at Downstate Corr. Facility; and Downstate Corr.
Facility,[FN1] Defendants.

> FN1. Although the caption of the
> Complaint identified Horan as a
> "Commissioner" of Downstate
> Correctional Facility, the body of the
> Complaint repeatedly identifies him as a
> "Senior Counselor" at that facility. (*See,
> e.g.,* Dkt. No. 1, at ¶¶ 4, 11.) As a result,
> the Clerk of the Court is directed to amend
> the docket sheet accordingly.

No. 1:12–CV–0549 (GTS/RFT).
Oct. 15, 2013.

Ranni Law Firm, Joseph J. Ranni, Esq., of Counsel,
Florida, NY, for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Christopher W. Hall, Esq.,
of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***
GLENN T. SUDDABY, United States District
Judge.

**\*1** Currently before the Court, in this
employment discrimination action filed by Susan
Taedger ("Plaintiff") against the five above-
captioned entities and individuals ("Defendants"),
is a motion to dismiss for failure to state a claim
filed by Defendants. (Dkt. No. 11.) For the reasons
set forth below, Defendants' motion is granted in
part and denied in part.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, Plaintiff's Complaint alleges as
follows. Between early 2010 and late 2011, while
she worked as a corrections counselor at Downstate
Correctional Facility ("C.F."), she was sexually
harassed by her direct supervisor, Defendant Peter
Horan. (*See generally* Dkt. No. 1 [Plf.'s Compl.].)
When she spurned his unwelcome and offensive
sexual advances, she was subjected to "unwarranted
criticism, name calling, humiliation, intimidation,
ridicule, mockery, insults, interference with work
assignments and performance, excessive and
oppressive monitoring, heightened scrutiny, and
pretextual verbal and/or written warnings." (*Id.*)
For example, she was unjustifiably denied
assistance with an unreasonably burdensome
workload; she was unjustifiably denied leave and/or
overtime while other similarly situated employees
were granted those things; her complaint of a
subordinate's misconduct was ignored; and her
work product was unjustifiably corrected. (*Id.*)

Similarly, after she complained to her
supervisors of the harassing and discriminatory
conduct to which she was being subjected, no good-
faith investigation was conducted on her behalf; her
prior performance evaluations were improperly
corrected, altered, deleted, and/or tampered with;
she had her personal possessions taken from her
office, and worked product changed in her office,
while she was not present; and she was transferred
to another building to dissuade her from making
additional complaints. (*Id.*) Subsequently, she was
locked out of the facility due to a purported
"administrative reason," was ordered by the Head
Personnel Clerk to undergo a mental health
evaluation, and was placed on involuntary leave. (
*Id.*) In November, she returned to work, though she
remains subject to a termination proceeding. (*Id.*)

Based on these factual allegations, Plaintiff's

© 2014 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

Page 2

Slip Copy, 2013 WL 5652488 (N.D.N.Y.), 97 Empl. Prac. Dec. P 44,932
**(Cite as: 2013 WL 5652488 (N.D.N.Y.))**

Complaint asserts the following nine claims against all Defendants: (1) a claim of discrimination based on gender under 42 U.S.C. § 2000e *et seq.* ("Title VII"); (2) a claim of hostile work environment based on gender under Title VII; (3) a claim of retaliation based on complaints of discrimination under Title VII; (4) a claim of discrimination based on gender under the Human Rights Law of the State of New York § 296, *et seq.* ("NYHRL"); (5) a claim of retaliation based on complaints of discrimination under the NYHRL; (6) a claim of hostile work environment based on gender under the NYHRL; (7) a claim of denial of equal protection through gender discrimination in violation of 42 U.S.C. § 1983 ("Section 1983"); (8) a claim of negligent infliction of emotional distress under New York State tort law; and (9) a claim of intentional infliction of emotional distress under New York State tort law. (*Id.*) Familiarity with the particular factual allegations supporting these claims in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for the review of the parties. (*Id.*)

**B. Parties' Briefing on Defendants' Motion**

**\*2** Generally, in support of their motion dismiss, Defendants assert the following nine arguments: (1) Plaintiff's three Title VII claims against Defendants Fischer and Horan in their individual capacities should be dismissed, because individuals are not liable under Title VII; (2) Plaintiff's three NYHRL claims, Section 1983 claim, and two tort claims against Defendants New York State, New York State Department of Correctional Services ("DOCS"), Downstate C.F., and Fischer should be dismissed as barred by the doctrine of sovereign immunity embodied in the Eleventh Amendment; (3) alternatively, Plaintiff's two tort claims against Defendants New York State, DOCS, Downstate C.F., and Fischer for money damages should be dismissed because those claims must be brought in the New York State Court of Claims; (4) Plaintiff's Section 1983 claim against Defendant Horan should be dismissed for failure to allege facts plausibly suggesting that he was

personally involved in the equal protection violation alleged; (5) Plaintiff's two tort claims against Defendant Fisher and Defendant Horan in his individual capacity should be dismissed because New York Correction Law § 24 immunizes them from such claims; (6) alternatively, Plaintiff's claim of intentional infliction of emotional distress against Defendant Horan in his individual capacity should be dismissed because (a) it is barred by the claim's one-year limitations period and (b) it fails to allege facts plausibly suggesting conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community; (7) similarly, Plaintiff's claim of negligent infliction of emotional distress against Defendant Horan in his individual capacity should be dismissed because it fails to allege facts plausibly suggesting that he unreasonably endangered Plaintiff's physical safety or caused her to fear for her physical safety; (8) in the alternative, Plaintiff's three Title VII claims and three NYHRL claims against all Defendants should be dismissed to the extent they are based on events occurring more than 300 days before April 7, 2011 (which was the date on which she filed a charge with the Equal Employment Opportunity Commission); and (9) Plaintiff's Title VII and NYHRL claims of gender discrimination should be dismissed against all Defendants because those claims fail to allege facts plausibly suggesting that Plaintiff experienced an adverse employment action (such as the loss of pay, sick time, vacation time, or a decrease in the terms, conditions or privileges of employment). (*See generally* Dkt. No. 11, Attach. 1 [Defs.' Memo. of Law].)

Generally, in response, Plaintiff asserts the following six arguments: (1) Plaintiff consents to the dismissal of her three Title VII claims against Defendants Horan and Fischer to the extent those two Defendants are sued in their individual capacities; (2) while the Eleventh Amendment (and doctrine of sovereign immunity embodied in it) bars some claims against states (and state

Page 3

Slip Copy, 2013 WL 5652488 (N.D.N.Y.), 97 Empl. Prac. Dec. P 44,932
**(Cite as: 2013 WL 5652488 (N.D.N.Y.))**

employees acting in the official capacities), it does not bar claims brought under statutes enacted to enforce the substantive provisions of the Fourteenth Amendment, such as Title VII; (3) the protection afforded by N.Y. Correction Law § 24 is not absolute and does not extend to actions taken by Defendant Horan in his individual capacity such as sexual harassment, continued discrimination, and retaliation; (4) Plaintiff has stated a claim of intentional infliction of emotional distress against Defendant Horan, and a claim of negligent infliction of emotional distress against him, because she has allege facts plausibly suggesting reactions such as mental anguish, humiliation, horror, grief and shame; (5) while Plaintiff's three Title VII claims do not fall within the 300–day limitations period, her three NYHRL claims are not governed by that limitations period but a three-year limitations period under N.Y. C.P.L.R. § 214 (even that portion of those claims based on events occurring more than 300 days before April 7, 2011); and (6) Plaintiff has stated a claim for gender discrimination under Title VII and NYHRL because she has alleged facts plausibly suggesting that Plaintiff experienced an adverse employment action through suspension, duty reassignments, loss of days off, denial of leave, denial of overtime, tampering with work product, falsification of her signature, and being locked out of the facility without just cause. (*See generally* Dkt. No. 13 [Plf.'s Reply Memo. of Law].)

**\*3** Generally, in their reply, Defendants assert the following six arguments: (1) Plaintiff has consented (either expressly or implicitly) to Defendants' arguments (a) Plaintiff three Title VII claims against Defendants Horan and Fischer should be dismissed because individuals are not liable under Title VII, and (b) Plaintiff's NYHRL claims, Section 1983 claim, and two tort claims against Defendants New York State, DOCS, Downstate C.F., and Fischer should be dismissed under the doctrine of sovereign immunity embodied in the Eleventh Amendment; (2) by arguing that only Defendant Horan's conduct was not protected

by N.Y. Correction Law § 24, Plaintiff has implicitly conceded that her two tort claims against Defendant Fischer should be dismissed; (3) in her conclusory paragraph on the subject, Plaintiff has failed to (a) identify what particular factual allegations in her Complaint satisfy the tough standard of plausibly suggesting conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community (necessary to state a claim of intentional infliction of emotional distress), and (b) explain why the claim is not barred by the one-year limitations period; (4) in her conclusory paragraph on the subject, Plaintiff has failed to identify what particular factual allegations in her Complaint plausibly suggest that Defendant Horan unreasonably endangered Plaintiff's physical safety or caused her to fear for her physical safety (necessary to state a claim of negligent infliction of emotional distress); (5) while Plaintiff argues that her three NYHRL claims are in no way barred by the 300–day limitations period referenced by Defendants, she expressly concedes that her three Title VII claims are barred to the extent they are based on events occurring in January and February of 2010; and (6) none of the employment conditions identified by Plaintiff rise to the level of "adverse employment actions" for purposes of gender discrimination claims under Title VII and the NYHRL. (*See generally* Dkt. No. 14 [Defs.' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

For the sake of brevity, the Court will not recite, in this Memorandum–Decision and Order, the well-known legal standard governing dismissals for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), but will direct the reader to the Court's decision in *Wade v. Tiffin Motorhomes, Inc.,* 686 F.Supp.2d 174, 182–84 (N.D.N.Y.2009) (Suddaby, J.), which accurately recites that standard.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Slip Copy, 2013 WL 5652488 (N.D.N.Y.), 97 Empl. Prac. Dec. P 44,932
**(Cite as: 2013 WL 5652488 (N.D.N.Y.))**

## B. Legal Standard Governing Defendants' Challenge to Plaintiff's Claims

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding the legal standards governing Plaintiff's claims in this action, the Court will not recite, in their entirety, those legal standard sin this Decision and Order, which (again) is intended primarily for the review of the parties. (Dkt. No. 11, Attach. 1 [Defs.' Memo. of Law]; Dkt. No. 13 [Plf.'s Opp'n Memo. of Law]; Dkt. No. 14 [Defs.' Reply Memo. of Law] .)

## III. ANALYSIS

## A. Plaintiff's Three Title VII Claims

**\*4** As stated above in Part I.B. of this Decision and Order, Defendants assert the following three arguments, in pertinent part: (1) Plaintiff's three Title VII claims against Defendants Fischer and Horan in their individual capacities should be dismissed because individuals are not liable under Title VII; (2) Plaintiff's three Title VII claims against all Defendants should be dismissed to the extent they are based on events occurring more than 300 days before April 7, 2011; and (3) in the alternative, Plaintiff's Title VII claim of discrimination based on gender should be dismissed against all Defendants because it fails to allege facts plausibly suggesting that she experienced an adverse employment action.

## 1. Lack of Individual Liability

After carefully considering the matter, the Court finds that Plaintiff's three Title VII claims against Defendant Horan in his individual capacity should be dismissed for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.B. of this Decision and Order. The Court finds that, while any Title VII claims asserted by Plaintiff against Defendant Fischer in his individual capacity would be dismissed for the same reason, the Court does not liberally construe Plaintiff's Complaint as asserting any such Title VII claims. (Dkt. No. 1, at 1 [stating, in caption of Complaint, that Plf.'s first

three claims are asserted against Fisher "in his capacity as Commissioner of New York State Department of Correctional Services]; Dkt. No. 13, at 5 [attaching page "5" of Plf.'s Opp'n Memo. of Law, stating that Plf.'s first three claims are asserted against Fisher "in his capacity as Commissioner of New York State Department of Correctional Services," unlike the remaining six claims, which are asserted against Horan "individually"].)

The Court would add only one point. In this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v. Gensini, 07–CV–0279, 2009 WL 3672105, at \*1, n. 1 (N.D.N.Y. Oct.30, 2009)* (Suddaby, J.) (collecting cases); *Este–Green v. Astrue,* 09–CV–0722, *2009 WL 2473509, at \*2 & n. 3 (N.D.N.Y.Aug.7, 2009)* (Suddaby, J.) (collecting cases). Here, Defendants are correct that Plaintiff has failed to oppose, if not expressly consented to, the above-described argument by Defendants.[FN2] At the very least, Defendants have met the lightened burden that was created by Plaintiffs' failure to respond.

> FN2. For example, in her Opposition Memorandum of Law, Plaintiff argues that her three VII claims are asserted against Defendant Horan in only his official capacity. (Dkt. No. 13, at 5 [attaching page "5" of Plf.'s Opp'n Memo. of Law].) The Court notes that this fact is not apparent from the face of Plaintiff's Complaint, which names Defendant Horan in his individual *and official* capacities in its

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Slip Copy, 2013 WL 5652488 (N.D.N.Y.), 97 Empl. Prac. Dec. P 44,932
**(Cite as: 2013 WL 5652488 (N.D.N.Y.))**

caption and appears to assert its First, Second and Third Causes of Action against *all* Defendants. (Dkt. No. 1, at 1, 9–12.)

For these reasons, Plaintiff's three Title VII claims against Defendant Fischer in his individual capacity is dismissed.

## 2. Statute of Limitations

**\*5** After carefully considering the matter, the Court finds that Plaintiff's Title VII discrimination claim and Title VII retaliation claim against all Defendants should be dismissed to the extent they are based on events occurring more than 300 days before April 7, 2011, for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.B. of this Decision and Order. Defendants are correct that Plaintiff has expressly conceded this argument. At the very least, Defendants have met their lightened burden with regard to this argument.

However, the Court must render a different conclusion with regard to Plaintiff's Title VII hostile-work-environment claim against all Defendants, given the Supreme Court's holding in *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (holding that employee could recover on hostile work environment claim for acts occurring more than 300 days before charge was filed with EEOC, as long as acts were part of same hostile work environment and at least one occurred within 300–day period).

For these reasons, to the extent Plaintiff's Title VII discrimination claim against Defendants and her Title VII retaliation claim against Defendants are based on events occurring before June 11, 2010, FN3 those claims are dismissed. However, Defendants' statute-of-limitations argument is rejected with regard to Plaintiff's Title VII hostile-work-environment claim.

> **FN3.** By the Court's calculation, 300 days before April 7, 2011, was June 11, 2010.

## 3. Lack of Adverse Employment Action

After carefully considering the matter, the Court rejects Defendants' adverse-employment-action argument with regard to Plaintiff's Title VII claim of gender discrimination for the reasons stated in Plaintiff's opposition memorandum of law. *See, supra,* Part I.B. of this Decision and Order.

The Court would add only one point. While Plaintiff's Complaint does not appear to expressly allege a loss of pay, sick time, or vacation time, it does appear to allege facts plausibly suggesting a decrease in the terms, conditions or privileges of employment. For example, it alleges that she received an unreasonable amount of additional work, was unjustifiably denied overtime and was unjustifiably denied time off. (Dkt. No. 1 at ¶¶ 13, 14, 22.) Moreover, it alleges that, on or about September 27, 2011, Plaintiff was placed on involuntary leave by DOCS' director of human resources, on which she remained until November 8, 2011. (*Id.* at ¶ 31.) The Court has found at least one case indicating that being placed on involuntary leave is itself an adverse employment action. *See Lara v. City of New York,* 97–CV–7663, 1999 WL 459803, at \*4 (S.D.N.Y. June 29, 1999) ("There is no dispute that Lara is a member of a protected class and that he suffered an adverse employment action when he was placed on the involuntary leave of absence."); *cf. Waldo v. New York City Health and Hosp. Corp.,* 06–CV–2614, 2009 WL 2777003, at \*16 (E.D.N.Y. Aug.31, 2009) ("Plaintiff satisfies the elements of a retaliation claim [under Title VII] ... adverse employment *actions,* i.e., plaintiff's placement on involuntary medical leave and subsequent termination.") (emphasis added).

**\*6** *For these reasons, the following Title VII claims survive Defendants' motion: (1) Plaintiff's Title VII hostile-work-environment claim against Defendant Horan in his official capacity and against all other Defendants; (2) Plaintiff's Title VII discrimination claim against Defendant Horan in his official capacity and against all other*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Slip Copy, 2013 WL 5652488 (N.D.N.Y.), 97 Empl. Prac. Dec. P 44,932
**(Cite as: 2013 WL 5652488 (N.D.N.Y.))**

*Defendants to the extent that claim based on events occurring after June 11, 2010; and (3) Plaintiff's Title VII retaliation claim against Defendant Horan in his official capacity and against all other Defendants to the extent that claim is based on events occurring after June 11, 2010.* However, because the Court imagines that a more fully developed record and more detailed briefing on the statue-of-limitation issue and adverse-employment-action issue could yield a different result, the Court will revisit those two issues on a motion for summary judgment, should Defendants choose to file one.[FN4]

> [FN4.] On any such motion for summary judgment, Defendants are also free to assert an argument that Plaintiff's Title VII hostile-work-environment claim against Defendant Horan in his official capacity (as well as against DOCS and Downstate C.F.) should be dismissed as redundant of her existing Title VII hostile-work-environment claim against Defendant New York State-which the Court did not construe Defendants' motion to dismiss to be making or Plaintiff's opposition papers to be conceding (and which the Court cannot *sua sponte* decide in this action).

**B. Plaintiff's Three NYHRL Claims**

As stated above in Part I.B. of this Decision and Order, Defendants assert the following three arguments, in pertinent part: (1) Plaintiff's three NYHRL claims against Defendants New York State, DOCS, Downstate C.F., and Fischer should be dismissed as barred by the doctrine of sovereign immunity embodied in the Eleventh Amendment; (2) Plaintiff's three NYHRL claims against all Defendants should be dismissed to the extent they are based on events occurring more than 300 days before April 7, 2011; and (3) in the alternative, Plaintiff's Title NYHRL claim of discrimination based on gender should be dismissed against all Defendants because it fails to allege facts plausibly suggesting that she experienced an adverse

employment action.

**1. Sovereign Immunity Under Eleventh Amendment**

After carefully considering the matter, the Court finds that Plaintiff's three NYHRL claims against Defendants New York State, DOCS, Downstate C.F., and Fischer should be dismissed for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.B. of this Decision and Order.

The Court would add only two points. First, Defendants are correct that Plaintiff has conceded this argument.[FN5] Furthermore, the Court finds that, at the very least, Defendants have met their lightened burden with regard to this argument. Second, in her opposition memorandum of law, Plaintiff appears to implicitly withdraw her three NYHRL claims against Defendant Horan in his official capacity. *See, infra,* note 5 of this Decision and Order. The Court finds that such withdrawal is appropriate, again for the reasons stated in Defendants' memoranda of law.

> [FN5.] For example, in her Opposition Memorandum of Law, Plaintiff argues that her three NYHRL claims are asserted against only Defendant Horan in his individual capacity. (Dkt. No. 13, at 6 [attaching page "6" of Plf.'s Opp'n Memo. of Law].) The Court notes that this fact is not apparent from Plaintiff's Complaint, which names Defendant Horan in his individual *and official* capacities in its caption and appears to assert its Fourth, Fifth and Sixth Causes of Action against *all* Defendants. (Dkt. No. 1, at 1, 12–14.)

**2. Statute of Limitations**

After carefully considering the matter, the Court finds that, in the alternative, Plaintiff's NYHRL discrimination claim and NYHRL retaliation claim against all Defendants should be dismissed to the extent they are based on events occurring before June 11, 2010; however,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Slip Copy, 2013 WL 5652488 (N.D.N.Y.), 97 Empl. Prac. Dec. P 44,932
**(Cite as: 2013 WL 5652488 (N.D.N.Y.))**

Defendants' statute-of-limitations argument is rejected with regard to Plaintiff's NYHRL hostile-work-environment claim. The Court renders these conclusions for the reasons stated above in Part III.A.2. of this Decision and Order.

### 3. Lack of Adverse Employment Action

**\*7** After carefully considering the matter, the Court rejects Defendants' adverse-employment-action argument with regard to Plaintiff's NYHRL claim of gender discrimination. The Court renders this conclusion for the reasons stated above in Part III.A.2. of this Decision and Order.

*For these reasons, the following NYHRL claims survive Defendants' motion: (1) Plaintiff's NYHRL hostile-work-environment claim against Defendant Horan in his individual capacity; and (2) Plaintiff's NYHRL discrimination claim and NYHRL retaliation claim against Defendant Horan in his individual capacity to the extent those claims are based on events occurring after June 11, 2010.*

### C. Plaintiff's Section 1983 Equal Protection Claim

As stated above in Part I.B. of this Decision and Order, Defendants assert the following two arguments, in pertinent part: (1) Plaintiff's three Section 1983 equal protection claim against Defendants New York State, DOCS, Downstate C.F., and Fischer should be dismissed as barred by the doctrine of sovereign immunity embodied in the Eleventh Amendment; and (2) Plaintiff's Section 1983 claim against Defendant Horan should be dismissed for failure to allege facts plausibly suggesting that he was personally involved in the equal protection violation alleged.

### 1. Sovereign Immunity Under Eleventh Amendment

After carefully considering the matter, the Court finds that Plaintiff's Section 1983 equal protection claim against Defendants New York State, DOCS, Downstate C.F., and Fischer should be dismissed for the reasons stated in Defendants'

memoranda of law. *See, supra,* Part I.B. of this Decision and Order.

The Court would add only two points. First, Defendants are correct that Plaintiff has conceded this argument.FN6 Furthermore, the Court finds that, at the very least, Defendants have met their lightened burden with regard to this argument. Second, in her opposition memorandum of law, Plaintiff appears to implicitly withdraw her Section 1983 equal protection claim against Defendant Horan in his official capacity. *See, infra,* note 6 of this Decision and Order. The Court finds that such withdrawal is appropriate, again for the reasons stated in Defendants' memoranda of law.

> FN6. For example, in her Opposition Memorandum of Law, Plaintiff argues that her Section 1983 equal protection claim is asserted against only Defendant Horan in his individual capacity. (Dkt. No. 13, at 6 [attaching page "6" of Plf.'s Opp'n Memo. of Law].) The Court notes that this fact is not apparent from Plaintiff's Complaint, which names Defendant Horan in his individual *and official* capacities in its caption and appears to assert its Seventh Cause of Action against *all* Defendants. (Dkt. No. 1, at 1, 15.)

### 2. Lack of Personal Involvement

After carefully considering the matter, the Court rejects Defendants' lack-of-personal-involvement argument with regard to Plaintiff's Section 1983 equal protection claim against Defendant Horan in his individual capacity. While it is true that Plaintiff did not respond to this argument, it is also true that Defendants asserted it in only one sentence of the "Preliminary Statement" section of their memorandum of law in chief. (Dkt. No. 11, Attach. 1, at 3 [attaching page "1" of Defs.' Memo. of Law].) In any event, the Court finds that, liberally construed, Plaintiff's Complaint alleges facts plausibly suggesting such personal involvement through, for example, (allegedly) personally harassing her and retaliating against her

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Slip Copy, 2013 WL 5652488 (N.D.N.Y.), 97 Empl. Prac. Dec. P 44,932
**(Cite as: 2013 WL 5652488 (N.D.N.Y.))**

based on her gender (*See, e.g.,* Dkt. No. 1, at ¶¶ 11–14, 18, 24, 32.)

**\*8** For these reasons, surviving Defendants' motion is Plaintiff's Section 1993 equal protection claim against Defendant Horan in his individual capacity.

## D. Plaintiff's Claims of Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress

As stated above in Part I.B. of this Decision and Order, Defendants assert the following five arguments, in pertinent part: (1) Plaintiff's two tort claims against Defendants New York State, DOCS, Downstate C.F., and Fischer should be dismissed as barred by the doctrine of sovereign immunity embodied in the Eleventh Amendment; (2) Plaintiff's two tort claims against Defendants New York State, DOCS, Downstate C.F., and Fischer for money damages should be dismissed because those claims must be brought in the New York State Court of Claims; (3) Plaintiff's two tort claims against Defendant Fischer and Defendant Horan in his individual capacity should be dismissed because New York Correction Law § 24 immunizes them from such claims; (4) Plaintiff's claim of intentional infliction of emotional distress against Defendant Horan in his individual capacity should be dismissed because (a) it is barred by the claim's one-year limitations period and (b) it fails to allege facts plausibly suggesting conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community; and (5) Plaintiff's claim of negligent infliction of emotional distress against Defendant Horan in his individual capacity should be dismissed because it fails to allege facts plausibly suggesting that Defendant Horan unreasonably endangered Plaintiff's physical safety or caused her to fear for her physical safety.

## 1. Sovereign Immunity Under Eleventh Amendment

After carefully considering the matter, the Court finds that Plaintiff's two tort claims against Defendants New York State, DOCS, Downstate C.F., and Fischer should be dismissed for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.B. of this Decision and Order.

The Court would add only two points. First, Defendants are correct that Plaintiff has conceded this argument.[FN7] Furthermore, the Court finds that, at the very least, Defendants have met their lightened burden with regard to this argument. Second, in her opposition memorandum of law, Plaintiff appears to implicitly withdraw her two tort claims against Defendant Horan in his official capacity. *See, infra,* note 7 of this Decision and Order. The Court finds that such withdrawal is appropriate, again for the reasons stated in Defendants' memoranda of law.

> FN7. For example, in her Opposition Memorandum of Law, Plaintiff argues that her two tort claims are asserted against only Defendant Horan in his individual capacity. (Dkt. No. 13, at 6 [attaching page "6" of Plf.'s Opp'n Memo. of Law].) The Court notes that this fact is not apparent from Plaintiff's Complaint, which names Defendant Horan in his individual *and official* capacities in its caption and appears to assert its Eighth and Ninth Causes of Action against *all* Defendants. (Dkt. No. 1, at 1, 15–16.)

## 2. Exclusive Jurisdiction in New York Court of Claims

After carefully considering the matter, the Court finds that it need not, and does not reach the merit of this argument, because it appears to be redundant of the argument discussed above in Part III.D.1. of this Decision and Order.

## 3. Immunity Under New York Correction Law § 24

**\*9** After carefully considering the matter, the Court finds that, in the alternative, Plaintiff's two tort claims against Defendant Horan in his official

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5652488 (N.D.N.Y.), 97 Empl. Prac. Dec. P 44,932
**(Cite as: 2013 WL 5652488 (N.D.N.Y.))**

capacity (and Defendant Fischer) should be dismissed for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.B. of this Decision and Order.

The Court would add only three points. First, Defendants are correct that Plaintiff has conceded this argument.[FN8] Furthermore, the Court finds that, at the very least, Defendants have met their lightened burden with regard to this argument. Second, in her opposition memorandum of law, Plaintiff appears to implicitly withdraw her two tort claims against Defendant Fisher and Defendant Horan in his official capacity. *See, infra,* note 8 of this Decision and Order. The Court finds that such withdrawal is appropriate, again for the reasons stated in Defendants' memoranda of law. Third, Defendants do not appear to be requesting the dismissal of Plaintiff's two tort claims against Defendant Horan in his individual capacity;[FN9] and, in any event, the Court would reject any such argument for the reason stated in Plaintiff's opposition memorandum of law. *See, supra,* Part I.B. of this Decision and Order.

> FN8. For example, in her Opposition Memorandum of Law, Plaintiff argues that her two tort claims are asserted against only Defendant Horan in his individual capacity. (Dkt. No. 13, at 6 [attaching page "6" of Plf.'s Opp'n Memo. of Law].) The Court notes that this fact is not apparent from Plaintiff's Complaint, which names Defendant Horan in his individual *and official* capacities in its caption and appears to assert its Eighth and Ninth Causes of Action against *all* Defendants. (Dkt. No. 1, at 1, 15–16.)

> FN9. The Court notes that the last paragraph on page 6 of Defendants' memorandum of law begins by stating, "As for Commissioner Fischer, if sued in his individual capacity, and Senior Counselor Horan, Correction Law section 24 gives them immunity from such claims." (Dkt.

No. 11, Attach. 1, at 8 [attaching page "6" of Defs.' Memo. of Law].) The Court construes that sentence as containing a typographical error, intending to mean, "As for *Senior Counselor Horan,* if sued in his individual capacity, and *Commissioner Fischer* (who is sued only in his official capacity), Correction Law section 24 gives them immunity from such claims." Elsewhere in their memorandum of law, Defendants appear to recognize that the caption of the Complaint expressly names Fisher in only his official capacity, and Horan in both his official and individual capacities.

**4. Impact of Statute of Limitations on Claim of Intentional Infliction of Emotional Distress**

After carefully considering the matter, the Court finds that Plaintiff's claim of intentional infliction of emotional distress against Defendant Horan in his individual capacity should be dismissed for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.B. of this Decision and Order.

The Court would add only two points. First, Defendants are correct that Plaintiff has conceded this argument.[FN10] Furthermore, the Court finds that, at the very least, Defendants have met their lightened burden with regard to this argument. Second, in her opposition memorandum of law, Plaintiff appears to implicitly withdraw her claim of intentional infliction of emotional distress Defendant Horan in his official capacity as well as against the other Defendants. *See, infra,* note 8 of this Decision and Order. The Court finds that such withdrawal is appropriate, again for the reasons stated in Defendants' memoranda of law.

> FN10. For example, in her Opposition Memorandum of Law, Plaintiff argues that her claim of intentional infliction of emotional distress is asserted against only Defendant Horan in his individual capacity. (Dkt. No. 13, at 6 [attaching page

Page 10

Slip Copy, 2013 WL 5652488 (N.D.N.Y.), 97 Empl. Prac. Dec. P 44,932
**(Cite as: 2013 WL 5652488 (N.D.N.Y.))**

"6" of Plf.'s Opp'n Memo. of Law].) The Court notes that this fact is not apparent from Plaintiff's Complaint, which names Defendant Horan in his individual *and official* capacities in its caption and appears to assert its Ninth Cause of Action against *all* Defendants. (Dkt. No. 1, at 1, 16.)

### 5. Lack of Outrageous–and–Extreme Element of Claim of Intentional Infliction of Emotional Distress

After carefully considering the matter, the Court finds that it need not, and does not, reach the merit of this argument, given the statute-of-limitations ground on which to dismiss this claim against Defendant Horan in his individual capacity.

### 6. Lack of Danger–to–Physical Safety Element of Claim of Negligent Infliction of Emotional Distress

After carefully considering the matter, the Court finds that Plaintiff's claim of negligent infliction of emotional distress against Defendant Horan in his individual capacity should be dismissed for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.B. of this Decision and Order.

**\*10** The Court would add only two points. First, Plaintiff's detailed Complaint is conspicuously absent of any factual allegation plausibly suggesting Defendant Horan had, or even threatened, physical contact with her. (*See, e.g.,* Dkt. No. 1, at ¶¶ 11–14, 18, 24, 32.) Second, because the actions alleged here were intentional and deliberate, they appear outside the ambit of actionable negligence. "New York Courts have rejected uniformly such attempts to transmogrify intentional torts into 'negligence.' " *Schmidt v. Bishop,* 779 F.Supp. 321, 324–25 (S.D.N.Y.1991) (dismissing negligence claim by plaintiff who alleged that her priest sexually abused her); *accord, Wilson v. Diocese of N.Y. of Episcopal Church,* 96–CV–2400, 1998 WL 82921, at *6 (S.D.N.Y.

Feb.26, 1998) (citing cases).

For these reasons, Plaintiff's two tort claims against Defendants are dismissed in their entirety.

**ACCORDINGLY,** it is

**ORDERED** that, in accordance with note 1 of this Decision and Order, the Clerk of the Court is directed to amend the docket sheet so as to identify Peter Horan as a "Senior Corrections Counselor" at Downstate Correctional Facility, rather than as the "Commissioner" of that facility; and it is further

**ORDERED** that Defendants' motion to dismiss for failure to state a claim upon which relief can be granted (Dkt. No. 11) is **GRANTED in part** and **DENIED in part;** and it is further

**ORDERED** that the following claims are **DISMISSED** from Plaintiff's Complaint (Dkt. No. 1):

(1) Plaintiff's Title VII discrimination claim against Defendant Horan in his individual capacity;

(2) Plaintiff's Title VII hostile-work-environment claim against Defendant Horan in his individual capacity;

(3) Plaintiff's Title VII retaliation claim against Defendant Horan in his individual capacity;

(4) Plaintiff's Title VII discrimination claim against Defendants New York State, DOCS, Downstate C.F., Fischer, and Horan in his official capacity to the extent it is based on events occurring before June 11, 2010;

(5) Plaintiff's Title VII retaliation claim against Defendants New York State, DOCS, Downstate C.F., Fischer, and Horan in his official capacity to the extent it is based on events occurring before June 11, 2010;

(6) Plaintiff's NYHRL discrimination claim against Defendants New York State, DOCS,

© 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Page 11

Slip Copy, 2013 WL 5652488 (N.D.N.Y.), 97 Empl. Prac. Dec. P 44,932
**(Cite as: 2013 WL 5652488 (N.D.N.Y.))**

Downstate C.F., Fischer, and Horan in his official capacity;

(7) Plaintiff's NYHRL hostile-work-environment claim against Defendants New York State, DOCS, Downstate C.F., Fischer, and Horan in his official capacity;

(8) Plaintiff's NYHRL retaliation claim against Defendants New York State, DOCS, Downstate C.F., Fischer, and Horan in his official capacity;

(9) Plaintiff's NYHRL discrimination claim against Defendant Horan in his individual capacity to the extent that claim is based on events occurring before June 11, 2010;

(10) Plaintiff's NYHRL retaliation claim against Defendant Horan in his individual capacity to the extent that claim is based on events occurring before June 11, 2010;

**\*11** (11) Plaintiff's Section 1983 equal protection claim against Defendants New York State, DOCS, Downstate C.F., Fischer, and Horan in his official capacity;

(12) Plaintiff's intentional-infliction-of-emotional-distress claim against all Defendants; and

(13) Plaintiff's negligent-infliction-of-emotional-distress claim against all Defendants; and it is further

**ORDERED** that the following claims *SURVIVE* Defendants' motion (Dkt. No. 11):

(1) Plaintiff's Title VII hostile-work-environment claim against Defendants New York State, DOCS, Downstate C.F., Fischer, and Horan in his official capacity;

(2) Plaintiff's Title VII discrimination claim against Defendants NewYork State, DOCS, Downstate C.F., Fischer, and Horan in his official capacity to the extent that claim based on events occurring after June 11, 2010;

(3) Plaintiff's Title VII retaliation claim against Defendants New York State, DOCS, Downstate C.F., Fischer, and Horan in his official capacity to the extent that claim based on events occurring after June 11, 2010

(4) Plaintiff's NYHRL hostile-work-environment claim against Defendant Horan in his individual capacity;

(5) Plaintiff's NYHRL discrimination claim against Defendant Horan in his individual capacity to the extent that claim is based on events occurring after June 11, 2010;

(6) Plaintiff's NYHRL retaliation claim against Defendant Horan in his individual capacity to the extent that claim is based on events occurring after June 11, 2010; and

(7) Plaintiff's Section 1983 equal protection claim against Defendant Horan in his individual capacity; and it is further

**ORDERED** that this case is referred back to Magistrate Judge Treece for a Rule 16 conference and the setting of pretrial scheduling deadlines.

N.D.N.Y.,2013.
Taedger v. New York
Slip Copy, 2013 WL 5652488 (N.D.N.Y.), 97 Empl. Prac. Dec. P 44,932

END OF DOCUMENT

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Henry BENITEZ, Plaintiff,
v.
HAM, et al., Defendant.
No. 9:04-CV-1159.

Oct. 21, 2009.
Henry Benitez, Malone, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy P. Mulvey, Esq., of Counsel, Syracuse, NY, for Defendants.

### ORDER

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge George H. Lowe, duly filed on the 30th day of September 2009. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. Defendants' motion for summary judgment (Dkt. No. 92) is GRANTED IN PART AND DENIED IN PART. The following claims are dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet.

It is further ordered that the following claims are dismissed sua sponte pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky.

It is further ordered that the following claims survive summary judgment and sua sponte review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

### *REPORT-RECOMMENDATION AND ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Henry Benitez alleges that 21 employees of the New York Department of Correctional Services ("DOCS") violated his constitutional rights by subjecting him to excessive force, denying him medical care, falsifying misbehavior reports, denying him assistance to prepare for a disciplinary hearing, and imposing a loaf diet on him as punishment. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 92.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

### I. FACTUAL AND PROCEDURAL SUMMARY

**\*2** Unless otherwise noted, the facts in this summary are taken from Plaintiff's verified complaint [FN1]. Plaintiff, a New York state prisoner, was transferred to Upstate Correctional Facility on September 14, 2002. (Dkt. No. 1 ¶ 8.) Plaintiff alleges that he was suffering from "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage." (Dkt. No. 1 ¶ 9.) From the time he arrived at Upstate, he made "numerous requests" to Defendant Drs. Evelyn Weissman and Richards to receive a medication called Atarax that had been prescribed to him previously at Auburn Correctional Facility, an MRI of his left wrist and right ankle, and a referral to an orthopedist. (Dkt. No. 1 ¶ 12.) Plaintiff alleges that Defendants Weissman and Richards refused his requests for Atarax, the MRI, and the referral "in retaliation for his having filed numerous formal grievances against them [and other Upstate medical staff members] within a period of two years, and for the purpose of preventing [Plaintiff] from demonstrating in a civil rights action against prison officials the extent of the injuries of his left hand and right foot." (Dkt. No. 1 ¶ 12-13.) Plaintiff alleges that, as a result, he continues to experience severe pain in his left

wrist and right ankle, numbness in different areas of his left hand and right foot, an inability to walk or stand for longer than ten minutes, and ongoing severe body itch. (Dkt. No. 1 ¶ 14.)

> FN1. Only two of the named Defendants filed affidavits supporting Defendants' motion for summary judgment. Only one of those affidavits-the affidavit of Defendant Dr. Evelyn Weissman-contradicts Plaintiff's version of events.

Regarding Plaintiff's requests for Atarax, Dr. Weissman declares that Atarax is

non-formulary, which means we do not regularly stock that medication, and special approval must be obtained to issue that medication. However, Vistaril and Hydroxyzine is the substitute we use for the same purpose as Atarax. Hydroxyzine is the generic form of Atarax. I prescribed Vistaril for [P]laintiff on October 2, 2002 ... Dr. Richards requested approval for Atarax in April 2004 and it was suggested that [P]laintiff try Claritin, which had become a formulary (regularly stocked) drug. Dr. Richards requested approval for Atarax again in June 2004, and the response was that if the generic (Hydroxyzine) had not worked, it was unclear that the branded drug Atarax would work ... Plaintiff's complaints of itching were not ignored, and he [was] constantly given medication for itching.

(Weissman Aff. ¶¶ 4-10.)

As to Plaintiff's other claims, Dr. Weissman declares:

Regarding [P]laintiff's claim that his request for an MRI was denied, Dr. Richards and I felt, in our medical judgment, an MRI was not warranted. However, because his pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003. Regarding [P]laintiff's claim that his request for an orthopedic consult was denied, that is incorrect. Dr. Richards requested an orthopedic consult for [P]laintiff on August 19, 2003 and [P]laintiff saw an orthopedist

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

on September 4, 2003. The orthopedist ... did not suggest an MRI and determined that [P]laintiff was improving and "... there is not much else that I can suggest for Henry to improve or accelerate his healing. For the time being, I am just going to suggest that he be patient."

**\*3** (Weissman Aff. ¶¶ 11-13.)

Plaintiff was transferred to Elmira Correctional Facility Reception Center on November 7, 2002, for a court appearance. Upon arrival, Plaintiff informed Defendant Correction Officer Ham that he suffered "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage, and that the handcuffs and leg irons ... were too tight and causing him swelling and enormous pain." Ham observed that Plaintiff's hands were swollen. However, he refused to remove or loosen the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred to Five Points Correctional Facility three hours later. (Dkt. No. 1 ¶ 9.)

Plaintiff was returned to the Elmira Correctional Facility Reception Center on November 14, 2002. At that time, Plaintiff again informed Defendant Ham that the restraints were too tight and were causing him swelling and extreme pain. Defendant Ham "again verbally acknowledged that [Plaintiff]'s hands were ... swollen" but refused to remove the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred out of the facility three hours later. (Dkt. No. 1 ¶ 10.)

On January 2, 2003, Defendant Correction Officers Nephew and Desotelle strip-frisked Plaintiff <u>FN2</u> in preparation for transferring Plaintiff for a court appearance. Defendant Sgt. Snyder was also in the room. When they had completed the search, Defendant Nephew ordered Plaintiff to put on his coat. Plaintiff told Nephew that wearing the coat would "severely aggravate his continuing body itch stemming from his hepatitis virus." (Dkt. No. 1 ¶ 15.) Defendant Snyder called Plaintiff a "spick" and threatened to forcibly put the coat on Plaintiff.

Plaintiff told Defendants Snyder, Nephew, and Desotelle that he would sue them if they used force. (Dkt. No. 1 ¶ 15.)

> FN2. Plaintiff does not allege that the strip-frisk violated his constitutional rights. Even if he did, I would find that such a claim would not survive *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B). Strip searches conducted in a prison setting are constitutional if they are reasonably related to a legitimate penological goal and are conducted in a reasonable manner. *Frazier v. Ward,* 528 F.Supp. 80, 81 (N.D.N.Y.1981). "However, a strip search is unconstitutional if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish. *See, e.g., Iqbal v. Hasty,* 490 F.3d 143, 172 (2d Cir.2007) (pretrial detainee alleged Fourth Amendment violation where he was subjected to repeated strip and body cavity searches that were not related to legitimate government purposes and designed to punish); *Covino,* 967 F.2d at 80 (strip search accompanied by physical and verbal abuse is unconstitutional); *Hodges v. Stanley,* 712 F.2d 34, 35-36 (2d Cir.1983) (second strip search performed soon after a first strip search served no legitimate interest when prisoner was under continuous escort); *Jean-Laurent v. Wilkerson,* 438 F.Supp.2d 318, 323 (S.D.N.Y.2006)." *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, at \*1, 2008 WL 1787692, at \*9 (E.D.N.Y. Apr. 17, 2008). Plaintiff does not allege, and the evidence does not show, that Defendants conducted the strip-frisk with an intent to intimidate, harass, or punish Plaintiff.

Shortly thereafter, Defendant Lt. Wright approached Plaintiff and asked him if he had spit at staff. Before Plaintiff could respond, Defendant Wright ordered several guards to get a video camera and put a "spittle mask" on Plaintiff. After the guards did so, Defendant Wright escorted Plaintiff to his cell. He asked Plaintiff to explain what had happened in the frisk room. Plaintiff said that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Wright would not believe his account of the incident, accused Defendant Wright of interfering with his court trip and unjustifiably putting a spittle mask on him, and said he would sue Defendants Wright and Snyder. Defendant Wright told Plaintiff that "transportation vans don't have cameras. You're going to learn not to spit ... [at] staff and ... threaten us with lawsuits." (Dkt. No. 1 ¶ 16.)

After Defendant Wright left Plaintiff's cell, Defendant Capt. Bezio approached and asked Plaintiff to explain what happened in the frisk room. Plaintiff told Defendant Bezio what had happened, denied that he had threatened to spit at a staff member, and asked Defendant Bezio to protect him while he was being transported to court. Defendant Bezio told Plaintiff to be "up and ready to go to court" and that "people don't like to get spat ... on." [FN3] (Dkt. No. 1 ¶ 19.)

> FN3. In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Bezio for these statements because (1) Plaintiff did not exhaust his administrative remedies regarding the statements; and (2) threats are not actionable constitutional violations. (Dkt. No. 92-10 at 35-36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Bezio based on the statements. Rather, he included this allegation in his complaint to provide relevant information for his failure to intervene claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

*4 On January 3, 2003, Defendant Correction Officer Duprat escorted Plaintiff to the transportation van. Defendant Duprat told Plaintiff to "remember what we told you about the van." [FN4] As they were walking, Plaintiff saw Defendant Bezio and told him that Defendant Duprat had threatened to "employ physical abuse" against him in the van. Defendant Bezio shrugged his shoulders. (Dkt. No. 1 ¶ 20.) Defendant Duprat drove Plaintiff in a van to a different building, where he called Defendant

Snyder "to arrange a beating" of Plaintiff. After the phone call, Defendant Duprat drove Plaintiff back to the first building. When they arrived, Defendant Snyder entered the rear section of the van and told Plaintiff that "you like ... suing us. Wright, my boss, doesn't like that and sent this as a reminder." Defendant Snyder then punched and slapped Plaintiff, who was in handcuffs and leg irons, in the face and the back of his head, knocking him unconscious. When Plaintiff revived, Defendants Duprat and Correction Officer Bogett entered the rear section of the van and punched and slapped Plaintiff several times in the head, chest, and right ear. When Plaintiff began to bleed from his right inner ear, Defendants Duprat and Bogett tied a spittle mask on Plaintiff's head. (Dkt. No. 1 ¶¶ 21-22.)

> FN4. In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Duprat for this statement because (1) Plaintiff did not exhaust his administrative remedies regarding the statement; and (2) threats are not actionable constitutional violations. (Dkt. No. 92-10 at 35-36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Duprat based on the statement. Rather, he included it in his complaint to provide relevant information for his excessive force claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

When Plaintiff arrived at Five Points Correctional Facility later that day, he notified Defendant Nurse Hensel that he had been bleeding from his inner right ear due to a beating by Upstate officials, that he was suffering severe pain in his head and right ear, and that he wanted to be examined by a doctor. Defendant Hensel refused to examine Plaintiff, made no record of his complaints, and refused to schedule Plaintiff to see a doctor. [FN5] (Dkt. No. 1 ¶ 23.)

> FN5. The medical records produced by Defendants in support of their motion for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

summary judgment do not reflect that Plaintiff saw Nurse Hensel on January 3, 2003. However, as the Court has noted previously (Dkt. No. 99 at 3), a SHU log book entry for January 3, 2003, indicates that Plaintiff was "taken to strip frisk room for pictures and to be assessed by R/N Hensel." (Defs.' Resp. to P.'s 1st Req. for Prod. of Docs., Ex. E at 11.) This document corroborates Plaintiff's claim that he saw Defendant Hensel on January 3, 2003. I note, however, that none of the parties included the log book entry in their moving or opposing papers.

Plaintiff's medical record from Five Points indicates that on January 3, 2003, the day he arrived, Plaintiff was seen by Nurse Nancy O'Connor Ryerson. She noted that Plaintiff arrived via van with cuffs and chains and spit net, and that he complained of pain and itching. "It was noted that he takes Naprosyn and Benadryl, and he was escorted to 12 Building. Apparently Naprosyn was not sent with him and it is a medication for which he would need a prescription from a doctor. Since this was not an emergency, the procedure is to place the inmate on the regular physician call-out list for an appointment. Nurse Ryerson also noted that he was Hepatitis C positive." (Bannister Aff. ¶ 5.)

On January 4, 2003, Plaintiff notified Defendant Nurse Goodwin [FN6] that he needed emergency medical treatment because of severe pain in his liver, left wrist, and right ear, and that he wanted medicine for his severe body itch. Defendant Goodwin refused to examine Plaintiff, made no record of his complaints, and did not provide any treatment to Plaintiff. (Dkt. No. 1 ¶ 24.)

> FN6. The complaint refers to this defendant as Nurse "Good." However, Defendants state that her name is actually Goodwin. (Dkt. No. 92-10 at 1 n. 1.) I will refer to her as Nurse Goodwin.

Plaintiff's medical records from Five Points indicate that on January 4, 2003, Plaintiff was seen by Nurse "Goon" at his cell after security staff told the nurse that Plaintiff stated his asthma was acting up. Nurse "Goon" 's

note indicated that Plaintiff never acknowledged shortness of breath and that she checked Plaintiff's transfer form and the computer and found that he had no history of asthma. (Bannister Aff. ¶ 6.)

**\*5** On January 5, 2003, Plaintiff alleges that he informed Defendant Nurse Kuhlman [FN7] that he had been bleeding from his inner right ear and that he was suffering from an ongoing, extreme body itch due to his hepatitis C and B virus. Defendant Kuhlman told Plaintiff that she would review his medical chart and return to him. Defendant Kuhlman refused to examine Plaintiff, made no record of his medical complaints, and refused to provide treatment. (Dkt. No. 1 ¶ 25.)

> FN7. The complaint refers to this defendant as Nurse Coleman. As discussed further below, Plaintiff did not serve this defendant. In his opposition to the motion for summary judgment, Plaintiff states that he ultimately learned through discovery that her name is actually Nurse Kuhlman. (Dkt. No. 109 at 6 n. 2.) I will refer to this defendant as Nurse Kuhlman.

Plaintiff's medical records from Five Points show that Defendant Kuhlman saw Plaintiff on January 5, 2003. Her note indicates that she went to his cell for his 4:00 p.m. medications and he complained about the way she distributed the medication [FN8]. He stated that the nurse would be getting a grievance. He was uncooperative and argumentative. (Bannister Aff. ¶ 7.)

> FN8. It is not clear what medications Nurse Kuhlman was distributing, since the Affidavit of Linda Bannister establishes that "nurses cannot give medications until they verify allergies and prescription orders" and that as of January 6, the day after Nurse Kuhlman saw Plaintiff, this verification had not been completed. (Bannister Aff. ¶ 8.)

On January 6, 2003, Plaintiff informed Defendant Nurse Costello that he needed treatment due to great pain in his right ear and his ongoing severe body itch.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Costello refused to examine Plaintiff's right ear, made no record of his medical complaint, and refused to promptly provide medical treatment. (Dkt. No. 1 ¶ 26.)

Plaintiff's medical records from Five Points show that Defendant Costello saw him on January 6, 2003. She noted that he was complaining that he needed an emergency prescription for severe headache and severe itching. She noted that he requested a prompt examination by a physician. She instructed him that she would have to find the chart or the transfer paperwork because nurses cannot give medications until they verify allergies and prescription orders. (Bannister Aff. ¶ 8.)

Plaintiff's medical records from Five Points show that he was seen again the next day by Defendant Costello. Plaintiff's chart was still not available, and he again requested a prescription for itching, Hepatitis C, and a physical exam. Defendant Costello again noted that she would have to verify his requests and then possibly schedule an appointment. (Bannister Aff. ¶ 9.)

Plaintiff's medical records from Five Points show that he was seen later that day by non-defendant Nurse Gardner at the request of security staff. Plaintiff stated "I was knocked out and beaten everywhere" and claimed that he had a lump on his head. Nurse Gardner examined him and noted no redness, bruising, or bump on head. (Bannister Aff. ¶ 10.)

Plaintiff alleges that Wright, Nephew, Desotelle, and Snyder retaliated against him for his threat to sue them by filing false misbehavior reports. (Dkt. No. 1 ¶¶ 17-18.) Defendant Correction Officer LaClair was assigned to assist Plaintiff with preparing for the subsequent disciplinary hearing. (Defs.' Ex. 14.)

According to a misbehavior report filed by Defendant LaClair, when he went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get him what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant La Clair "informed him the interview was

over and left the area." (Defs.' Ex. 15 at 2-3.) Plaintiff alleges that Defendant LaClair "falsified [the] misbehavior report against [Plaintiff] in order to refrain" from assisting Plaintiff. (Dkt. No. 1 ¶ 35.)

**\*6** On January 15, 2003, Defendant Bullis arrived at Plaintiff's cell and informed him that he would conduct the disciplinary hearing that day. He asked Plaintiff whether he wanted to attend the hearing. Plaintiff said that he did not because Defendant LaClair had not assisted him, but asked Defendant Bullis to interview Defendant LaClair and an inmate witness about the events leading to Defendant LaClair's refusal to provide assistance. Plaintiff asked Defendant Bullis not to impose a loaf diet as a punishment if he found Plaintiff guilty because the loaf diet caused Plaintiff severe abdominal pains and constipation due to his hepatitis. (Dkt. No. 1 ¶ 36.)

Defendant Bullis did not interview Defendant LaClair or the inmate witness. He found Plaintiff guilty and imposed a penalty of 21 days of the loaf diet. (Dkt. No. 1 ¶ 37.) Plaintiff alleges that Defendants Weissman and Girdich "maliciously" approved the penalty in "reckless disregard" of the pain it would inflict on Plaintiff. (Dkt. No. 1 ¶ 38.) Plaintiff alleges that "[d]ue to the danger that the ... loaf diet posed" to his well-being, he refused to eat it. As a result, he lost 33 pounds and suffered severe abdominal pains and emotional distress that exacerbated his hepatitis. (Dkt. No. 1 ¶ 39.)

Plaintiff alleges that Defendants Brousseau, Donelli, Selsky, Girdich, and Eagen mishandled the grievances and appeals he filed or attempted to file regarding his claims. (Dkt. No. 1 ¶¶ 28-34, 40.)

Plaintiff filed this lawsuit on October 6, 2004. The parties proceeded to discovery, which proved contentious. Plaintiff successfully moved to compel responses to his discovery requests, and thereafter filed four motions for sanctions seeking Defendants' compliance with the order compelling discovery. (Dkt.Nos.56, 73, 94, 103.) I granted each of those motions in part. (Dkt. Nos.62, 79, 99, 107.) As is relevant here, I ruled that because not all of the pages of the Five Points Movement and Control Log Book

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

for November 14, 2003, had been provided to Plaintiff before the original was destroyed, Plaintiff could ask the Court to draw factual inferences favorable to him. (Dkt. No. 99 at 2.) I ruled that because Defendants could not locate the SHU log book for January 2003, Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing pages for January 14, 2003" in opposition to Defendants' motion for summary judgment. (Dkt. No. 99 at 1-2.) I noted that Defendants had told Plaintiff that photographs taken of him on January 10, 2003, would be produced but that, without explanation, Defendants could no longer find the photographs. Accordingly, I ruled that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 99 at 2-3.) I ordered that if photographs taken of Plaintiff on January 3, 2003, no longer existed, Plaintiff could similarly request favorable inferences. (Dkt. No. 99 at 3.)

**\*7** On March 16, 2009, Plaintiff again moved for sanctions. (Dkt. No. 103.) I noted that the photographs from January 3 and 10, 2003, were still missing. (Dkt. No. 107 at 1.) I reiterated that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 107 at 2.)

Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 92.) Plaintiff has opposed the motion. (Dkt. No. 109.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact

exists. _Major League Baseball Properties, Inc. v. Salvino, Inc.,_ 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. _Salahuddin v. Goord,_ 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN9] Rather, "[a] dispute regarding a material fact is _genuine_ if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN10] In determining whether a genuine issue of material [FN11] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [FN12]

FN9. _Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,_ 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); _Anderson v. Liberty Lobby, Inc.,_ 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); _see also_ Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is properly made [by a defendant] and supported [as provided in this rule], the [plaintiff] may not rely merely on allegations ... of the [plaintiff's] pleading ....").

FN10. _Ross v. McGinnis,_ No. 00-CV-0275, 2004 U.S. Dist. LEXIS 9367, at \* 20-21, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar.29, 2004) (internal quotations omitted) (emphasis added).

FN11. A fact is "material" only if it would have some effect on the outcome of the suit. _Anderson v. Liberty Lobby,_ 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN12. _Schwapp v. Town of Avon,_ 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); _Thompson v. Gjivoje,_ 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. FN13 For these reasons, it is appropriate to briefly summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

> FN13. The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

**\*8** Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); FN14 or (2) a challenge to the legal cognizability 14 of the claim. FN15

> FN14. *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ( "The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

> FN15. *See* *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice; *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 379 F.Supp.2d 348, 370 (S.D.N.Y.2005)* ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6)]." ) (citation omitted); *Util. Metal Research & Generac Power Sys., Inc.,* No. 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993, at *1-2 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth., 333 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); Tangorre v. Mako's, Inc.,* No.01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12(b)(6) motion-one aimed at the sufficiency of the pleadings under Rule 8(a), and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN16] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN17] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN18]

FN16. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (citation omitted; emphasis added); *see*

*also Swierkiewicz, 534 U.S. at 512* (citation omitted); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (citation omitted).

FN17. *Swierkiewicz, 534 U.S. at 514* (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir.1995)* ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") (citation omitted); *Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir.1988)* ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") (citations omitted).

FN18. *Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y.1996)* (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* No. 98-CV-0293, 1998 U.S. Dist. LEXIS 8750, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J.). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp., 335 F.3d 152, 156 (2d Cir.2003)* (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 (2d Cir.1996)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556-57, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but has not *shown*-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN19] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.* "[FN20] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

> FN19. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

> FN20. *Hernandez,* 18 F.3d at 136 (citation omitted); *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN21] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN22] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN23] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.[FN24] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN25]

> FN21. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* No. 96-CV-7544, U.S. Dist. LEXIS 18131 1997 WL 714878, at *1, n. 2, 1997 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

> FN22. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

FN23. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN24. *Yang v. New York City Trans. Auth.,* No. 01-CV-3933, 2002 U.S. Dist. LEXIS 20223, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN25. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also* *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice (citation omitted); *see, e.g., See Rhodes v. Hoy,* No. 05-CV-0836, 2007 U.S. Dist. LEXIS 48370, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* No. 07-CV-0166, 2008 U.S. Dist. LEXIS 62919, 2008 WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before

dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) (citations omitted); *Hylton v. All Island Cab Co.,* No. 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* No. 00-CV-1309, 2001 U.S. Dist. LEXIS 737, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

**\*9** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed), [FN26] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[FN27] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [FN28] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [FN29]

FN26. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 U.S.App. LEXIS 17113, 2008 WL 3294864, at *5 (2d Cir Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") (citation omitted).

FN27. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) (unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit); *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN28. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005)

(acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN29. *Stinson v. Sheriff's Dep't of Sullivan County.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

**III. ANALYSIS**

**A. Weissman/Richards Health Care**

Plaintiff alleges that Defendant Drs. Weissman and Richards violated his Eighth Amendment right to adequate medical care by prescribing an ineffective medication for his body itch, refusing to order an MRI of his left wrist and right ankle, and refusing to refer him to an orthopedist. (Dkt. No. 1 ¶ 12.) Defendants move for summary judgment of these claims, arguing that (1) Plaintiff did not suffer from a serious medical need; and (2) Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 13-14.)

*1. Eighth Amendment Standard*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102-03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corr. Med. Dept.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

**\*10** The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id.* If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.* A "serious medical need" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor

or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

If the claim is that treatment was provided that was inadequate, the second inquiry is narrower. *Salahuddin,* 467 F.3d at 280. For example, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

To satisfy the subjective component of an Eighth Amendment medical care claim, the defendant's behavior must be "wanton." What is considered "wanton" must be determined with "due regard for differences in the kind of conduct against which an Eighth Amendment objection is raised." *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Where a prisoner claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle,* 429 U.S. at 105; *Wilson v. Seiter,* 501 U.S. 294, 302-03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

ignored that serious medical need. *Farmer,* 511 U.S. at 835; *Ross v. Giambruno,* 112 F.3d 505, at *2 (2d Cir.1997).* An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105-06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703 (citation omitted). Medical decisions that are contrary to accepted medical standards may constitute deliberate indifference if "the doctor has based his judgment on something other than sound medical judgment." *Stevens v. Goord,* 535 F.Supp.2d 373, 385 (S.D.N.Y.2008) (citation omitted). For instance, a doctor may be deliberately indifferent if he opts for an easier and less efficacious treatment plan "not on the basis of [his or her] medical views, but because of monetary incentives." *Chance,* 143 F.3d at 704.

### 2. *Atarax*

**\*11** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to prescribe *Atarax*. (Dkt. No. 1 ¶¶ 1, 12.) Defendants move for summary judgment, arguing that Plaintiff's claim regarding the *Atarax* medication fulfills neither the objective nor the subjective prong of a viable Eighth Amendment claim. (Dkt. No. 92-10 at 13-14.)

Regarding the objective prong, the parties' briefs focus entirely on whether Plaintiff suffered from a serious medical need.[FN30] Applying the analytical framework described above, I must first address whether Plaintiff was

actually deprived of adequate medical care. I find that there is a triable issue of fact that the refusal to prescribe *Atarax* constituted a denial of adequate or reasonable care. I base this finding on the fact that Defendant Dr. Richards twice requested approval to prescribe *Atarax,* noting that he had already tried treating Plaintiff with *Hydroxyzine,* Vistril, *Allegra,* and Zytrec "all of which worsened [Plaintiff's] condition." (Weissman Aff. Ex. A-9.)

> FN30. Defendants argue that Plaintiff's severe body itch was not a serious medical need because it was not a "condition of urgency, one that may produce death, degeneration, or extreme pain". (Dkt. No. 92-10 at 13.) Plaintiff argues that severe body itch was a symptom of his Hepatitis C, which is a serious medical need. (Dkt. No. 109 at 28-30.)

Because Plaintiff alleges that he was provided with inadequate treatment, rather than completely deprived of treatment, the next inquiry is whether the *deprivation* was sufficiently serious. This requires an analysis of what harm, if any, the failure to prescribe *Atarax* caused or will cause Plaintiff. Here, there is simply no evidence before the Court that being deprived of *Atarax* harmed or threatened to harm Plaintiff. Rather, the evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation. Therefore, I find that Plaintiff has not raised a triable issue of fact regarding the objective prong of his Eighth Amendment claim regarding Defendant Weissman and Richards' failure to prescribe *Atarax.*

Having found that there is not a triable issue of fact as to the objective prong, it is not necessary to analyze the subjective prong. However, I will briefly address the parties' contentions for the sake of completeness. Defendants argue that the refusal by Defendants Weissman and Richards to prescribe *Atarax* was not deliberate indifference because the decision of "which medicine to prescribe for a particular condition amount[s] to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92-10 at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

13-14.) Defendants' argument regarding deliberate indifference is based entirely on the affidavit of Dr. Weissman. [FN31] Interestingly, in contrast to her statements regarding Plaintiff's orthopedic care (discussed below), Dr. Weissman does *not* state that the decision not to prescribe Atarax was based on her medical judgment. Rather, she states that Atarax is a "non-formulary" medication and "special approval must be obtained to issue that medication." (Weissman Aff. ¶ 4.) Dr. Weissman does not say who was authorized to approve the use of non-formulary drugs. Dr. Richards twice requested approval to prescribe Atarax to Plaintiff. (Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.) In one of these requests, he stated that the other medications he had tried "worsened" Plaintiff's condition. (Weissman Aff. Ex. A-9.) His requests were denied. (Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.) This sequence of events raises two interesting and related issues: does the acquiescence of Dr. Weissman and Dr. Richards to a course of treatment for Plaintiff with which they disagreed constitute deliberate indifference? [FN32] Or does the fact that the decision not to prescribe Atarax was made by someone other than Dr. Weissman and Dr. Richards indicate that they were not personally involved with, and thus not liable for, the decision? *See Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005) (claims against administrators who refused to approve treatment requested by treating physicians survived summary judgment; treating physicians were not named as defendants). The parties have not addressed these issues, and, due to my finding that there is no triable issue of fact as to the objective prong and in the absence of briefing, I decline to do so.

FN31. Dr. Richards did not file an affidavit supporting Defendants' motion for summary judgment.

FN32. *See Sulton v. Wright,* 265 F.Supp.2d 292 (S.D.N.Y.2003) (holding that a prisoner stated an Eighth Amendment claim against a doctor and physician's assistant who pursued less vigorous treatment than they had originally recommended when their request for approval of knee surgery was denied).

**3.** *MRI and Orthopedic Referral*

**\*12** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to take MRIs of his left wrist and right ankle or to refer him to an orthopedist who could determine if medical footwear was necessary to correct his right foot problem. (Dkt. No. 1 ¶ 12.) Defendants argue that (1) any deprivation was not sufficiently serious to trigger Eighth Amendment scrutiny; and (2) they were not deliberately indifferent. (Dkt. No. 92-10 at 13-14.) Defendants are correct.

Even if one assumes that the deprivation was sufficiently serious to trigger Eighth Amendment scrutiny, the evidence does not raise a triable issue of fact that Defendants were deliberately indifferent. Regarding the MRIs, Dr. Weissman declares that "Dr. Richards and I felt, in our medical judgment, an MRI was not warranted." Because Plaintiff's "pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003." (Weissman Aff. ¶ 11.) In September 2003, Dr. Richards referred Plaintiff to an orthopedist for treatment of his left wrist because, after completing physical therapy, Plaintiff was "still having [a] considerable amount of pain." (Weissman Aff. Ex. A-13.) The orthopedist examined Plaintiff and reported that Plaintiff "seems to be improving at this point and unfortunately, there is not much else I can suggest for Henry to improve or accelerate his healing." (Weissman Aff. Ex. A-14.)

Plaintiff filed a grievance a year after seeing the orthopedist complaining that Dr. Richards and Dr. Weissman "willfully refused to examine my injuries, to provide medical treatment for said injuries, and to order an MRI test of said injuries conducted ... in an attempt to prevent me from proving the precise nature and extent of my injuries in a court of law and, thus, to dissuade me from suing." (P.'s Decl. in Opp'n to Aff. of Evelyn Weissman, Ex. D.) Plaintiff argues that this grievance proves that he "continued to complain to these defendants about continuing severe pain in his left wrist and right ankle for more than one year after he had been evaluated

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

by the orthopedist." (Dkt. No. 109 at 24-25.) The grievance Plaintiff cites does not mention any "continuing severe pain in his left wrist and right ankle." Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment claims against Defendants Weissman and Richards.[FN33]

> FN33. Plaintiff's complaint also asserts a retaliation claim against Defendants Weissman and Richards on these facts. (Dkt. No. 1 ¶ 12.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e) (2)(B) because the evidence does not establish that Defendants took adverse action. While the denial of medical care may establish adverse action, *see e.g. Odom v. Poirier,* No. 99 Civ. 4933, 2004 WL 2884409, at * 4 (S.D.N.Y. Dec.10, 2004), I have found that Defendants Weissman and Richards did not deny Plaintiff medical care. Therefore, I recommend that the Court dismiss this claim.

**B. Ham/Grievances**

Plaintiff alleges that Defendant Ham violated his Eighth Amendment rights by refusing to loosen or remove his restraints on November 7 and 14, 2002. (Dkt. No. 1 ¶¶ 9-10.) He further alleges that Defendants Brousseau and Donelli violated his constitutional rights by refusing to forward his grievance regarding Defendant Ham for an investigation. (Dkt. No. 1 ¶¶ 28-29.) Defendants argue that (1) Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham; (2) Plaintiff's allegations are not "sufficiently serious" to implicate the Eighth Amendment; and (3) Plaintiff's allegations regarding the handling of his grievance do not raise a constitutional claim. (Dkt. No. 92-10 at 21-23, 38.)

1. *Exhaustion of Administrative Remedies*

**\*13** Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham. (Dkt. No. 92-10 at 21-23.) I find that there is a triable issue of fact that Plaintiff's failure to

receive a final decision on the merits of his grievance regarding Defendant Ham was justified.

The Prison Litigation Reform Act ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." [FN34] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN35] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN36]

> FN34. 42 U.S.C. § 1997e.

> FN35. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

> FN36. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances.[FN37] First, an inmate must file a complaint with the facility's IGP clerk within twenty-one (21) calendar days of the alleged occurrence. If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen (16) calendar days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen (16) calendar days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven (7) calendar days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the grievant's appeal. Third, a grievant may appeal to the central office review committee ("CORC") within seven

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

(7) working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty (30) calendar days of receipt of the appeal. It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.[FN38] If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

> FN37. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7; *see also White v. The State of New York,* No. 00-CV-3434, 2002 WL 31235713, at *2 (S.D.N.Y. Oct.3, 2002).

> FN38. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g., Croswell v. McCoy,* 01-CV-0547, 2003 U.S. Dist. LEXIS 3442, at *12, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17,

2006) (Hurd, J.).

Here, Plaintiff declares that on the day of the first incident with Defendant Ham, he asked a Five Points Correctional Facility officer for a grievance form. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 17.) The officer did not give Plaintiff a form and told Plaintiff that he would need to file his grievance at Elmira Correctional Facility, where the incident had occurred. *Id.* Although an April 16, 2004, revision to the inmate grievance procedure specified that grievances "may only be filed at the facility where the inmate is housed even if it pertains to another facility," (*Id.,* at Ex. A), the procedures in effect at the time Plaintiff asked for a form to file a complaint against Defendant Ham were silent as to which facility should handle a particular grievance. Even if one assumes that the Five Points officer's advice was correct under DOCS practice at the time, it is difficult to see how Plaintiff could have filed a grievance at Elmira. Plaintiff was only at Elmira Correctional Facility for a few hours after receiving these instructions from the officer, during which time he was handcuffed and shackled. (Dkt. No. 1 ¶ 10.)

**\*14** On December 8, 2002, Plaintiff filed a grievance at Upstate Correctional Facility regarding Defendant Ham's actions. (Dkt. No. 92-4, Ex. 4.) Defendant Brousseau, the IGP supervisor, returned the grievance to Plaintiff because Plaintiff failed to submit it within fourteen days of the incident.[FN39] *Id.*

> FN39. The inmate grievance procedures in place at the time of the incident required inmates to file grievances within 14, rather than 21, days.

On December 18, 2002, Plaintiff submitted a grievance complaining that Defendant Brousseau's refusal to accept the previous grievance violated his constitutional right of access to the courts because it prevented him from exhausting his claims against Defendant Ham. (Dkt. No. 92-4, Ex. 4.) The IGRC denied Plaintiff's grievance on December 26, 2002. *Id.* The IGRC stated that Defendant Brousseau's refusal was proper because Plaintiff "did not present any mitigating circumstances that would warrant accepting the [untimely] complaint ... [Plaintiff] had been

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

back at the facility since 11/15/02 and had filed one grievance during this time period, this shows he had ample opportunity to file this complaint in a timely manner." *Id.* The grievance to which the IGRC's decision referred was a grievance regarding Defendant Richards' denial of Atarax. (Dkt. No. 92-4, Ex. 3.) Because that event occurred at Upstate Correctional Facility, there was no ambiguity about where Plaintiff's grievance should be filed.

Plaintiff appealed the IGRC's determination to the Superintendent. (Dkt. No. 92-4, Ex. 4.) Defendant Donelli affirmed the IGRC's determination on January 15, 2003. *Id.*

Defendants assert that Plaintiff "did not appeal [Defendant Donelli's decision] to the CORC." (Dkt. No. 92-3, Stmt. Pursuant to Rule 7.1(a)(3) ¶ 8.) For this proposition, they cite Exhibit 4 and to the Affidavit of Karen Bellamy. *Id.* Exhibit 4 shows that Plaintiff signed an "Appeal Statement" stating that he wished to appeal Defendant Donelli's decision to CORC. (Dkt. No. 92-4, Ex. 4.) The Appeal Statement was signed by a grievance clerk. *Id.* That exhibit also shows that Defendant Brousseau responded to an inquiry regarding the status of the grievance by stating that the grievance had been received by CORC and was being processed. *Id.* However, the record before the Court does include any final disposition from CORC of Plaintiff's appeal. The appeal does not appear in a list provided in the Affidavit of Karen Bellamy of grievances on which Plaintiff received a final decision from CORC. (Bellamy Aff. Ex. B.) Thus, Plaintiff never received a decision from CORC and did not exhaust his administrative remedies. *See Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, at * 4, 2002 WL 313796, at * 2 (S.D.N.Y. Feb.27, 2002). Even if CORC had acted on Plaintiff's appeal, I assume that CORC would have upheld the IGRC's finding and denied Plaintiff's grievance as untimely. In that event, I would find that Plaintiff had not exhausted his administrative remedies because "courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies." *Soto v. Belcher,* 339 F.Supp.2d 592, 595

(S.D.N.Y.2004).

**\*15** Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his administrative remedies.[FN40] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [FN41] Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [FN42] Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [FN43] Justification "must be determined by looking at the circumstances which might understandably lead ... uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Good,* 380 F.3d 670, 678 (2d Cir.2004). Here, the silence of the regulations regarding which facility was the proper venue for Plaintiff's grievance, the bad advice that Plaintiff received from the officer at Five Points, and Plaintiff's inability to follow that advice because he was shackled during his entire tenure at Elmira create a triable issue of fact that Plaintiff's failure to file a timely grievance regarding Defendant Ham's actions was justified. I therefore find that summary judgment is not appropriate on the grounds that Plaintiff failed to exhaust his administrative remedies.

FN40. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford. Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

FN41. *Hemphill,* 380 F.3d at 686 (citation omitted).

FN42. *Id.* (citations omitted).

FN43. *Id.* (citations and internal quotations omitted).

2. *"Sufficiently Serious"*

Defendants argue that there is not a triable issue of material fact regarding Plaintiff's Eighth Amendment claim against Defendant Ham because "Plaintiff's alleged 'enormous pain' is nothing more than *de minimis* for Constitutional purposes." (Dkt. No. 92-10 at 22-23.)

Claims that prison officials applied restraints too tightly are analyzed under the Eighth Amendment as claims of excessive force. *See Davidson v. Flynn,* 32 F.3d 27 (2d Cir.1994). When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

**\*16** In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9 (officers who punched and kicked handcuffed and shackled inmate used unconstitutional force although inmate required no medical attention) (citations omitted); *Davidson,* 32 F.3d at 30 n. 1 (officers who placed handcuffs too tightly on inmate in retaliation for filing lawsuits used unconstitutional force where inmate suffered permanent scarring and numbness); *compare Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, at \*24, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004) (officers who placed prisoner in tight restraints did not violate constitution where prisoner suffered temporary pain, numbness and swelling and no improper or wanton motive was suggested for the officers' actions).[FN44]

FN44. Defendants served this unpublished case on Plaintiff with their moving papers as required by Local Rule 7.1(a)(1). (Dkt. No. 92-11.)

Plaintiff does not allege that he was permanently injured as a result of Defendant Ham's actions. Plaintiff states that he suffered "enormous pain" and "severe swelling" as a result of being shackled so tightly. (Dkt. No. 109 at 38.) Although this would not end the Eighth Amendment inquiry if Defendant Ham's actions had been more egregious, there is simply no evidence in the record that Defendant Ham applied restraints to Plaintiff "maliciously and sadistically to cause harm" or in a way that was "repugnant to the conscience of mankind." Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's claims against Defendant Ham.

3. *Grievances*

Plaintiff alleges that Defendants Brousseau and Donelli "refused to forward" his complaint regarding

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Ham's actions "for an investigation" (Dkt. No. 1 ¶¶ 28-29), thus violating his First Amendment right to petition the government. (Dkt. No. 109 at 50-51.) Defendants argue that Plaintiff's allegation fails to state a constitutional violation. (Dkt. No. 92-10 at 38.) Defendants are correct.

The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at *3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 (W.D.N.Y.1998).

**\*17** *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369-370 (W.D.N.Y.2005). Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham.

**C. Frisk Room Incident/Aftermath/Grievances**

Plaintiff alleges that he threatened to sue Defendants Nephew, Desotelle, and Snyder if they used force to put on his coat. (Dkt. No. 1 ¶ 15.) Plaintiff alleges that, in retaliation for this threat, (1) Defendant Wright conspired with Defendant Snyder to subject Plaintiff to excessive force; (2) Defendants Duprat, Snyder, and Bogett used excessive force on Plaintiff; (3) Defendants Wright,

Nephew, Desotelle, and Snyder falsified misbehavior reports against Plaintiff; and (4) Defendant Bezio failed to intervene to prevent the use of excessive force.[FN45] (Dkt. No. 1 ¶¶ 16-22.) He further alleges that Defendants Brousseau and Donelli would not allow Plaintiff to file a grievance regarding these events. (Dkt. No. 1 ¶¶ 30-31.) Finally, he alleges that Defendants Girdich and Eagen denied the grievance he filed regarding Defendant Brousseau and Donelli's refusal to process Plaintiff's grievance. (Dkt. No. 1 ¶¶ 32-34.)

FN45. The complaint contains some language that could, very liberally construed, assert a claim against these Defendants for denial of Plaintiff's right of access to the courts on the theory that, at the time of these events, Plaintiff was being transported for a court appearance. Defendants addressed this possible claim in their motion for summary judgment. (Dkt. No. 92-10 at 40-42.) In his opposition to the motion, Plaintiff states that he did not intend to assert a claim for denial of access to the courts. (Dkt. No. 109 at 55.) I have therefore not addressed Defendants' arguments.

*1. Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding any of these claims. (Dkt. No. 92-10 at 25-26, 31.) Plaintiff declares that on January 13, 2003, he attempted to submit a grievance to Defendant Brousseau regarding the claims. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 26.) Plaintiff declares that Defendant Brousseau "refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27.

On April 3, 2003, Plaintiff submitted a grievance complaining that Defendant Brousseau had refused to accept his January 13 grievance. (Dkt. No. 92-4, Ex. 8.) Plaintiff requested "[t]hat Ms. Brousseau submit the grievance complaint in question to the IGRC. Alternatively, that I be allowed to resubmit a copy of the grievance complaint in issue to the IGRC before moving for judicial intervention." *Id.* CORC denied the grievance on May 28, 2003, stating that it had "not been presented

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

with sufficient evidence to substantiate any malfeasance" by Defendant Brousseau. *Id.*

As discussed above, Second Circuit precedent holds that a defendant may be equitably estopped from raising the exhaustion defense if he or she engaged in conduct that hindered the plaintiff's ability to pursue his or her administrative remedies. *Ziemba v. Wezner,* 366 F.3d 161, 163-64 (2d Cir.2004). A prison official's refusal to accept or forward a prisoner's grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies. *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008). Thus, Plaintiff's declaration that Defendant Brousseau refused to accept his grievance raises a triable issue of fact that Defendants are estopped from asserting the exhaustion defense. Therefore, I recommend that the Court reject Defendants' argument that they are entitled to summary judgment as a result of Plaintiff's failure to exhaust his administrative remedies.

2. *Conspiracy*

**\*18** Defendants move for summary judgment of Plaintiff's conspiracy claim. [FN46] They argue that (a) Plaintiff has not shown that there was any meeting of the minds; and (b) the claim is barred by the intracorporate conspiracy doctrine. [FN47] (Dkt. No. 92-10 at 31-32.)

FN46. Defendants characterize Defendants Wright and Snyder as the only defendants to the conspiracy claim. Read broadly, the complaint also alleges that Defendant Duprat conspired with Defendants Wright and Snyder by calling Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) I will include Defendant Duprat in my analysis of Plaintiff's conspiracy claim.

FN47. Defendants also argue that to the extent Plaintiff's conspiracy claim is brought under 42 U.S.C. § 1985, he has not shown that Defendants were motivated by any class-based animus. (Dkt. No. 92-10 at 31-32.) In his opposition to Defendants' motion, Plaintiff states that he did not intend to raise a claim under 42 U.S.C. § 1985. (Dkt. No. 109 at 44 n. 15.) Therefore, I

have not addressed Defendants' argument regarding class-based animus.

a. *Meeting of the Minds*

Defendants argue that Plaintiff has not provided any factual basis for a finding that Defendants had a "meeting of the minds" as required for a conspiracy claim. (Dkt. No. 92-10 at 31-32.) I find that Plaintiff has raised a triable issue of fact.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (citations omitted).

Plaintiff has raised a genuine issue of material fact as to all of the elements of his § 1983 conspiracy claim. Plaintiff states in his verified complaint that Defendant Wright told him that " '[t]ransportation vans don't have cameras. You're going to learn not to spit ... [at] staff and not threaten us with lawsuits.' " (Dkt. No. 1 ¶ 16.) The next day, Defendant Duprat called Defendant Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) Defendant Snyder entered the transportation van in which Plaintiff was sitting, said "Wright, my boss, doesn't like [you suing us] and sent this as a reminder," and then punched and slapped Plaintiff until Plaintiff lost consciousness. (Dkt. No. 1 ¶¶ 21-22.) A reasonable jury could, if it found Plaintiff's testimony credible, return a verdict for Plaintiff on his conspiracy claim based on this evidence.

b. *Intracorporate Conspiracy Doctrine*

Defendants argue that Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. (Dkt. No. 92-10 at 32.) Under that doctrine, employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, at \*5, 1999 WL 151702, at \*2 (W.D.N.Y. Mar.17, 1999). "This doctrine

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

applies to public entities and their employees." *Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009) (citations omitted). Although the Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, *see Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978); *Girard v. 94th and Fifth Avenue Corp.,* 530 F.2d 66, 72 (2d Cir.1976), it has not extended its application of the doctrine to conspiracy claims under § 1983. Several district courts in the Second Circuit have, however, applied the doctrine to § 1983 cases.[FN48] The district court cases cited in the footnote applied the intracorporate conspiracy doctrine to § 1983 without discussing whether it was appropriate to do so. In *Anemone v. Metropolitan Transportation Authority,* 419 F.Supp.2d 602, 604 (S.D.N.Y.2006), the Southern District squarely held that the intracorporate conspiracy doctrine should be applied to § 1983 cases because "the doctrine's logic is sound" and not "a single case within the Second Circuit [has] held the doctrine inapplicable to Section 1983 claims." I will assume that the doctrine applies in § 1983 cases.

>    FN48. *See Green v. Greene,* No. 9:07-CV-0351 (GTS/DEP), 2009 U.S. Dist. LEXIS 68186, 2009 WL 2424353 (N.D.N.Y. Aug.5, 2009); *Sebast v. Mahan,* No. 09-cv-98 (GLS/RFT), 2009 U.S. Dist. LEXIS 64712, 2009 WL 2256949, at *3 (N.D.N.Y. July 28, 2009); *Lee v. City of Syracuse,* 603 F.Supp.2d 417 (N.D.N.Y.2009); *Lukowski v. County of Seneca,* No. 08-CV6098, 2009 U.S. Dist. LEXIS 14282, 2009 WL 467075 (W.D.N.Y. Feb.24, 2009); *Perrin v. Canandaigua City School Dist.,* No. 08-CV-61536, 2008 U.S. Dist. LEXIS 95280, 2008 WL 5054241 (W.D.N.Y. Nov.21, 2008); *Rodriguez v. City of New York,* --- F.Supp.2d ----, No. 05-CV-5117, 2008 U.S. Dist. LEXIS 9966, 2008 WL 420015 (E.D.N.Y. Feb.11, 2008); *Crews v. County of Nassau,* No. 06-CV-2610, 2009 U.S. Dist. LEXIS 38354, 2007 WL 4591325 (E.D.N.Y. Dec. 27, 2007); *Little v. City of New York,* 487 F.Supp.2d 426 (S.D.N.Y.2007); *Clark v. City of Oswego,* No. 5:03-CV-202 (NAM/DEP), 2006 U.S. Dist. LEXIS 95769, 2007 WL 925724 (N.D.N.Y. March 26, 2007); *Malone v. City of New York,* No. CV-05-2882, 2006 U.S. Dist. LEXIS 61866, 2006 WL 2524197 (E.D.N.Y. Aug. 30, 2006); *Caidor v. M & T Bank,* No. 5:05-CV-297 (FJS/GJD), 2006 U.S. Dist. LEXIS 22980, 2006 WL 839547 (N.D.N.Y. Mar.27, 2006).

**\*19** Even where the intracorporate conspiracy doctrine applies, there is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (citation and quotation marks omitted), *vacated and remanded on other grounds, Orafan v. Rashid,* No. 06-2951, 249 Fed. Appx. 217 (2d Cir. Sept.28, 2007). I have previously found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleges that officers assaulted him in retaliation for participating in a federal lawsuit. *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force. *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005). I find that the exception applies here because, as in *Medina,* Defendants allegedly conspired to retaliate against Plaintiff for his exercise of his right to access the courts. Therefore, I recommend that the Court deny Defendants' motion for summary judgment of the conspiracy claim against Defendants Wright, Snyder, and Duprat.

3. *Excessive Force*

Defendants move for summary judgment of Plaintiff's excessive force claims. They argue that there is no "objective evidence" that any excessive force was used. (Dkt. No. 92-10 at 33-35.) Specifically, Defendants argue that:

[P]laintiff alleges that ... [D]efendants Snyder, Bogett, and Duprat punched him, slapped him, knocked him unconscious, and caused his ear to bleed. There is no

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

objective evidence to support this conclusory allegation. An unusual incident report was generated because of [P]laintiff's behavior on January 3, 2003, but the report specifically states that no force was used on [P]laintiff. To the extent [P]laintiff is claiming the alleged force was used in the van, after the incidents described in the unusual incident report, there is no objective evidence to support this conclusion either. Plaintiff's medical records for January 3, 2003, upon arrival at Five Points C.F. indicate "arrived via van with cuffs & chains and spit net-complains of pain and itching," that [P]laintiff was escorted to 12 building, and that [P]laintiff was given Naprosyn and Benadryl. There is no indication of bleeding, or that [P]laintiff reported being assaulted in the January 3, 2003 entry, or the entries for January 4, 5, and 6, 2003. Plaintiff does report being "knocked-out and beaten everywhere" on January 7, 2003, while still at Five Points C.F., but without any record of reporting this type of conduct for the four (4) days prior to January 7, 2003, it is not credible that the incident to which [P]laintiff is referring occurred on January 3, 2003. Moreover, the January 7, 2003, entry does not indicate whether [P]laintiff was claiming to have been "knocked out and beaten everywhere" by staff or other inmates. Plaintiff has no objective evidence to support his claim of excessive force.

**\*20** (*Id.* at 34-35, citations omitted.)

Defendants refer to Plaintiff's allegations as "conclusory." "Conclusory" means to "express[ ] a factual inference without stating the underlying facts on which the inference is based." *Black's Law Dictionary* 284 (7th ed.1999). Plaintiff's allegations are not conclusory. Rather, Plaintiff describes the incident in detail. The ultimate determination of whether or not Defendants used excessive force, then, will rest largely on the finder of fact's judgment regarding Plaintiff's credibility.

Defendants, naturally, do not find Plaintiff credible. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Rule v. Brine, Inc.,* 85 F.3d

1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Although Defendants do not explicitly say so, their argument that "Plaintiff has no *objective* evidence" is apparently an attempt to invoke a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). In *Jeffreys,* the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554.

The narrow holding of *Jeffreys* is not applicable here for three reasons. First, in order for the *Jeffreys* exception to apply, the plaintiff must rely "almost exclusively on his own testimony." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff is not relying "almost exclusively on his own testimony." Rather, because of Defendants' conduct during discovery, Plaintiff is relying on his own testimony plus adverse inferences drawn in his favor. As a consequence of Defendants' conduct during discovery, I ordered that Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing photographs of January 3 and 10, 2003." (Dkt. No. 107 at 2.) Plaintiff requests that the Court draw the following inference in his favor: "That were the Defendants to provide the Court with the missing photographs taken of [Plaintiff] at Five Points C.F. on January 3, 2003, such photographs would reveal that [Plaintiff] had bruises and lacerations on his face, right ear, and chest." (Dkt. No. 109 at 46-47 n. 15.) The Court grants Plaintiff's request and draws the inference in his favor.

Second, in order for the *Jeffreys* exception to apply, Plaintiff's testimony must be "contradictory or incomplete." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff's testimony is neither contradictory nor incomplete. In *Jeffreys,* the plaintiff, who alleged that police officers had

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

beaten and defenestrated him, confessed on at least three occasions that he had jumped out of a third-story window rather than having been thrown. *Id.* at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.* Here, in contrast, Plaintiff has never given a contradictory account of the events in the transportation van on January 3, 2003. Although Defendants stress that Plaintiff's medical records do not show that Plaintiff reported the incident upon arrival at Five Points, Plaintiff states in his verified complaint that he informed Defendant Hensel on the day of the incident that he had been beaten by Upstate guards. He further alleges that Defendant Hensel made no record of his complaint. (Dkt. No. 1 ¶ 23.) Plaintiff's claim regarding Nurse Hensel is corroborated by the log book entry that shows that he was taken to see Nurse Hensel on January 3, 2003, and the fact that Defendants did not provide the Court with a medical record of that visit with Plaintiff's other Five Points Medical Records. (Defs.' Resp. to P's 1st Req. for Produc. of Docs., Ex. E at 11; Bannister Aff.) As Defendants admit, Plaintiff's medical records show that within four days of the incident he reported that he had been "knocked-out and beaten everywhere." (Bannister Aff. ¶ 10.) In addition, unlike in *Jeffreys,* Plaintiff has specifically identified the officers whom he alleges beat him.

**\*21** Third, the *Jeffreys* exception is most applicable where the plaintiff's version of events is contradicted by defense testimony. In *Jeffreys,* for instance, one of the arresting officers declared that, contrary to the plaintiff's version of events, he was the only officer who entered the room where the plaintiff was allegedly beaten and that he saw the plaintiff jump out the open window. *Jeffreys,* 426 F.3d at 551-52. Here, Plaintiff's version of events has not been contradicted by an affidavit from any of the officers whom he alleges used excessive force because Defendants' motion for summary judgment is not supported by any affidavit from Defendants Snyder, Duprat, or Bogett. The only proof offered by Defendants that they did *not* use

excessive force is a notation on a January 3, 2003, unusual incident report stating "Use of Force: No." (Dkt. No. 92-5, Ex. 16.)

Accordingly, I find that Plaintiff has presented sufficient "objective evidence" to raise a triable issue of fact that Defendants Snyder, Duprat, and Bogett subjected him to excessive force.[FN49] I therefore recommend that the Court deny Defendants' motion for summary judgment of this claim.

> FN49. Read broadly, the complaint also asserts an excessive force claim against Wright and retaliation claims against Defendants Snyder, Duprat, Bogett, and Wright. Defendants have not addressed these potential claims. I find that the claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

4. *False Misbehavior Reports*

Plaintiff alleges that Defendants Nephew, Desotelle, Snyder, and Wright filed false misbehavior reports against him "in retaliation for his having threatened to sue them." (Dkt. No. 1 ¶¶ 17-18.) Defendants argue that (a) Plaintiff forfeited his claim by refusing to attend the disciplinary hearing on the charges; and (b) they would have issued the misbehavior reports regardless of any alleged retaliatory motive. (Dkt. No. 92-10 at 25-29.)

a. *Forfeiture*

Defendants argue that Plaintiff "cannot establish a prima facie case of retaliation, because although he claims the misbehavior report[s were] 'falsified,' he has forfeited his opportunity to present any evidence calling into question the truth of the misbehavior report[s] by refusing to attend the disciplinary hearing." (Dkt. No. 92-10 at 26.) Defendants cite *Brewer v. Kamas,* 533 F.Supp.2d 318 (W.D.N.Y.2008). In order to analyze *Brewer,* a review of Second Circuit precedent governing prisoners' allegations regarding false misbehavior reports is required.

A prisoner's claim that a correctional officer filed a false misbehavior report may implicate two separate constitutional provisions: (a) the Fourteenth Amendment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

right to procedural due process; or (b) the right not to be retaliated against for exercising First Amendment rights such as the right of access to the courts or the right to petition the government for redress of grievances.

In the procedural due process context, the Second Circuit has held that while a prisoner "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," he *does* have "the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Where a prisoner is falsely accused of violating disciplinary rules, and a hearing is held on the allegedly false charges that comports with the procedural due process standards set forth by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and any resulting guilty finding is based on "some evidence," the correctional officer's filing of unfounded charges does not give rise to procedural process liability. *Freeman,* 808 F.2d at 953-54.

**\*22** Two years after its *Freeman* opinion, the Second Circuit addressed the second variety of false misbehavior claim-a claim that an officer filed a false misbehavior report in retaliation for the exercise of constitutionally protected rights-in *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988). In *Franco,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for his cooperation with an investigation by the state Inspector General into incidents of inmate abuse at Attica Correctional Facility. *Franco,* 854 F.2d at 586. The defendants moved for summary judgment, arguing that Plaintiff could not state a claim because he had received a disciplinary hearing that complied with *Wolff v. McDonnell* and resulted in a guilty finding based on "some evidence." *Id.* The trial court granted the defendants' motion, relying on *Freeman. Id.* The trial court noted, however, "that under [t]his reading of *Freeman,* the mere provision of procedural due process could eliminate all liability in any case in which prison officials had intentionally filed false and unfounded charges." *Id.* The Second Circuit settled "the substantial and troublesome questions raised in th[e] case" by holding

that "[a]lthough our decision in *Freeman* accords prison officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights" such as the prisoner's First Amendment rights of access to the courts and to petition for redress of grievances. *Id.* at 590 (citations omitted). Accordingly, the Second Circuit reversed the trial court's judgment and remanded the matter for further proceedings. *Id.* at 590-91.

In *Jones v. Coughlin,* 45 F.3d 677 (2d Cir.1995), the Second Circuit again clarified that the holding in *Freeman* is doctrinally different and distinct from the type of retaliation claim discussed in *Franco.* In *Jones,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for filing an administrative complaint against one of their colleagues. *Jones,* 45 F.3d at 678. At his disciplinary hearing, the prisoner was denied the opportunity to call witnesses. *Id.* He was found guilty and sentenced to serve 120 days in the SHU. *Id.* After he had served his SHU sentence, DOCS official Donald Selsky reversed the decision and expunged it from the prisoner's record. *Id.* at 679. The prisoner filed suit. *Id.* The trial court granted the prison officials' motion for summary judgment, finding that the prisoner's allegations against the corrections officers failed to state a claim under *Freeman* and that the prisoner's allegations against the hearing officer failed because any procedural due process defects in the hearing had been cured by Selsky's reversal of the decision. *Id.*

**\*23** On appeal, the Second Circuit stated that *Freeman* did not provide the "proper framework" for a decision in the case for both "factual and doctrinal reasons." *Jones,* 45 F.3d at 679. Factually, the case was distinguishable "if, as alleged, Jones was unfairly denied the right to call key witnesses in defense of the charges against him." *Id.* Doctrinally, the Second Circuit stated that "we have held that a prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of his grievances, and that this right is distinct from the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

procedural due process claim at issue in *Freeman." Id.* at 679-80. The Second Circuit vacated the trial court's judgment and remanded for further proceedings. *Id.* at 680.

This brings us to *Brewer.* In *Brewer,* a prisoner alleged that correction officers filed false misbehavior reports against him in retaliation for filing grievances. *Brewer, 533 F.Supp.2d at 323.* The prisoner refused to attend his disciplinary hearing and was found guilty. *Id.* He sued the officers in federal court. *Id.* at 324. The officers moved for summary judgment. *Id.* The court granted the motion, finding that the prisoner could not establish that the disciplinary charges were false because (1) he refused to attend his disciplinary hearing; (2) he offered no "explanation as to why he chose not to attend the hearing so as to rebut the charges, or why it was otherwise constitutionally deficient"; and (3) he did not "offer ..., in opposition to [d]efendants' motion, any evidence calling into question the truth of the ... charges." *Id.* at 330. (citation omitted). Based on these three factors, the court stated that the plaintiff "was provided with the requisite opportunity to rebut the alleged false disciplinary charges, as required by due process, and Plaintiff, by failing to do so, has waived his right to further challenge the validity" of the misbehavior report. *Id.* (citation omitted).

*Brewer* is not applicable here for three reasons. First, the case is factually distinguishable. In *Brewer,* the prisoner did not offer any explanation for his refusal to attend the hearing, did not explain why the hearing was constitutionally deficient, and did not offer any evidence calling into question the truth of the charges. *Brewer, 533 F.Supp.2d at 330.* Here, Plaintiff has explained that he did not attend the hearing because Defendant LaClair refused to assist him prepare a defense, has argued that the hearing was constitutionally deficient because Defendant Bullis did not call Defendant LaClair and an inmate as witnesses, and has offered his own testimony under penalty of perjury to rebut Defendants' version of the events leading to the misbehavior reports.

Second, Defendants overstate the holding of *Brewer.*

The court did not hold that the prisoner had forfeited his opportunity to present evidence calling into question the truth of the misbehavior report simply by refusing to attend the disciplinary hearing. Rather, the court held that the prisoner had waived his right for three reasons, with the refusal to attend being only one of them. *Brewer, 533 F.Supp.2d at 330.*

**\*24** Third, because the prisoner in *Brewer* asserted a retaliation claim rather than a procedural due process claim, the precedent relied upon by the *Brewer* court is puzzling. The portion of the decision cited at length by Defendants relies on (1) *Freeman,* which is a procedural due process case; (2) language from *Jones* that discusses the ways in which *Jones* was *factually* distinguishable from *Freeman,* rather than the language in *Jones* clarifying that a retaliation claim is *doctrinally* different from the type of procedural due process claim at issue in *Freeman;* and (3) quotes from *Franco* that summarize the procedural due process holding in *Freeman,* rather than quotes from *Franco* discussing the proper analysis of a retaliation claim. Thus, although the prisoner in *Brewer* raised a retaliation claim, the court analyzed it as a procedural due process claim.

Because I find that *Brewer* is factually distinguishable from Plaintiff's case, that the holding in *Brewer* is not as broad as Defendants suggest, and that *Brewer's* legal analysis rests on a line of cases to which the Second Circuit has referred as the improper framework for analyzing a retaliation claim, I recommend that the Court reject Defendants' argument that Plaintiff waived his claim regarding the allegedly false and retaliatory misbehavior reports by failing to appear at his disciplinary hearing.[FN50]

> FN50. I note that *Howard v. Wilkerson, 768 F.Supp. 1002 (S.D.N.Y.1991)* holds that "[a]n inmate's refusal to attend a disciplinary hearing waives his *due process objections* ... only when it occurs through no fault of prison officials." *Howard, 768 F.Supp. at 1006* (citation and quotation marks omitted) (emphasis added). *Howard* is cited in *Nance v. Villafranca,* No. 91-CV-717, 1994 U.S. Dist. LEXIS 11114

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 27

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

(N.D.N.Y. June 20, 1994), which Defendants cite for a different proposition. (Dkt. No. 92-10 at 39.)

b. *Regardless of retaliatory motive*

Defendants argue that there is "ample evidence" that Defendants "would have issued the misbehavior report[s] regardless of whether [P]laintiff threatened to sue them." (Dkt. No. 92-10 at 28, 30.)
"An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right ... states a claim under § 1983. A plaintiff alleging retaliatory punishment bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (citations and quotation marks omitted).

Here, the misbehavior reports by Defendants Nephew, Desotelle, and Snyder charged Plaintiff with creating a disturbance, committing an unhygenic act, refusing a direct order, and making threats. (Dkt. No. 92-5, Ex. 11.) As the Second Circuit explained in *Hynes v. Squillace,* 143 F.3d 653 (2d Cir.1998), the "most serious charge" in a misbehavior report that includes charges of creating a disturbance, making threats, and refusing a direct order is the direct order charge. *Hynes,* 143 F.3d at 655, 657. Here, Plaintiff admits that he did not put on his coat when Defendant Nephew ordered him to do so. (Dkt. No. 1 ¶ 15.) Thus, Defendants have met their burden of showing that Plaintiff would have received the same punishment even absent the allegedly retaliatory motive by demonstrating that there is no dispute that Plaintiff committed the most serious of the prohibited conduct charged in the misbehavior report. Therefore, I

recommend that the Court grant Defendants' motion for summary judgment and dismiss the retaliation claims against Defendants Nephew, Desotelle, and Snyder arising from the January 2, 2003, misbehavior reports.

**\*25** The misbehavior report by Defendant Wright charged Plaintiff with committing an unhygenic act, harassment, and threats.[FN51] (Dkt. No. 92-5, Ex. 11.) The most serious of these charges was the threat charge.

> FN51. Although Defendants assert that Wright charged Plaintiff with disobeying a direct order, the evidence before the court does not support that assertion. (Dkt. No. 92-5, Exs.11-12.)

Plaintiff admits that when Defendant Wright asked him to explain what happened in the frisk room, Plaintiff "responded that Wright would not believe his account of the incident, that Wright had unjustifiably interfered with [his] court trip ... and that [Plaintiff] would sue Wright and Snyder for their unlawful acts and actions." (Dkt. No. 1 ¶ 16.) This is certainly an admission to the harassment charge. DOCS Rule 107.11 provides as follows: "An inmate shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B)(8)(ii). However, it is not an admission to the threat charge, which requires that "[i]nmate[s] shall not ... make any threat, spoken, in writing, or by gesture." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B) (3)(I). Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the retaliation claim against Defendant Wright.

5. *Failure to Intervene*

Plaintiff alleges that Defendant Bezio violated his constitutional rights by failing to intervene to protect Plaintiff from Defendants Duprat, Bogett, and Snyder. (Dkt. No. 1 ¶¶ 19-20.) Defendants move for summary judgment, arguing that there was no underlying constitutional violation with which to intervene. (Dkt. No. 92-10 at 36-37.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean-Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citation omitted); *see also Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997) ("Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability."). Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a jury could determine that Defendant Bezio failed to intervene to protect Plaintiff. Plaintiff's verified complaint states that on the day before the incident he asked Defendant Bezio to protect him while he was being transported to court. (Dkt. No. 1 ¶ 19.) Plaintiff alleges that Defendant Duprat made a threatening comment as he escorted Plaintiff to the transportation van and that Plaintiff informed Defendant Bezio of the threat before they reached the van. (Dkt. No. 1 ¶ 20.) Defendant Bezio merely shrugged his shoulders. *Id.* None of the defendants has filed an affidavit contradicting Plaintiff's version of events. As discussed above, there is a triable issue of fact that a constitutional violation occurred with which Defendant Bezio could have intervened. Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the failure to intervene claim against Defendant Bezio.[FN52]

> FN52. Read broadly, the complaint asserts a retaliation claim against Defendant Bezio based

on these same events and a failure to intervene claim against Defendant Duprat because he was present when Defendant Snyder initially beat Plaintiff. (Dkt. No. 1 ¶ 21.) Defendants have not moved for summary judgment of these claims. I find that these claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

### 6. *Grievances*

**\*26** Plaintiff alleges that Defendants Brousseau, Donelli, Girdich, and Eagen violated his constitutional rights by refusing to allow him to file a grievance regarding the events of January 2 and 3, 2003. (Dkt. No. 1 ¶¶ 30-34.) Defendants move for summary judgment, arguing that Plaintiff has not stated a constitutional claim. (Dkt. No. 92-10 at 38.) As discussed above in Section III(B)(3), Defendants are correct. Therefore, I recommend that the Court grant Defendants' motion and dismiss the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding the handling of Plaintiff's grievances.

### D. Disciplinary Hearing/Sentence

Plaintiff raises several claims regarding the conduct of his disciplinary hearing, his disciplinary sentence, and his appeal of the sentence. Specifically, he claims that (1) Defendant LaClair violated his right to due process by falsifying a misbehavior report against Plaintiff to avoid serving as Plaintiff's pre-hearing assistant (Dkt. No. 1 ¶ 35); (2) Defendant Bullis violated his due process rights by failing to call an inmate and Defendant LaClair as witnesses (Dkt. No. 1 ¶¶ 36-37); (3) Defendant Bullis violated his Eighth Amendment rights by sentencing him to a 21-day loaf diet (Dkt. No. 1 ¶ 36-37) and Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the loaf diet (Dkt. No. 1 ¶ 38); and (4) Defendant Selsky violated Plaintiff's right to due process by affirming Defendant Bullis' disposition (Dkt. No. 1 ¶ 40).

### 1. *LaClair*

Plaintiff alleges that Defendant LaClair falsified a misbehavior report against him in order to avoid serving

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

as Plaintiff's pre-hearing assistant "and for the purpose of depriving Benitez of due process." [FN53] (Dkt. No. 1 ¶ 35.)

FN53. The only version of the events between Defendant LaClair and Plaintiff in evidence before the Court is Defendant LaClair's misbehavior report. According to that report, when Defendant LaClair went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get [him] what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant LaClair "informed him the interview was over and left the area." (Dkt. No. 92-5, Ex. 15 at 2-3.) Although Plaintiff states in his verified complaint that Defendant LaClair "intentionally and maliciously falsified" the report, he does not offer any other version of what happened. (Dkt. No. 1 ¶ 35.) He alleges that he asked Defendant Bullis to "interview inmate Rolan and LaClair regarding the acts and actions of LaClair that caused him not to provide Benitez pre-hearing assistance," but he does not provide any information about what those interviews might have revealed. (Dkt. No. 1 ¶ 36.) Due to Defendants' failure to provide Plaintiff with pages of the SHU log book for January 14, 2003, Plaintiff asks the Court to draw an adverse inference that "were Defendants to provide the Court with the missing pages of the ... log book ... such pages would not support any of the allegations of misconduct set out in the misbehavior report that LaClair filed against Benitez on that date." (Dkt. No. 109 at 41 n. 14.) Plaintiff does not explain, however, why such an inference is logical.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

Punishment implicates a protected liberty interest where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular punishment; and (2) the punishment imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Here, no liberty interest is implicated. As a result of being found guilty of the disciplinary charges, Plaintiff was sentenced to a loaf diet. The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss. *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004). Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant LaClair. [FN54]

FN54. Although Defendants argue, in regard to Plaintiff's other claims regarding his disciplinary hearing, that due process was not required because no liberty interest was implicated by the imposition of the loaf diet, they did not assert that argument regarding the claim against Defendant LaClair. Rather, Defendants argue that Plaintiff waived Defendant LaClair's assistance by threatening him. (Dkt. No. 92-10 at 38-39.) Due process requires that prison officials provide pre-hearing assistance to a prisoner facing disciplinary charges who is confined to the SHU. *Eng v. Coughlin,* 858 F.2d 889 (2d Cir.1988). "An assistant's role is to act as merely a surrogate for the inmate, not a legal advisor or advocate. [A]n assistant's role is to perform tasks like interviewing witnesses that the inmate would perform himself if her were in the general population." *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (citations and punctuation omitted). The assistance "must be provided in good faith and in the best interests of the inmate." *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citation omitted). An "assigned

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

assistant who does nothing to assist a ... prisoner ... has failed to accord the prisoner his limited constitutional due process right of assistance." *Eng,* 858 F.2d at 898. Defendants cite several cases holding that an inmate may waive his right to assistance by remaining silent when assistance is offered or by refusing to sign a form requesting assistance. (Dkt. No. 92-10 at 39, citing *inter alia, Jackson,* 30 F.Supp.2d at 619.) However, Defendants have not cited any cases holding that an inmate waives his right to assistance by threatening his assistant. In light of my finding that Plaintiff was not deprived of a liberty interest, it is not necessary to reach this issue.

2. *Failure to Call Witnesses*

**\*27** Plaintiff alleges that Defendant Bullis violated his right to due process by failing to call the witnesses that Plaintiff requested. (Dkt. No. 1 ¶ 37.) Defendants move for summary judgment, arguing that Plaintiff cannot state a due process claim because he was not deprived of a liberty interest. (Dkt. No. 92-10 at 39-40.) As discussed above, Defendants are correct. *McEachin,* 357 F.2d at 200. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss this claim.

3. *Imposition of Loaf Diet*

Plaintiff alleges that Defendant Bullis violated his Eighth Amendment rights by imposing the loaf diet on him and that Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the punishment. (Dkt. No. 1 ¶¶ 37-38.) Defendants move for summary judgment of the claim, arguing that (a) Plaintiff failed to exhaust his administrative remedies; and (b) Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 14-20.)

a. *Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff did not exhaust his administrative remedies regarding his Eighth Amendment claims against Defendant Bullis because he did not appeal

the grievance he filed regarding Defendant Bullis' imposition of the loaf diet to the CORC. (Dkt. No. 92-10 at 14.) Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his Eighth Amendment claim against Defendants Weissman and Girdich because he did not file a grievance at all. (*Id.* at 15.)

DOCS has a separate and distinct administrative process for inmates to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process. N.Y. Comp.Codes R. & Regs. tit.7, § 701.3(e)(1)-(2). For Tier III superintendent hearings, such as Plaintiff's, the inmate must file an appeal with Donald Selsky, DOCS Director of Special Housing/Inmate Disciplinary Program, pursuant to New York Compilation of Codes, Rules and Regulations, title 7, section 254.8. The appeal must be filed within 30 days of the inmate's receipt of the hearing officer's written disposition. N.Y. Comp.Codes R. & Regs. tit.7, § 254.8. Plaintiff raised the issue of the loaf diet in his appeal of the disciplinary sentence. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, Ex. D.) Defendant Selsky denied the appeal. *Id.* at Ex. E. Therefore, Plaintiff exhausted his administrative remedies as to his claim against Defendant Bullis.

Plaintiff declares that on January 18, 2003, he submitted a grievance to Defendant Brousseau complaining about Defendant Bullis' imposition of, and Defendants Weissman and Girdich's approval of, the loaf diet. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, ¶ 26.) He declares that Defendant Brousseau "deliberately refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27. Therefore, as discussed above, there is a question of fact that Defendants are estopped from asserting the exhaustion defense.

b. *Deliberate Indifference*

**\*28** Defendants argue that Plaintiff has not raised a triable issue of fact that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they ordered and approved that the loaf diet be imposed on Plaintiff. (Dkt. No. 92-10 at 15-20.) Defendants are correct.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Where a prisoner claims that punishment imposed following a disciplinary hearing violates his Eighth Amendment rights, the proper analysis of the subjective prong of the claim requires the court to "consider whether the [o]rder was reasonably calculated to restore prison discipline and security and, in that ... context, whether the officials were deliberately indifferent to [the prisoner's] health and safety." *Trammell v. Keane,* 338 F.3d 155, 163 (2d Cir.2003).

Here, the order imposing the loaf diet on Plaintiff was reasonably calculated to restore prison discipline and security. DOCS regulation allow the imposition of the loaf diet as punishment where, *inter alia,* the inmate is found guilty of committing unhygenic acts in the SHU or the inmate is a long-term SHU inmate who is disruptive and who has lost all other available privileges. (Dkt. No. 92-8, Bezio Aff., ¶ 5.) Here, Plaintiff was found guilty of committing unhygenic acts in the SHU. Moreover, Plaintiff is a long-term SHU inmate (he will remain in the SHU until June 3, 2021, and in keeplock until July 1, 2025) who has lost package, commissary, and phone privileges and has lost 11 years of good time credits. (Bezio Aff., ¶ 6.) Therefore, the imposition of the loaf diet was reasonably calculated to restore prison discipline.

There is no evidence that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they imposed and approved the loaf diet. To establish deliberate indifference, an inmate must prove that (1) the defendant was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the defendant actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-703. Here, although Plaintiff told Defendant Bullis that the loaf diet would cause him severe abdominal pains and constipation due to his hepatitis (Dkt. No. 1 ¶ 36), his medical record did not support his assertion. Dr. Weissman declares that "there is nothing in his medical record that indicates that [Plaintiff] is medically unable to receive the restricted diet penalty ... [T]he fact that [P]laintiff is Hepatitis C positive does not mean he cannot receive the restricted diet because Hepatitis C is not a

contraindication for the restricted diet." (Weissman Aff. ¶¶ 14-15.) Thus, there is no evidence in the record indicating that Defendants Bullis, Weissman, and Girdich were aware of facts from which the inference could be drawn that the loaf diet would harm Plaintiff or that they drew that inference. Moreover, Plaintiff admits that he refused to eat the loaf diet. (Dkt. No. 1 ¶ 39.) Accordingly, any weight loss and pain that he experienced could not have resulted from the loaf diet itself. Accordingly, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's Eighth Amendment claims against Defendants Bullis, Weissman, and Girdich.

4. *Selsky*

**\*29** Plaintiff alleges that Defendant Selsky affirmed Defendant Bullis' "disciplinary determination, even though he knew or should have known that Bullis violated [Plaintiff]'s clearly established due process rights." (Dkt. No. 1 ¶ 40.) Defendants' motion for summary judgment does not directly address this claim. However, I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B) because, as discussed above, Defendant Bullis did not violate Plaintiff's due process rights. Therefore, I recommend that the Court dismiss the claim against Defendant Selsky.

**E. Five Points Health Care**

Plaintiff alleges that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by failing to provide adequate medical care at Five Points Correctional Facility following the alleged beating by Defendants Snyder, Duprat, and Bogett. (Dkt. No. 1 ¶¶ 23-26.) Defendants move for summary judgment, arguing that (1) Plaintiff failed to serve Defendant Kuhlman; and (2) Plaintiff cannot raise a triable issue of fact that these Defendants violated his Eighth Amendment rights because Plaintiff did not suffer from a serious medical need and Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 6, 20.)

1. *Failure to Serve Defendant Kuhlman*

Defendants argue that the claim against Defendant Kuhlman must be dismissed because she was not served

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

within 120 days of the filing of the amended complaint on October 6, 2004. (Dkt. No. 92-10 at 6.) Under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within 120 days [FN55] after the filing of the complaint. Fed.R.Civ.P. 4(m). The court "must" extend the time for service for an appropriate period if the plaintiff shows good cause for the failure to serve. *Id.*

> FN55. This 120-day service period is shortened, or "expedited," by the Court's Local Rules of Practice (and the Court's General Order 25), which provide that all defendants must be served with the summons and complaint within sixty (60) days of the filing of the complaint. N.D.N.Y. L.R. 4.1(b) (emphasis added).

Here, on June 24, 2005, the summons was returned unexecuted as to Defendant "Coleman." (Dkt. No. 21.) On May 22, 2007, the Clerk's office sent Plaintiff a letter informing him that the Marshals Service had not been able to serve the defendant because there was no one by that name at Five Points Correctional Facility. The Clerk's office provided Plaintiff with another USM-285 form and asked for more information about the defendant. (Dkt. No. 54.) Plaintiff states that he was not able to ascertain Defendant Kuhlman's correct identity until after I issued orders on May 2, 2007, and October 3, 2007, compelling defendants to respond to discovery. (Dkt. No. 109 at 7-8.) The docket shows that on January 31, 2008, Plaintiff attempted to file an amended complaint "correctly identif[ying] defendant Kuhlman by substituting the name 'Coleman' ... for 'Kuhlman.' " (Dkt. No. 74.) On February 4, 2008, I ordered Plaintiff's motion stricken from the record because the deadline for filing motions to amend had expired on January 30, 2006. (Dkt. No. 75.) I find, therefore, that Plaintiff has demonstrated good cause for his failure to serve Nurse Kuhlman.

2. *Merits*

**\*30** Plaintiff claims that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by refusing to treat him for head pain, pain in his liver, pain in his left wrist, and severe body itch. Plaintiff also alleges that he informed Defendant Hensel that "he had ... lost blood from within his right ear." (Dkt. No. 1 ¶¶ 23-26.) Defendants argue that Plaintiff has not raised a triable issue of fact as to either the objective or subjective prong of his Eighth Amendment medical care claim. (Dkt. No. 92-10 at 20.)

As discussed above, the objective prong of an Eighth Amendment medical claim requires the court to determine whether the prisoner was deprived of adequate medical care and, if so, whether the inadequacy was sufficiently serious. *Salahuddin,* 467 F.3d at 279-80. Where the prisoner alleges that he was completely deprived of treatment, the court must examine whether the inmate's medical condition is sufficiently serious. *Id.* at 280. Here, because Plaintiff alleges that he was totally deprived of medical care, I must consider whether the bleeding in his inner right ear, head pain, pain in his liver, pain in his left wrist, and severe body itch are "serious medical conditions," in other words, whether they are conditions "of urgency that may produce death, degeneration, or extreme pain." *Id.; Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting).

Defendants argue, without analysis, that none of Plaintiff's "conditions constitute a condition of urgency, one that may produce death, degeneration, or extreme pain." (Dkt. No. 92-10 at 20.) As discussed above in regard to Plaintiff's claims against Defendant Weissman and Richardson, I agree that Plaintiff's severe body itch is not a serious medical condition. However, Plaintiff's bleeding inner ear, head pain, and liver pain, as alleged, appear urgent and capable of producing extreme pain. *See Bjorkstrand v. DuBose,* No. CIV. S-08-1531, 2008 WL 5386637, at * 3 (E.D.Cal. Dec.24, 2008) (finding that dried blood in ear was not a serious medical condition because "there was no emergency problem with the left ear, such as active bleeding."). I therefore find that Defendants have not met their burden of showing that they are entitled to judgment as a matter of law on the issue of whether Plaintiff suffered from a serious medical condition.

Defendants argue that Plaintiff cannot raise a triable issue of material fact as to deliberate indifference because

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

the issue of "[w]hether or not [P]laintiff needed treatment or to be seen by a physician amounts to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92-10 at 20.) As Plaintiff notes (Dkt. No. 109 at 37), none of the named Five Points Defendants has filed an affidavit supporting Defendants' motion for summary judgment. They have therefore not established that their treatment of Plaintiff was based on their medical judgment. The evidence, when viewed in the light most favorable to Plaintiff, indicates that he arrived at Five Points on January 3 complaining of severe pain inflicted through excessive force and that he received absolutely no treatment for his injuries until Nurse Gardner examined him on January 7. Therefore, I find that Plaintiff has raised a triable issue of fact that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment right to adequate medical treatment.

**\*31 ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 92) be **_GRANTED IN PART AND DENIED IN PART;_** and it is further

**RECOMMENDED** that the following claims be dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet; and it is further

**RECOMMENDED** that the following claims be

dismissed _sua sponte_ pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky; and it is further

**RECOMMENDED** that the following claims survive summary judgment and _sua sponte_ review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello; and it is further

**ORDERED** that the Clerk provide Plaintiff with Form USM 285 for service on Defendant Kuhlman; and it is further

**ORDERED** that the Clerk serve copies of _Miller v. Bailey,_ No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, 2008 WL 1787692 (E.D.N.Y. Apr. 17, 2008); _Odom v. Poirier,_ No. 99 Civ. 4933, 2004 U.S. Dist. LEXIS 25059, 2004 WL 2884409 (S.D.N.Y. Dec.10, 2004); _Warren v. Purcell,_ No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004); _Bond v. Board of Educ. of City of New York,_ 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, 1999 WL 151702 (W.D.N.Y. Mar.17, 1999); _Medina v. Hunt,_ No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008); _Hill v. City of New York,_ No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005); and _Mendez v. Artuz,_ No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, 2002 WL 313796 (S.D.N.Y. Feb.27, 2002) on Plaintiff in accordance with the Second Circuit's decision in _LeBron v. Sanders,_ 557 F.3d 76 (2d Cir.2009).

**\*32** Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2009.

Benitez v. Ham
Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

C Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
No. 97-CV-1385 LEK DRH.

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

> FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

### II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

#### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

#### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
Eugene JONES, Plaintiff,
v.
Sergeant FURMAN, C.O. Carpender, C.O. Bly, C.O.
Losito, C.O. John Doe # 1, C.O. John Doe # 2, C.O.
John Doe # 3, C.O. John Doe # 4, Nurse John Doe,
Nurse J. Brink, R. Murphy, C.O., Lanasa, C.O., D.
Hersh, Nurse, and T. Lanasa, Correctional Officer,
Defendants.
No. 02-CV-939F.

March 21, 2007.
Eugene Jones, Fallsburg, NY, pro se.

Andrew M. Cuomo, Attorney General, State of New York,
Stephen F. Gawlik, Assistant Attorney General, of
Counsel, Buffalo, NY, for Defendants.

**DECISION and ORDER**

LESLIE G. FOSCHIO, United States Magistrate Judge.

*JURISDICTION*

**\*1** On May 7, 2003, the parties to this action
consented pursuant to 28 U.S.C. § 636(c) to proceed
before the undersigned. The matter is presently before the
court on Defendants' motion for summary judgment (Doc.
No. 58), filed February 18, 2005.

*BACKGROUND*

Plaintiff Eugene Jones ("Plaintiff"), proceeding *pro
se,* commenced this civil rights action on December 27,
2002, alleging that while incarcerated at Southport
Correctional Facility ("Southport"), Defendants Sergeant
Furman ("Sgt.Furman"), C.O. Carpender[FN1] ("Carpender"),
C.O. Bly ("Bly"), C.O. Losito ("Losito"), C.O. John Does
1 through 4 and Nurse Jane Doe (together, "the Doe
Defendants"), and Nurse J. Brink ("Brink"), subjected
Plaintiff to excessive force, cruel and unusual punishment

and acted with deliberate indifference to Plaintiff's
medical needs, in violation of the Eighth Amendment. On
March 27, 2003, an answer was filed by Defendants Sgt.
Furman, Carpenter, Bly, Losito and Brink. On October 21,
2003, Plaintiff filed an Amended Complaint (Doc. No. 21)
("Amended Complaint"), asserting essentially the same
claims against the original named Defendants, and naming
new Defendants, including C.O. Lanasa ("Lanasa"), C.O.
R. Murphy ("Murphy"), and Nurse D. Hersh ("Hersh") in
place of the Doe Defendants. Answers to the Amended
Complaint were filed on November 13, 2003, by
Defendants Sgt. Furman, Bly, Brink, Carpenter, and
Losito (Doc. No. 22), and on October 14, 2004, by
Defendants Hersh, LaNasa and Murphy (Doc. No. 49).

> FN1. Plaintiff incorrectly spells Carpenter's name
> as "Carpender".

On February 18, 2005, Defendant filed the instant
motion seeking summary judgment ("Defendants'
motion"). Defendants also filed, on February 18, 2005,
papers in support of the motion a Memorandum of Law
(Doc. No. 59) ("Defendants' Memorandum"), a Statement
of Facts Not in Dispute (Doc. No. 60) (Defendants'
Statement of Facts"), and the Declarations of Defendants
Brink (Doc. No. 61) ("Brink Declaration"), Furman (Doc.
No. 62) ("Furman Declaration"), Lanasa (Doc. No. 63)
("Lanasa Declaration"), Murphy (Doc. No. 64) ("Murphy
Declaration"), Hersh, a/k/a Weed (Doc. No. 65) ("Weed
Declaration"), Carpenter (Doc. No. 66) ("Carpenter
Declaration"), Bly (Doc. No. 67) ("Bly Declaration"), and
Losito (Doc. No. 68) ("Losito Declaration").

In opposition to summary judgment, Plaintiff filed on
June 8, 2005, a Memorandum of Law (Doc. No. 72)
("Plaintiff's Memorandum"), a Statement of Disputed
Factual Issues and Questions (Doc. No. 73) ("Plaintiff's
Statement of Facts"), and the Declaration of Plaintiff
(Doc. No. 74) ("Plaintiff's Declaration"), attached to
which are exhibits A though X ("Plaintiff's Exh(s). ----").
In further support of summary judgment, Defendants filed
on June 16, 2005 the Reply Declaration of Assistant
Attorney General Stephen F. Gawlik ("Gawlik") (Doc.
No. 75) ("Gawlik Declaration"). Oral argument was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

deemed unnecessary.

Based on the following, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

FACTS [FN2]

FN2. Taken from the pleadings and motion papers filed in this action.

*2 Plaintiff's claims are based on separate incidents occurring on April 26, 2002 and June 4, 2002. Because Plaintiff's and Defendants' versions of the events concerning each incident vary greatly, and are critical to resolution of Defendants' motion, the court describes both.

**The April 26, 2002 Incident**

Plaintiff alleges that while incarcerated at the Southport Correctional Facility ("Southport"), on April 26, 2002, Defendants Sgt. Furman, and Corrections Officers Bly, Carpenter, and Lanasa, subjected Plaintiff to excessive force by engaging in an unprovoked physical attack on Plaintiff, and that following the attack, Defendants Thurman, Bly, Carpender, Lanasa and Nurse Brink ("Brink") acted with deliberate indifference to Plaintiff's medical needs by failing to treat Plaintiff for injuries allegedly sustained as a result of the attack. First Claim for Relief, Amended Complaint at 4. According to Plaintiff, on the morning of April 26, 2002, Plaintiff was released from his prison cell to attend recreation, and Sgt. Furman proceeded to pat-frisk Plaintiff, and remarked that Plaintiff "like[d] to write, huh? Well, we are going to give you something to write about." Id. Plaintiff maintains that after the pat-frisk concluded, Plaintiff "was directed back on to the company," and when Plaintiff reached the "shower area" he was struck on the right side of his head by Sgt. Furman, causing Plaintiff to fall to the floor, where Defendants Furman, Bly, Carpenter and Lanasa kicked, punched and jabbed at Plaintiff with batons. Id. According to Plaintiff, he was handcuffed and restrained with a wrist chain during the incident. Id.

According to Plaintiff, after the incident, Defendants Bly and Carpenter dragged Plaintiff to his cell and placed him inside. Amended Complaint at 4. Plaintiff requested that his injuries, including a sore and painful right ear,

lumps behind his right ear and on the back of his head, small cuts on his nose and hand, and bruising on his ribs, back, and legs, be treated, but Sgt. Furman responded "Yeah, right!," and no treatment was provided at that time. Id.

Later, while Defendant Losito was on rounds, Plaintiff described his injuries to Losito and requested to see the nurse. Amended Complaint at 4. Losito responded that "the nurse will be around with medication and as long as you ['re] still breathing [it's] not a[n] emergency." Id. Plaintiff never saw the nurse on April 26, 2002. Id. Rather, on April 27 or 28, 2002, Plaintiff informed Defendant Nurse Brink of his injuries and blood in his urine while Brink was distributing medications to the inmates. Id. at 5. Plaintiff maintains Brink did not believe Plaintiff and, instead, responded by calling Plaintiff a "trouble maker and liar." Id.

Defendants deny any force was used against Plaintiff on April 26, 2002. Rather, Defendants maintain that Plaintiff, during his daily exercise run on April 26, 2002, refused to comply with exercise procedures by repeatedly turning his head while undergoing a pat-frisk. As a result, Sgt. Furman ordered Plaintiff to stop turning his head and warned that Plaintiff's continued refusal to comply with proper exercise procedures would constitute an exercise refusal necessitating Plaintiff's return to his cell. Because Plaintiff continued to turn his head, he was placed in restraints and escorted back to his cell where the restraints were removed without incident.

*3 According to Defendants, Plaintiff was seen by Nurse Brink on April 28, 2002 during Brink's regular rounds. Brink maintains that at that time, Plaintiff complained that since the previous evening, he had been passing blood in his urine, but made no other complaints and exhibited no other signs or symptoms, and there was no indication that Plaintiff suffered from any serious ailment requiring immediate attention. Brink Declaration ¶ 4. Brink advised Plaintiff to increase his fluids intake and report any change in signs or symptoms, and also requested a urinalysis be ordered. Id. The urinalysis order was approved by Southport Medical Director Dr. Alves. and, on April 30, 2002, Plaintiff's urine sample was collected for urinalysis which showed blood, bacteria and

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

increased white blood cell count indicative of a mild urinary tract infection ("UTI"). *Id.* ¶¶ 4-5. Follow-up urinalysis on samples collected from Plaintiff on May 7 and 13, 2002 established that by May 13, 2002, Plaintiff's urine was normal. *Id.* ¶ 6.

On April 30, 2002, Plaintiff was seen by Nurse Peters [FN3] in connection with complaints of problems with his right ear. Upon examination, Nurse Peters observed no bruising or swelling and scheduled an ear examination.

FN3. Nurse Peters is not a party to this action.

When Nurse Brink next saw Plaintiff on May 1, 2002, Plaintiff complained that he was unable to hear out of his right ear. Brink found no outward sign of injury and discussed the matter with staff from Southport's mental health unit, advising of Plaintiff's recent allegations of paranoia. Brink noted in Plaintiff's medical chart that Plaintiff would sporadically refuse his morning psychiatric medications and that an ear examination was pending.

On May 2, 2002, Nurse Brink, at the request of Southport's security staff, examined Plaintiff in connection with Plaintiff's complaint that he had recently been the subject of an excessive use of force, which revealed a mark on Plaintiff's nose, a right swollen ear, a bump on the back of Plaintiff's head, a sore right rib, bilateral flank soreness, and a mark between Plaintiff's fourth and fifth left fingers. Upon a complete physical examination of Plaintiff in his underwear, Nurse Brink observed only a 3 cm superficial abrasion on Plaintiff's nose, and a 2 cm superficial abrasion on Plaintiff's knuckle. Otherwise, Plaintiff had no swelling or trauma about his ears, his ear canals were healthy, there were no bumps or bruising on Plaintiff's head, his lungs were clear, Plaintiff ambulated without difficulty and had full range of motion in all extremities, digits were normal, all skin was intact, and Plaintiff required no medication.

**The June 4, 2002 Incident**

As to the incident Plaintiff claims occurred on June 4, 2002, Plaintiff alleges Sgt. Furman advised that Plaintiff was being moved from C-Block, 2-Company, 6-Cell to C-Block, 1-Company, 15-Cell, and while escorting Plaintiff to the new cell, remarked that such cell "was

technically our of order, but that was where [Plaintiff] was being placed." Second Claim for Relief, Amended Complaint at 6. Plaintiff describes his new cell as "not in living condition," as the toilet did not flush, the sink's cold water did not work, although the hot water was on and would not stop running, the cell's floor was covered with water and grime, and the cell mattress was wet with water or urine. *Id.* Plaintiff maintains that upon informing Furman of the cell's conditions, Furman ignored Plaintiff and walked away. *Id.*

**\*4** According to Plaintiff, later that day, Defendant Murphy dropped two of Plaintiff's books into Plaintiff's cell. Amended Complaint at 6. When Plaintiff asked about his other personal property, including legal materials, bed sheets, letters, photographs, and other items, Murphy "just walked away." *Id.* Plaintiff also maintains that Murphy failed to provide Plaintiff with lunch, and when Plaintiff complained to Sgt. Furman about not receiving his luncheon meal, Furman acted as though he could not hear Plaintiff and walked away. *Id.*

Plaintiff asserts that the stress Defendants caused Plaintiff on June 4, 2002, "gave me a mental breakdown," such that after dinner, Plaintiff ate and smeared feces on his body, face and around his cell. Amended Complaint at 6-7. Plaintiff further maintains he slashed his wrist and forearm with a medication tube and that when he showed such wounds to Defendant Losito and requested help, Losito did nothing. *Id.* at 7. Defendants Losito and Nurse Hersh later stopped by Plaintiff's cell and, upon observing the blood and feces smeared on Plaintiff and around the cell, as well as the slash marks on Plaintiff's arms for which Plaintiff again requested help, Losito and Hersh laughed and Hersh stated "You want to kill yourself? Use your socks and hang yourself from the bars," and then walked away. *Id.*

On June 5, 2002, at 7:10 A.M., Nurse Peters stopped by Plaintiff's cell and advised that she was going to get Plaintiff some help. At 9:15 A.M. on June 5, 2002, two unidentified corrections officers and a sergeant removed Plaintiff, who was covered in feces and crying uncontrollably, from the cell and escorted him to the infirmary. Plaintiff was never returned to the cell where the alleged actions on June 4th and 5th took place.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

Defendants maintain that when Sgt. Furman placed Plaintiff in the new cell on June 4, 2002, Plaintiff did not inform Furman of any problems with the cell's conditions. Rather, according to Southport's logbook,[FN4] Plaintiff was placed in the new cell on June 4, 2002, at 2:30 P.M., after Plaintiff made threats against Defendant Murphy. The officer making rounds at 5:15 P.M. that same day observed that Plaintiff had wiped feces on the cell's walls. Southport's logbook indicates that on June 5, 2002, at 9:10 A.M., Mr. Militello, a mental health worker from the New York State Office of Mental Health, visited Plaintiff and, by 10:10 A.M. on June 5, 2002, Plaintiff had been transferred to Southport's infirmary.

FN4. Copies of the relevant portions of Southport's logbook are attached as Exh. A to the Furman Declaration.

According to Plaintiff's medical records, on June 4, 2002, Plaintiff was examined at 7:30 P.M., by Nurse Whedon [FN5] who noted that Plaintiff complained of a rash and dryness on his lower legs. June 4, 2002 Medical Records, Weed Declaration Exh. A. On June 5, 2002, Plaintiff was transferred from Southport to the Elmira Correctional Facility ("Elmira").

FN5. Nurse W hedon is not a party to this action.

According to Outpatient Psychiatric Progress Notes prepared by Militello and submitted by Plaintiff ("Outpatient Psychiatric Progress Notes"), Plaintiff's Exh. W, when Plaintiff was transferred to Elmira on June 5, 2002, Plaintiff exhibited anger, self-harm, threats to self-harm, was withdrawn, had regressed and had behavioral problems including scratching his wrists, and smearing feces on himself. Plaintiff was noted to have an extensive pyschiatric history. Plaintiff was diagnosed with schizophrenia and antisocial personality disorder, and was further noted with self-harm gestures, and tendencies toward exposing himself to females and violence. On June 24, 2003, Mr. H.E. Smith ("Smith"), Executive Director of Central New York Psychiatric Center filed a petition ("the Petition") in New York Supreme Court, Oneida County, seeking an order pursuant to New York Correction Law § 402, committing Plaintiff to a state hospital for the mentally ill. Plaintiff's Exh. X. According

to Smith, the Petition was based on an examination of Plaintiff conducted by prison physicians [FN6] on June 23, 2002. *Id.*

FN6. The record does not specify whether such "physicians" included a psychiatrist.

## DISCUSSION

### 1. Summary Judgment

*5 Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The court is required to construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 58, 59 (2d Cir.1999) (citing *Anderson, supra,* 477 U.S. at 255); *Rattner,* 930 F.2d at 209. The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex,* 477 U.S. at 322; *see Anderson,* 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 323-24 (1986) (quoting Fed.R.Civ.P. 56). Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

support the non-moving party's case." *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 742 (2d Cir.1998). Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). Rule 56 further provides that

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

> Fed.R.Civ.P. 56(e).

*6 Here, Plaintiff alleges Defendants violated his civil rights under 42 U.S.C. § 1983. Pursuant to § 1983, an individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States. 42 U.S.C. § 1983. However, "Section 1983 'is not itself a source of a substantive rights,' but merely provides 'a method for vindication of federal rights elsewhere conferred.' " *Albright v.. Oliver,* 510 U.S. 266, 271 (1994) (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)). Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor,* 490 U.S. 386, 394, (1989); and *Baker,* 443 U.S. at 140).

Based on the incident of April 26, 2002, Plaintiff claims violations of his Eight Amendment rights when Defendants Furman, Bly, Carpenter and Lanasa used excessive force on him, and when Defendants Furman, Bly, Carpenter, Lanasa and Brink acted with deliberate indifference to Plaintiff's medical needs. Amended Complaint at 5. Based on the incident of June 4, 2002, Plaintiff alleges violations of his Eighth Amendment rights against cruel and unusual punishment occurred when

Defendant Sgt. Furman placed Plaintiff in an unsanitary cell and refused to resolve Plaintiff's complaints of not being served a meal and providing clean bedding, and Murphy withheld from Plaintiff food, clean bedding and Plaintiff's personal property. Amended Complaint at 7. Plaintiff further claims Losito and Hersh violated his Eighth Amendment rights by acting with deliberate indifference to Plaintiff's psychiatric and medical needs. *Id.* at 7-8.[FN7]

> FN7. Although Defendants assert as an affirmative defense that Plaintiff failed to exhaust administrative remedies for any of the instant claims, Answer filed by Defendants Sgt. Furman, Bly, Brink, Carpenter, and Losito (Doc. No. 22), ¶ 17; Answer filed by Defendants Hersh, Lanasa and Murphy (Doc. NO. 49) ¶ 18, Defendants have not moved for summary judgment on that ground. Further, it is unclear from the record whether Plaintiff has, in fact, exhausted his administrative remedies. *See* Amended Complaint, Inmate Grievance Program Superintendent Statement (advising Plaintiff his grievance was untimely and granting Plaintiff permission to appeal to the Superintendent's Office, but failing to disclose whether Plaintiff ever pursued such appeal). The court takes no position as to whether Defendants can now move for leave to amend the scheduling order to permit further dispositive motions as to the exhaustion issue after the cut-off date provided in the Scheduling Order (Doc. No. 53) for dispositive motions. Accordingly, for the purposes of the instant motion, no exhaustion of remedies defense is before the court.

## 2. Eighth Amendment

Plaintiff's claims of excessive force, deliberate indifference to medical needs, and unsanitary conditions of confinement pertaining to the separate incidents on April 26, 2002 and June 4, 2002 all arise under the Eighth Amendment. In particular, the Eighth Amendment prohibits "cruel and unusual punishments" during imprisonment. U.S. Const. 8th amend.; *Wilson v. Seiter,* 501 U.S. 294, 296-97 (1991); *Romano v. Howarth,* 998 F.2d 101, 104 (2d cir.1993). Not every governmental

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

action affecting the interests or well-being of a prisoner, however, is subject to Eighth Amendment protections. *Whitley v. Albers,* 475 U.S. 312, 319 (1986). Rather, only the unnecessary and wanton infliction of pain constitutes the cruel and unusual punishment forbidden by the Eighth Amendment. *Id.* Nevertheless, within the ambit of the Eighth Amendment are protections against the use of excessive force, deliberate indifference to an inmate's serious medical need, and inhumane conditions of confinement. *See Trammell v. Keane,* 338 F .3d 155, 162 (2d Cir.2003) (observing different tests for evaluating Eighth Amendment claims for excessive force, conditions of confinement, and denial of medical care).

**A. Excessive Force**

**\*7** Defendants argue in support of summary judgment that despite Plaintiff's claims asserted in the Amended Complaint and by Plaintiff in his affidavit opposing summary judgment, there is a complete lack of any objective evidence supporting Plaintiff's assertion that on April 26, 2002, he was subjected to excessive force, resulting in injuries for which Plaintiff was subsequently denied medical treatment. Defendants' Memorandum at 3-9. In opposition to summary judgment, Plaintiff submits the affidavit of David Albelo ("Albelo") ("Albelo Affidavit"), an inmate who was also confined in Southport's C-Block on April 26, 2002, and who witnessed the incident. Albelo Affidavit, Plaintiff's Exh. A, ¶ 1-4.

In assessing an inmate's claims that prison officials subjected him to cruel and unusual punishment by using excessive force, courts must determine whether the prison officials acted "in a good-faith effort to maintain or restore prison discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillan,* 503 U.S. 1, 7 (1992). An inmate plaintiff claiming that prison officials subjected him to cruel and unusual punishment by use of excessive force must establish both an objective and subjective component of the claim. *Romano,* 998 F.2d at 105.

Objectively, a § 1983 plaintiff must establish that the alleged deprivation is sufficiently serious or harmful to reach constitutional dimensions. *Romano,* 998 F.S2d at 104, *see also Wilson,* 501 U.S. at 296. This objective component is "contextual and responsive to 'contemporary standards of decency.' " *Hudson,* 503 U.S. at 8. Thus,

while a *de minimis* use of force will rarely suffice to state a constitutional claim, a plaintiff is not required to show that the application of force resulted in any serious injury. *Id.* at 9-10; *see also Johnson v. Glick,* 481 U.S. 1028, 1033 (2d Cir.1973) (noting that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."). An inmate's constitutional protections against excessive force by corrections officers "is nowhere nearly so extensive as that afforded by the common law tort action for battery ." *Johnson,* 481 F.2d at 1033; *Anderson v. Sullivan,* 702 F.Supp. 424, 426 (S.D.N.Y.1988).

In the instant case, Plaintiff has filed in opposition to summary judgment the affidavit of David Albelo ("Albelo") ("Albelo Affidavit"), an inmate who was also confined in Southport's C-Block on April 26, 2002, and who claims to have witnessed the incident. Albelo Affidavit, Plaintiff's Exh. A, ¶ 1-4. Albelo avers he observed Sgt. Furman strike Plaintiff in the side of the head, causing Plaintiff to fall to the floor, and then observed Furman, Bly, Carpenter and two other corrections officers punch and kick Plaintiff as he lay on the floor in handcuffs and chains. *Id.* ¶ 5. According to Albelo, he and other inmates screamed for the officers to stop assaulting Plaintiff, *id.* ¶ 6, but that "Plaintiff was then half dragged and half walked to his cell while officer Bly slapped him." *Id.* ¶ 7. Albelo further stated that he was concerned about Plaintiff's well-being and asked the "unit officer" to check on Plaintiff, but the unit officer told Albelo to "mind your business, it does not concern [ ] you." *Id.* ¶ 9.

**\*8** The statements contained in the Albelo Affidavit contradicts the statements made by Defendants in support of summary judgment in which Defendants, while admitting that Plaintiff was placed in handcuffs and chained, deny that any force was used in returning Plaintiff to his cell on the morning of April 26, 2002, following Plaintiff's refusal to comply with Sgt. Furman's order to stop turning his head while being pat-frisked in preparation for the exercise run. Furman Declaration ¶¶ 5-10; Bly Declaration ¶¶ 5-7; Carpenter Declaration ¶¶ 5-8.

Nor is the fact that Plaintiff's medical records are

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

devoid of any evidence that Plaintiff was injured in the April 26, 2002 dispositive of the claim. Rather, an Eighth Amendment excessive force claim does not require any serious injury. *Hudson,* 503 U.S. at 8; *Johnson,* 481 F.2d at 1028. Furthermore, the record on this motion establishes that Plaintiff was not thoroughly examined in connection with his complaints following the April 26, 2002 incident until May 2, 2002, almost a week later, during which time more minor injuries would likely become less apparent. Had Plaintiff undergone a thorough examination on April 26, 2002, the two abrasions observed on May 2, 2002, including the 3 cm superficial abrasion on Plaintiff's nose, and the 2 cm superficial abrasion on Plaintiff's knuckle, would likely have appeared more palpable and thus more serious. As such, there is a material issue of fact as to the first prong of Plaintiff's excessive force claim, and the court next considers the second, subjective prong of the claim.

The subjective component of an Eighth Amendment excessive force claim requires that the defendants act malicious and with the intent to harm the inmate plaintiff. *Hudson,* 503 U.S. at 7; *Romano,* 998 F.2d at 105. To determine whether the defendants acted maliciously, the trier of fact should consider (1) the extent of the plaintiff's injuries; (2) the need for the application of force; (3) the correlation between the need for force and the amount of force used; (4) the threat reasonably perceived by the defendants; and (5) any efforts made by the defendants to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321. Here, the record also establishes a material issue of fact as to whether Plaintiff was subjected to the use of any force in being returned to his cell on April 26, 2002 and, if so, whether the use of such force was reasonable.

Specifically, as discussed above, *supra,* at 5, Defendants admit that Plaintiff was both handcuffed and restrained with a wrist chain before being escorted to his cell on April 26, 2002, but deny any force was used against Plaintiff, in contrast to Plaintiff's allegations, corroborated by Albelo, that Defendants struck Plaintiff in the side of the head, knocking Plaintiff to the ground, and then continued to punch and kick plaintiff while he lay in on the floor, still restrained by handcuffs and the chain. Defendants' assertion that no force was used implies that any threat posed by Plaintiff was small, such that any use of force by Defendants could be disproportionate. It is significant that Defendants do not challenge the accuracy or authenticity of the Albelo Affidavit, which is both signed and notarized as required to be considered admissible evidence. This unresolved factual issue as to the subjective prong of Plaintiff's excessive force claim is not only material, but also sufficient to preclude summary judgment.

**\*9** Summary judgment on Plaintiff's excessive force claim arising from the April 26, 2002 incident is DENIED.

**B. Deliberate Indifference to Serious Medical Need**

Defendants also maintain that the record contains no objective evidence supporting Plaintiff's alleged injuries resulting from Defendants alleged use of excessive force on April 26, 2002, or that Plaintiff was denied necessary medical treatment for any serious injury. *Id.* at 9-12. According to Defendants, the record also fails to contain any evidence that on June 4, 2002, Plaintiff experienced a mental breakdown for which he was denied appropriate psychiatric care. *Id.* at 17-19.

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (bracketed text in original)). A serious medical condition exists where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Chance,* 143 F.3d at 702. The standard for determining whether there has been an Eighth Amendment violation based on deliberate indifference to a prisoner's serious medical needs

incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison officials acted with a sufficiently culpable state of mind.

*Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

Cir.2003) (citing *Estelle,* 429 U.S. at 104, and *Hathaway v. Coughlin,* 99 F.3d 550. 553 (2d Cir.1996)).

Denying or delaying access to medical care or intentionally interfering with prescribed treatment may constitute deliberate indifference. *Estelle,* 429 U.S. at 104; *see Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding dentist's outright refusal for one year to treat a cavity, a degenerative condition tending to cause acute and pain if left untreated, combined with imposition of an unreasonable condition on such treatment, could constitute deliberate indifference on the part of the prison dentist, precluding summary judgment in defendant's favor). Such delay in treatment violates the Eighth Amendment "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards by intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104-05. Further, culpable intent requires the inmate establish both that a prison official "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes v. New York City Department of Corrections,* 84 F.3d 614, 620 (2d Cir.1996) (citing *Farmer v. Brennan,* 511 U.S. 825, 834-35 (1994). Nevertheless, neither "inadvertent failures to provide adequate medical care" nor "negligence in diagnosing or treating a medical condition" comprise Eighth Amendment violations. *Estelle,* 429 U.S. at 105-06 (holding medical malpractice does not become a constitutional violation merely because the victim is a prisoner); *Harrison,* 219 F.3d at 139 ("We agree that the mere malpractice of medicine does not amount to an Eighth Amendment violation."). Nor does a "mere disagreement" with a physician over the appropriate course of treatment arise to a constitutional violation, although in certain instances a physician may evince deliberate indifference by consciously choosing "an easier and less efficacious" treatment plan. *Chance,* 143 F.3d at 703.

**\*10** As to the objective prong, a sufficiently serious conditions is "a condition of urgency, one that may produce death, degeneration or extreme pain." *Hathaway,* 99 F.3d at 66. In the instant case, the record is devoid of any evidence establishing that Plaintiff, in connection with

either incident, had any medical urgency that might produce death, degeneration or extreme pain. Rather, the record demonstrates that any injury inflicted on Plaintiff in connection with the April 26, 2002 incident was relatively minor, given that by the time Plaintiff underwent the thorough physical examination on May 2, 2002, only two small abrasions were discovered. As such, assuming, *arguendo,* that on April 26, 2002, Plaintiff did in fact suffer the alleged injuries, including soreness, pain in and a lump behind his right ear, lump on the back of his head, small abrasions on his nose and knuckle, and bruising to his back, ribs and legs, Amended Complaint at 4, such injuries do not constitute the requisite "serious medical condition" necessary to establish an Eight Amendment deliberate indifference claim. *Compare Hemmings v. Gorczyk,* 134 F.3d 104, 109 (2d Cir.1998) (reversing district court's grant of summary judgment in favor of defendants on inmate plaintiffs Eighth Amendment deliberate indifference to serious medical needs claim where inmate suffered from ruptured Achilles tendon, which remained swollen and painful, requiring plaintiff use crutches to walk, which was originally diagnosed as a bad sprain, yet defendants failed for two months to provide proper treatment despite fact that plaintiff's disabling condition was "easily observable"). That by May 2, 2002, such injuries had healed without any medical treatment further establishes that the injuries were not likely to produce death, degeneration or extreme pain without urgent medical treatment. Additionally, that Plaintiff, on April 28, 2002, reported he was passing blood in his urine, yet failed at that time to make any other complaints, demonstrates that Plaintiff's claimed injuries had already sufficiently healed such that urgent treatment for them was never required. That Plaintiff received timely medical care in response to such complaint, including collecting a urine sample which, upon analysis, showed evidence of a mild UTI, rather than any trauma, further undermines Plaintiff's asserted denial of urgent medical care. The record thus fails to establish any factual issue which, if decided in Plaintiff's favor, could establish the objective prong of Plaintiff's deliberate indifference claim with regard to the April 26, 2002 incident.

The record is similarly deficient as to the June 4, 2002 incident. Specifically, although Plaintiff claims that he had a "mental breakdown" after he was placed in the allegedly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

unsanitary cell, which caused him to eat and smear feces on himself, and to attempt to slash his wrists with a medication tube, Amended Complaint, at 7, the record shows that Plaintiff was first observed to have wiped feces on himself and the walls of his cell at 5:15 P.M. on June 4, 2002, less than three hours after Plaintiff was moved to the cell. Prison Logbook, Furman Declaration Exh. A. At 7:10 P.M. that same day, Plaintiff was seen by Nurse Whedon in connection with Plaintiff's complaints of a rash and dryness on his lower legs. Weed Declaration ¶ 4 and Exh. A, Plaintiff's Ambulatory Health Record for June 4, 2002. In fact, two affidavits submitted by Plaintiff in opposition to summary judgment corroborate the fact that Plaintiff was seen by a nurse in the evening of June 4, 2002. *See* Plaintiff's Exhs. T (Affidavit of Inmate Bussey ("Bussey Affidavit")) and U (Affidavit of Inmate Douglas ("Douglas Affidavit")).[FN8] Significantly, Whedon did not note any injury to Plaintiff's wrists. Moreover, the very next morning, June 5, 2002, at 9:10 A.M., Plaintiff was seen by a mental health worker, Mr. Militello, who had Plaintiff transferred to the infirmary and then transferred to Elmira for reevaluation of Plaintiff's schizophrenia diagnosis because Plaintiff was exhibiting signs of mental illness. Furman Declaration ¶¶ 14-15; Outpatient Psychiatric Progress Notes, Plaintiff's Exh. W. Militello also reported that Plaintiff exhibited anger, was threatening to harm himself, had smeared feces on himself, and described Plaintiff as having "scratched wrists," Outpatient Psychiatric Progress Notes, but did not report any physical or mental condition arising to a serious medical need for which treatment had been denied. Rather, the record establishes that Defendants realized in the evening of June 4, 2002 that Plaintiff was experiencing some mental issues for which help was provided the next morning. The record thus fails to establish any factual issue which, if decided in Plaintiff's favor, could establish the objective prong of Plaintiff's deliberate indifference claim with regard to the June 24, 2002 incident.

FN8. Both Bussey and Douglas state that at 6:30 P.M. on June 24, 2002, Defendant Nurse Hersh, accompanied by C.O. Losito, stopped at Plaintiff's cell and while dispensing nighttime medications. Bussey Affidavit ¶ 10; Douglas Affidavit ¶ 10.

**\*11** Because Plaintiff has failed to establish the objective prong for his deliberate indifference claim as to either the April 26 or June 4, 2002 incident, the court need not address whether Plaintiff can establish the subjective prong as to either incident. Summary judgment as to Plaintiff's claim that Defendants acted with deliberate indifference to his serious medical needs is GRANTED as to Defendants.

**C. Conditions of Confinement**

Defendants argue in support of summary judgment that the alleged unsanitary conditions of the cell to which Plaintiff was transferred on June 4, 2002, even if true, are insufficient to support Plaintiff's claims that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment. Defendants' Memorandum at 13-15. Nor does Defendant Murphy's failure to serve Plaintiff lunch one day constitute any Eighth Amendment claim. *Id* . at 15-17. In opposition to summary judgment, Plaintiff submits the Bussey and Douglas Affidavits in which Southport inmates Bussey and Douglas corroborate Plaintiff's assertions that he, upon being placed in a different cell on June 4, 2002, complained of the living conditions in the cell, or the fact that he was not served lunch, and that although Defendant Murphy dropped two of Plaintiff's books into Plaintiff's cell, Plaintiff's request for the rest of his personal belongings were ignored. Bussey Affidavit ¶¶ 3-6; Douglas Affidavit ¶¶ 3-6.

To establish an Eighth Amendment violation based on prison conditions, a plaintiff must demonstrate "that it is contrary to current standards of decency for anyone to be exposed against his will" to the challenged prison conditions. *Helling v. McKinney,* 509 U.S. 25, 35 (1993).

An Eighth Amendment claim based on prison conditions must satisfy

both an objective element-that the prison official's transgression was "sufficiently serious"-and an objective element-that the officials acted, or omitted to act, with a "sufficiently culpable state of mind," *i.e.,* with "deliberate indifference to inmate health or safety."

*Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (quoting *Farmer,* 511 U.S. at 834).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

As to the objective element, while the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981), prison inmates may not be denied "the minimal civilized measure of life's necessities." *Id.* at 347. The Supreme Court has held that the Eighth Amendment requires that inmates not be deprived of their "basic human needs-*e.g.,* food, clothing, shelter, medical care, and reasonable safety." *Helling,* 509 U.S. at 32 (internal citation and quotation omitted). "Nor may prison officials expose prisoners to conditions that 'pose an unreasonable risk of serious damage to [their] future health.' " *Phelps,* 308 F.3d at 185 (quoting *Helling,* 509 U.S. at 35). The Eighth Amendment's objective prong requires an inmate "prove that the conditions of his confinement violate contemporary standards of decency." *Id.*

**\*12** As to the subjective element, the Supreme Court has held that

a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Farmer,* 511 U.S. at 837.

The "deliberate indifference" element is equivalent to criminal law's reckless indifference standard. *Id.* at 839-40.

In the instant case, Plaintiff's Eighth Amendment claim fails to satisfy the objective element necessary to state a claim based on prison conditions. Although Plaintiff claims the cell to which he was moved on June 4, 2002 was dirty, the mattress was wet, no bedding was provided, the cell sink's cold water did not work, while the hot water continually ran, and Plaintiff missed receiving one meal, the amount of time for which Plaintiff endured such conditions, less than one full day, renders the claim without merit. *See Hutto v. Finney,* 437 U.S. 678, 687

(1978) ("the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of 'grue' *[sic]* might be tolerable for a few days and intolerably cruel for weeks and months."). As such, Defendant's motion for summary judgment is GRANTED as to Plaintiff's claim challenging the conditions of his confinement based on the June 4, 2002 incident.

**3. Deprivation of Property**

Although not asserted as such, Plaintiff's claim that upon being transferred to a different cell on June 4, 2002, Defendants failed to give Plaintiff his personal property is properly construed under the Fourteenth Amendment as asserting a deprivation of property without due process. Nevertheless, no claim under 42 U.S.C. § 1983 lies based on the negligent conduct of a state actor even though such conduct may result in deprivation of a property interest. *Daniels v. Williams,* 474 U.S. 327, 330-31 (1986). Further, even intentional, unauthorized deprivations of property by prison officials are not redressable pursuant to 42 U.S.C. § 1983 if "adequate state post-deprivation remedies are available." *Hudson v. Palmer,* 468 U.S. 517, 533 (1984). In New York, several adequate post-deprivation remedies are available such that even if Defendants either negligently or intentionally failed to provide Plaintiff with his personal property, no claim for relief under § 1983 lies.

Specifically, an administrative procedure for inmate personal property claims is provided by N.Y. Comp.Codes R. & Regs. Tit. 7, Pt. 1700. Plaintiff may also commence an action to recover the value of his lost property in New York Court of Claims. *See Butler v. Castro,* 896 F.2d 698, 700 (2d Cir.1990)(holding that New York court of claims presents adequate post-deprivation remedy which precludes § 1983 action only where alleged deprivation was result of random, unauthorized conduct rather than the result of operation of established state procedure). Plaintiff alleges no state policy caused the alleged interference with his property. As such, Plaintiff may not sue under § 1983 to recover for deprivation of personal property. *Hudson,* 468 U.S. at 533.

**\*13** Summary judgment is thus GRANTED in favor of Defendants on Plaintiff's Fourteenth Amendment Due

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

Process claim based on the June 4, 2002 incident.

**4. Qualified Immunity**

Alternatively, Defendants assert they are entitled to qualified immunity on all claims for damages. Defendants' Memorandum at 19-21. Plaintiff has not responded to this argument. Because the court is granting summary judgment on Plaintiff's claims alleging deliberate indifference to his serious medical needs and challenging the conditions of his confinement, as well as on Plaintiff's Fourteenth Amendment due process claim, the court addresses qualified immunity only as to Plaintiff's excessive force claim.

Qualified immunity shields law enforcement officials who perform discretionary functions from liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable prison official would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 806 (1982); *Washington Square Post No. 1212 v. Maduro,* 907 F.2d 1288, 1291 (2d Cir.1990). Even if the right at issue was clearly established, if it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity. *Saucier v. Katz,* 533 U.S.194, 201-02 (2001); *Anderson v. Creighton,* 483 U .S. 635, 641 (1987); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568-69 (2d Cir.1996); *Van Emrik v. Chemung County Dep't of Soc. Servs.,* 911 F.2d 863, 865-66 (2d Cir.1990); *Robison v. Via,* 821 F.2d 913, 920-21 (2d Cir.1987). "The availability of the defense depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed." *Weyant v. Okst,* 101 F.3d 845, 858 (2d Cir.1996) (internal quotation marks omitted).

A right is clearly established if (1) it was defined with reasonable specificity, (2) its existence has been affirmed by either the Supreme Court or the relevant court of appeals, and (3) a reasonable defendant official would have understood that the existing law that his acts were unlawful. *Brown v. City of Oneonta, N.Y. Police Dep't,* 106 F.3d 1125, 1131 (2d Cir.1997). If, however, it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may be entitled to qualified immunity. *Robison,* 821 F.2d at 920-21.

A defendant is entitled to summary judgment based on qualified immunity if the court finds that the asserted rights were not clearly established, or "if the defendant adduces[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to the plaintiff ... could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not violate a federally protected right." *Robison,* 821 F.2d at 921 (internal quotation omitted). Stated another way, a defendant is entitled to qualified immunity under the objectively reasonable standard if "officers of reasonable competence could disagree" on the legality of the defendant's actions. *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995).

**\*14** Where, however, the objective reasonableness of an officer's actions depends on disputed facts, summary judgment based on qualified immunity is properly denied. *Rivera v. United States,* 928 F.2d 592, 607 (2d Cir.1991); *Brawer v. Carter,* 937 F.Supp. 1071, 1082 (S.D.N.Y.1996). Provided that no factual issues are disputed, the application of qualified immunity to the facts is a question of law for the court to decide. *Finnegan v. Fountain,* 915 F.2d 817, 821 (2d Cir.1990). Accordingly, as to Plaintiff's excessive force claim, the court must evaluate whether Defendants' actions, in light of clearly established law in existence as of April 26, 2002, violated Plaintiff's civil rights.

Prison inmates have a clearly established right to be free from the application of excessive force by prison employees. *Hudson,* 503 U.S. at 7. However, a prisoner does not have a clearly established right to be free from the use of force by corrections officers attempting to subdue the prisoner with regard to a physical altercation and whether Defendants' conduct violated a clearly established right is not dependent on whether identical conduct has been previously held to violate a prisoner's constitutional rights. *See Hope v. Pelzer,* 536 U.S. 730, 740-41 (2002) (for purposes of qualified immunity, notice that a corrections officer's conduct violates established law does not require facts of previous cases be materially or fundamentally similar to situation in question, but that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

state of law at relevant time provides fair warning that conduct is unconstitutional).

Here, the same disputed issues of fact that preclude summary judgment on Plaintiff's excessive force claim also prevent the court from finding Defendants are qualifiedly immune from liability on such claim. Accordingly, determination of Defendants' qualified immunity defense must await a fact trier's resolution of the questions of fact presented. Summary judgment based on qualified immunity is DENIED.

### CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment (Doc. No. 58) is DENIED in part and GRANTED in part. The action will proceed only on Plaintiff's Eighth Amendment excessive force claim asserted against Defendants Sgt. Furman, Bly, Carpenter and Lanasa based on the April 26, 2002 incident. The parties are directed to appear before the court on **April 18, 2007** at 10:30 A .M. to schedule a trial date. Defendants are directed to make arrangements for Plaintiff to participate in the conference by telephone.

SO ORDERED.

W.D.N.Y.,2007.

Jones v. Furman
Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jonathan HENRY, Plaintiff,
v.
James F. DINELLE, Corrections Officer; Russell E.
Duckett, Corrections Officer; Alfred J. Deluca,
Corrections Officer; Donald L. Broekema, Sergeant;
and Jean Norton, Nurse, Defendants.
No. 9:10–CV–0456 (GTS/DEP).

Nov. 29, 2011.
Sivin & Miller, LLP, Edward Sivin, Esq., of Counsel,
New York, NY, for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Timothy P. Mulvey, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### MEMORANDUM–DECISION and ORDER

Hon. GLENN T. SUDDABY, District Judge.

*1 Currently before the Court, in this prisoner civil
rights action filed by Jonathan Henry ("Plaintiff") against
the five above-captioned employees of the New York
State Department of Corrections and Community
Supervision ("Defendants"), is Defendants' motion for
partial summary judgment. (Dkt. No. 24.) For the reasons
set forth below, Defendants' motion is granted in part and
denied in part.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint
alleges that, between approximately January 29, 2009, and
January 31, 2009, at Ulster Correctional Facility in
Napanoch, New York, Defendants violated Plaintiff's
following rights in the following manner: (1) Defendants

Nurse Jean Norton, Corrections Officer James F. Dinelle,
Corrections Officer Russell E. Duckett and Corrections
Officer Alfred J. DeLuca violated Plaintiff's rights under
the First Amendment by filing retaliatory false
misbehavior reports against him, and subsequently
providing false testimony against him at administrative
disciplinary hearings, which resulted in his spending time
in the Special Housing Unit ("SHU"); (2) Defendant
Dinelle violated Plaintiff's rights under the Eighth
Amendment by assaulting him on two occasions, and
Defendants DeLuca and Duckett violated Plaintiff's rights
under the Eighth Amendment by assaulting him once; (3)
Defendant Sergeant Donald L. Broekema violated
Plaintiff's rights under the Eighth Amendment by failing to
intervene to prevent one of these assaults from occurring;
(4) Defendant Norton violated Plaintiff's rights under the
Eighth Amendment by harassing him almost immediately
before he was subjected to the above-described assaults;
and (5) Defendants Norton, Dinelle, Duckett and DeLuca
violated Plaintiff's rights under the Fourteenth Amendment
by performing the aforementioned acts, which constituted
atypical and significant hardships in relation to the
ordinary incidents of prison life. (See generally Dkt. No.
1 [Plf.'s Compl.].) Familiarity with the factual allegations
supporting these claims in Plaintiff's Complaint is assumed
in this Decision and Order, which is intended primarily for
review by the parties. (Id.)

### B. Undisputed Material Facts

At all times relevant to Plaintiff's Complaint, Plaintiff
was an inmate and Defendants were employees of the New
York State Department of Corrections and Community
Supervision at Ulster Correctional Facility. On January 30,
2009, Defendant Dinelle took Plaintiff to the medical
ward, because Plaintiff was experiencing a foul odor and
oozing from a wound on his leg. After Defendant Norton
treated Plaintiff, she filed an inmate misbehavior report
against Plaintiff based on (1) Plaintiff's harassing behavior
toward Defendant Norton and Defendant Dinelle, and (2)
Plaintiff's disobedience of a direct order to be quiet. The
misbehavior report was signed by Defendant Dinelle as an
employee witness.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

At his deposition, Plaintiff testified, while leaving the infirmary, he was punched and kicked by Defendant Dinelle and two unknown prison officials. Plaintiff was then taken to the SHU, where he waited with Defendants Dinelle and Duckett, and up to three more individuals, for a sergeant to arrive. When Defendant Broekema (a sergeant) arrived at the SHU, Plaintiff was taken to a frisk room, where a frisk was conducted. During the frisk, Defendants Dinelle, Duckett and (Plaintiff suspected) DeLuca used force to bring Plaintiff to the ground. Plaintiff testified that, during the use of force, he was simultaneously punched in the nose by two officers while their supervisor watched.

**\*2** After the use of force, Plaintiff stated to Defendants Dinelle, Broekema and Duckette, "I will be contacting my attorney," or "I will be calling a lawyer." [FN1] Plaintiff never used the term "grievance" when addressing Defendants Dinelle, Broekema and Duckette (or Defendant Norton).[FN2] Subsequently, Defendant Duckett filed an inmate misbehavior report against Plaintiff based on his disobedience of frisk procedures and a direct order. Defendant DeLuca signed this report as a witness to the events.

> [FN1.] (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 100, 102–03 [attaching pages 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo .].)

> [FN2.] (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 59–60, 100, 102–03 [attaching pages 175, 176, 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo.].)

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which

(again) is intended primarily for review by the parties. (*Id.*)

**C. Defendants' Motion**

Generally, in support of their motion for partial summary judgment, Defendants argue as follows: (1) Plaintiff's claim that Defendants issued false misbehavior reports should be dismissed because Plaintiff has no constitutional right to be free of false misbehavior reports; (2) Plaintiff's First Amendment retaliation claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (a) engaged in protected activity, or (b) suffered adverse action as a result of engaging in protected activity; (3) Plaintiff's Fourteenth Amendment substantive due process claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants deprived Plaintiff of his liberty rights; (4) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she (a) used force against Plaintiff, or (b) was in a position to prevent the use of force from occurring, yet failed to do so; (5) Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"; (6) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Broekema had a realistic opportunity to intervene to prevent or stop the assault, yet failed to do so; and (7) Defendants are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].).[FN3]

> [FN3.] In their motion, Defendants do not challenge the evidentiary sufficiency of Plaintiff's Eighth Amendment excessive-force claim against Defendants Dinelle or Duckett. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].)

In Plaintiff's response to Defendants' motion for partial summary judgment, he argues as follows: (1) his

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

retaliation claims should not be dismissed because there are triable issues of fact as to whether Defendants retaliated against him for stating that he would be contacting an attorney; (2) his failure-to-intervene claim against Defendant Broekema should not be dismissed because there are triable issues of fact as to whether Defendant Broekema failed to prevent excessive force from being used against him; (3) his excessive-force claim against Defendant DeLuca should not be dismissed because there are triable issues of fact as to whether Defendant DeLuca used excessive force against him; and (4) Defendants are not protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].) <sup>FN4</sup>

> FN4. Plaintiff does not oppose Defendants' arguments that (1) Plaintiff's excessive-force claim against Defendant Norton should be dismissed, and (2) Plaintiff's substantive due process claim should be dismissed. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].)

**\*3** In their reply, Defendants essentially reiterate their previously advanced arguments. (*See generally* Dkt. No. 29, Attach. 1 [Defs .' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't,* 04–CV–0828, 2009 WL 3165551, at \*2–3 (N.D.N.Y. Sept.29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B. Legal Standards Governing Plaintiff's Claims

### 1. First Amendment Retaliation Claim

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that, in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of his First Amendment rights. *See Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

> *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that (1) the speech or conduct at issue was "protected", (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights, and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

**\*4** In determining whether an inmate has established a prima facie case of a causal connection between his protected activity and a prison official's adverse action, a number of factors may be considered, including the following: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996); *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002). Even where the inmate has established such a prima facie case, the prison official may be entitled to judgment as a matter of law on the inmate's retaliation claim where the prison official has satisfied his burden of establishing that the adverse action would have been taken on proper grounds alone. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994); *Jordan v. Garvin,* 01–CV–4393, 2004 WL 302361, at *6 (S.D.N.Y. Feb.17, 2004).

## 2. Eighth Amendment Claims of Excessive–Force and Failure–to–Intervene

To establish a claim of excessive-force under the Eighth Amendment, a plaintiff must satisfy two components: "one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009). In consideration of the subjective element, a plaintiff must allege facts which, if true, would establish that the defendant's actions were wanton " 'in light of the particular circumstances surrounding the challenged conduct.' " *Id.* (quoting *Blyden v. Mancusi,* 186 F.3d 252, 262 [2d Cir.1999] ). The objective component asks whether the punishment was sufficiently harmful to establish a violation "in light of 'contemporary standards of decency.' " *Wright,* 554 F.3d at 268 (quoting *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Generally, officers have a duty to intervene and prevent such cruel and unusual punishment from occurring or continuing. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). "It is well-established that a law enforcement official has an affirmative duty to intervene

on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora,* 08–CV–0431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb.24, 2010) (Peebles, M.J.). A corrections officer who does not participate in, but is present when an assault on an inmate occurs may still be liable for any resulting constitutional deprivation. *Id.* at *8. To establish a claim of failure-to-intervene, the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). Generally, officers cannot be held liable for failure to intervene in incidents that happen in a "matter of seconds." *Parker v. Fogg,* 85–CV–177, 1994 WL 49696 at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.).

## 3. Fourteenth Amendment Substantive Due Process Claims

**\*5** The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125–126 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91–CV–1196, Memorandum–Decision and

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

Order (N.D.N.Y. filed Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

"An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes 'an atypical and significant hardship on the ordinary incidents of prison life.' " *Whitaker v. Super,* 08–CV–0449, 2009 WL 5033939, at *5 (N.D.N.Y. Dec.14, 2009) (Kahn, J. adopting Report–Recommendation by Lowe, M.J.) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 [1995] ). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). When evaluating whether an inmate's confinement in SHU violates his substantive due process rights, the issue, then, is whether his keeplock confinement imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Id.* at 64.

"In the Second Circuit, determining whether a disciplinary confinement constituted an 'atypical and significant hardship' requires examining 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement.' " *Whitaker,* 2009 WL 5033939, at *5 (quoting *Palmer,* 364 F.3d at 64). "Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an 'atypical and significant hardship' only if 'the conditions were more severe than the normal SHU conditions.' " *Id.* (quoting *Palmer,* 364 F.3d at 65).[FN5]

> FN5. Generally, " '[n]ormal' SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week." *Whitaker,* 2009 WL 5033939, at *5 n. 27 (citing *Ortiz v. McBride,* 380 F.3d 649, 655 [2d Cir.2004] ).

**4. Qualified Immunity Defenses**

**\*6** The qualified immunity defense is available to only those government officials performing discretionary functions, as opposed to ministerial functions. *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).[FN6] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007).[FN7] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley*

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

*v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).[FN8] As the Supreme Court has explained,

> **FN6.** *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

> **FN7.** *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' "); *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

> **FN8.** *See also Malsh v. Corr. Oficer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity

should be recognized.

> *Malley,* 475 U.S. at 341.[FN9]

> **FN9.** *See also Hunter v. Bryant,* 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks omitted].

## III. ANALYSIS

### A. Plaintiff's Retaliation Claim Under the First Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (1) engaged in protected activity, or (2) suffered adverse action as a result of engaging in protected activity. More specifically, Defendants argue that the claim should be dismissed because (1) the statement of an inmate's intent to contact an attorney is not protected conduct, (2) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Norton knew of Plaintiff's intention to contact an attorney, and (3) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants' actions were retaliatory. (Dkt. No. 24, Attach.10.) [FN10]

> **FN10.** Defendants also argue that Plaintiff's First Amendment claim should be dismissed to the extent that it is based solely on the fact that misbehavior reports against him were *false* (as opposed to being false *and retaliatory* ). The Court agrees that Plaintiff has no general constitutional right to be free from false misbehavior reports. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997). As a result, to the extent that the Plaintiff's Complaint may be construed as asserting a claim based solely on the issuance of false behavior reports, that claim is dismissed.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

**\*7** After carefully considering the admissible record evidence adduced in this case, and carefully reviewing the relevant case law, the Court has trouble finding that an inmate's one-time making of an oral statement (immediately after the use of force against him) that he would be "contacting [his] attorney," or "calling a lawyer" at some unidentified point in the future constitutes engagement in activity that is protected by the First Amendment—especially where, as here, the inmate did not reference the prison grievance process in his statement.

Representation by a lawyer is certainly not necessary to file an inmate grievance in the New York State Department of Corrections and Community Supervision, nor does such representation necessarily result in the filing of a grievance. Rather, such representation is most typically associated with the filing of a civil rights action in federal court (as is clear from the motions for appointment of counsel typically filed in federal court actions). As a result, the statement in question does not reasonably imply that Plaintiff would be filing a grievance as much as it implies that he was going to consult an attorney as to whether or not to file a civil rights action in federal court.

Here, such a statement is problematic. This is because, generally, the filing of the prisoner civil rights action in federal court in New York State must be preceded by the prisoner's exhaustion of his available administrative remedies (or his acquisition of a valid excuse for failing to exhaust those remedies). Any filing without such prior exhaustion (or acquisition of a valid excuse), under the circumstances, would be so wholly without merit as to be frivolous. Of course, filing a court action that is frivolous is not constitutionally protected activity.[FN11]

FN11. See *Wade–Bey v. Fluery,* 07–CV–117, 2008 WL 2714450 at \*6 (W.D.Mich. July 8, 2010) ("Although it is well established that prisoners have a constitutional right of access to the courts ..., the filing of a frivolous lawsuit would not be protected activity.") [citation omitted].

Moreover, to the extent that Plaintiff's statement could be construed as reasonably implying that he was going to consult an attorney as to whether or not to file a grievance, the Court has trouble finding that such a vague statement is constitutionally protected.[FN12] As one district court has stated, "[h]oping to engage in constitutionally protected activity is not itself constitutionally protected activity."[FN13] The Court notes that a contrary rule would enable a prisoner who has committed conduct giving rise to a misbehavior report to create a genuine issue of material fact (and thus reach a jury) on a retaliation claim (alleging adverse action based on the issuance of that misbehavior report) simply by uttering the words, "I'm calling a lawyer," after he commits the conduct in question but before the misbehavior report is issued.

FN12. The Court notes that numerous cases exist for the point of law that even *expressly threatening* to file a *grievance* does not constitutes protected activity. *See, e.g., Bridges v. Gilbert,* 557 F.3d 541, 554–55 (7th Cir.2009) ("[I]t seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance.") [emphasis in original]; *Brown v. Darnold,* 09–CV–0240, 2011 WL 4336724, at \*4 (S.D.Ill. Sept.14, 2011) ("Plaintiff cannot establish that his threat to file a grievance against Defendant Darnold is a constitutionally protected activity."); *Koster v. Jelinek,* 10–CV–3003, 2011 WL 3349831, at \*3, n. 2 (C.D.Ill. Aug.3, 2011) ("The plaintiff does not seem to be asserting that he had a First Amendment right to threaten the facilitators with lawsuits and grievances, nor does the Court believe that he has such a right."); *Ingram v. SCI Camp Hill,* 08–CV–0023, 2010 WL 4973302, at \*15 (M.D.Pa. Dec.1, 2010) ("Stating an intention to file a grievance is not a constitutionally protected activity."), *aff'd,* No. 11–1025, 2011 WL 4907821 (3d Cir. Oct.17, 2011); *Lamon v. Junious,* 09–CV–0484, 2009 WL 3248173, at \*3 (E.D.Cal. Oct.8, 2009) ("A mere threat to file suit does not rise to the level of a protected activity...."); *Miller v. Blanchard,* 04–CV–0235, 2004 WL 1354368, at \*6 (W.D.Wis. June 14, 2004) ("Plaintiff alleges that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

defendants retaliated against him after he threatened to file a lawsuit against them. Inmates do not have a First Amendment right to make threats.").

FN13. *McKinnie v. Heisz,* 09–CV–0188, 2009 WL 1455489, at *11 (W.D.Wis. May 7, 2009) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.").

In any event, even assuming, for the sake of argument, that Plaintiff's statement was constitutionally protected, the Court finds, based on the current record, that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that his statement to Defendants Dinelle, Duckett, and Broekema that he would be contacting an attorney was a substantial or motivating factor for the issuance of the misbehavior report by Defendant Norton (which was signed by Defendant Dinelle as a witness), and the misbehavior report by Defendant Duckett (which was signed by Defendant DeLuca as a witness). The Court makes this finding for two alternate reasons.

**\*8** First, with regard to the misbehavior report issued by Defendant Norton, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she was aware Plaintiff would be contacting an attorney. In addition, with regard to the report made by Defendant Duckett (which was signed by Defendant DeLuca as a witness), although there is record evidence that Defendant Duckett had knowledge of Plaintiff's statement that he would contact an attorney, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett had reason to believe, at the time the misbehavior report was issued, Plaintiff would actually follow through with his one-time oral statement, made on the heals of a heated incident.

Second, even assuming that Defendant Duckett or Defendant Norton had reason to believe Plaintiff would contact an attorney, Plaintiff has failed to adduce

admissible record evidence from which a rational factfinder could conclude that Defendant Duckett or Defendant Norton would not have issued the misbehavior report anyway, based on Plaintiff's actions. Indeed, at Plaintiff's disciplinary hearings, evidence was adduced that he in fact committed most of the misconduct alleged in the misbehavior reports, which resulted in the hearing officer finding multiple violations and sentencing Plaintiff to SHU. FN14 Furthermore, those convictions were never subsequently reversed on administrative appeal. FN15 As a result, no admissible record evidence exists from which a rational factfinder could conclude that Plaintiff has established the third element of a retaliation claim—the existence of a causal connection between the protected speech and the adverse action.

FN14. *See Hynes v. Squillance,* 143 F.3d 653, 657 (2d Cir.1998) (holding that defendants met their burden of showing that they would have taken disciplinary action on valid basis alone where the evidence demonstrated that plaintiff had committed "the most serious, if not all, of the prohibited conduct"); *Jermosen v. Coughlin,* 86–CV–0208, 2002 WL 73804, at *2 (N.D.N.Y. Jan.11, 2002) (Munson, J.) (concluding, as a matter of law, that defendants showed by a preponderance of the evidence that they would have issued a misbehavior report against plaintiff even in the absence of his complaints against correctional department personnel, because they established that the misbehavior report resulted in a disciplinary conviction, "demonstrat[ing] that plaintiff in fact committed the prohibited conduct charged in the misbehavior report.").

FN15. For these reasons, the Court finds to be inapposite the case that Plaintiff cites for the proposition that the Court must accept as true his sworn denial that he committed any of the violations alleged in the misbehavior reports issued against him. *See Samuels v. Mockry,* 142 F.3d 134, 135–36 (2d Cir.1998) (addressing a situation in which a prisoner was placed in a prison's "Limited Privileges Program," upon a finding rendered by the prison's Program Committee, that he had refused to accept a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

mandatory work assignment, *"without a hearing or a misbehavior report"* ) [emphasis added]. The Court would add only that, even if it were to accept Plaintiff's sworn denial as true, the Court would still find that he has failed to establish that Defendants Duckett and Norton would not have issued the misbehavior reports against him anyway, based on their subjective belief that he was acting in a disturbing, interfering, harassing and disobedient manner at the time in question (as evident from, *inter alia,* their misbehavior reports, the disciplinary hearing testimony of three of the Defendants, and admissions made by Plaintiff during his deposition regarding the "confusion" and "misunderstanding" that occurred during his examination by Defendant Norton, his persistent assertions about his prescribed frequency of visits, and his unsolicited comments about his proper course of treatment).

For each of these alternative reasons, Plaintiff's retaliation claim under the First Amendment is dismissed.

### B. Plaintiff's Claims Under the Eighth Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's Eighth Amendment claims because (1) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Norton used any force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so, (2) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Broekema had a reasonable opportunity to intervene and prevent the alleged assault by Defendants Dinelle, DeLuca and Duckett, yet failed to do so, and (3) Plaintiff's identification of Defendant DeLuca is "very tentative."

As an initial matter, because Plaintiff did not oppose Defendants' argument that his excessive-force claim against Defendant Norton should be dismissed, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou v.*

*S.U.N.Y. Inst. of Tech.,* 08–CV–0444, 2011 WL 4344025, at *11 (N.D.N.Y. Sept.14, 2011)* (Suddaby, J.). After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, the Court can find no record evidence to support the claim that Defendant Norton used force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so. As a result, Plaintiff's Eighth Amendment claim against Defendant Norton is dismissed.

**\*9** Turning to Plaintiff's failure-to-intervene claim against Defendant Broekema, it is undisputed that it was Defendants Duckett, Dinelle and DeLuca who used force against Plaintiff. Plaintiff testified that, while Defendant Broekema was in the room at the time, Defendant Broekema was standing behind Defendant Dinelle on his "immediate right." In addition, Plaintiff testified that Defendant Duckett's threat of physical force against Plaintiff was conditioned on Plaintiff's continued failure to comply with (what Plaintiff perceived to be) conflicting instructions by Defendants Duckett and Dinelle during the frisk. (Dkt. No. 24, Attach. 4, at 97–99.) Furthermore, Plaintiff testified that it was only after he failed to put his hands in his pockets (rather soon after being warned by Defendant Duckett) that either Defendant Duckett or Defendant Dinelle punched him *one time* with a "closed fist" in the side of his nose, causing him to immediately fall to the ground. (*Id.* at 98–99.) Finally, Plaintiff testified that the kicks that he suffered soon after falling to the ground were limited in nature, having occurred only "a couple of times," and indeed having only *possibly* occurred. (*Id.* at 99.)

While the Court in no way condones the conduct alleged in this action, the Court is simply unable to find, based on the current record, that Plaintiff has adduced sufficient admissible record evidence to reach a jury on his Eighth Amendment claim against Defendant Broekema. Rather, based on the evidence presented, a rational factfinder could only conclude that the use of force was simply too uncertain for a reasonable person in Defendant Broekema's position to expect; and it was too brief in nature to give Defendant Broekema a realistic opportunity

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

to intervene in it, so as prevent the one punch and possibly few kicks that Plaintiff presumably experienced.[FN16]

> FN16. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988) (noting that "three blows [that occurred] in such rapid succession ... [is] not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator"); *Blake v. Base,* 90–CV–0008, 1998 WL 642621, at *13 (N.D.N.Y. Sept.14, 1998) (McCurn, J.) (dismissing failure-to-intervene claim against police officer based on finding that the punch to the face and few body blows that plaintiff allegedly suffered "transpired so quickly ... that even if defendant ... should have intervened, he simply did not have enough time to prevent plaintiff from being struck"); *Parker v. Fogg,* 85–CV–0177, 1994 WL 49696, at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.) (holding that an officer is not liable for failure-to-intervene if there "was no 'realistic opportunity' to prevent [an] attack [that ends] in a matter of seconds"); *see also Murray–Ruhl v. Passinault,* 246 F. App'x 338, 347 (6th Cir.2007) (holding that there was no reasonable opportunity for an officer to intervene when one officer stood by while another fired twelve shots in rapid succession); *Ontha v. Rutherford Cnty., Tennessee,* 222 F. App'x 498, 506 (6th Cir.2007) ("[C]ourts have been unwilling to impose a duty to intervene where ... an entire incident unfolds 'in a matter of seconds.' "); *Miller v. Smith,* 220 F.3d 491, 295 (7th Cir.2000) (noting that a prisoner may only recover for a correction's officer's failure to intervene when that officer "ignored a realistic opportunity to intervene").

Finally, based on the current record, the Court rejects Defendants' third argument (i.e., that Plaintiff's excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"). Defendants argue that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant DeLuca was present during the use of force

against Plaintiff (let alone that Defendant DeLuca used force against Plaintiff). This is because Plaintiff's basis for bringing his excessive-force claim against Defendant DeLuca is that he remembered being assaulted by three individuals, including Defendants Dinelle and Duckett, whose last names began with the letter "D." While this fact is undisputed, it is also undisputed that Defendant DeLuca was interviewed by the Inspector General's Office regarding his involvement in the incidents giving rise to Plaintiff's claims,[FN17] and that both Defendant Broekema's use-of-force report, and Defendant Broekema's Facility Memorandum, state that Defendant DeLuca participated in the use of force against Plaintiff.[FN18] Based on this evidence, a rational factfinder could conclude that Defendant DeLuca violated Plaintiff's Eighth Amendment rights. As a result, Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca survives Defendants' motion for summary judgment. The Court would add only that, although it does not construe Plaintiff's Complaint as alleging that Defendant DeLuca failed to intervene in the use of force against Plaintiff, assuming, (based on Plaintiff's motion papers) that Plaintiff has sufficiently alleged this claim, the claim is dismissed because the entirety of the record evidence as it pertains to Defendant DeLuca establishes that he used force against Plaintiff.

> FN17. (Dkt. No. 27, Attach. 2, at 19–20.)

> FN18. (Dkt. No. 27, Attach. 2, at 10, 14.)

## C. Plaintiff's Claim Under the Fourteenth Amendment

**\*10** As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Defendants did not deprive Plaintiff of his liberty rights. As stated above in note 2 of this Decision and Order, Plaintiff failed to address Defendants' argument that his substantive due process claim should be dismissed. As a result, as stated above in Part III.B. of this Decision and Order, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou,* 2011 WL 4344025, at *11.

After carefully considering the matter, the Court finds

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, although the record evidence establishes that Plaintiff was confined in SHU for 150 days as a result of the misbehavior reports issued by Defendants Norton and Duckett, Plaintiff has failed to adduced admissible record evidence from which a rational factfinder could conclude that the conditions of his confinement during this 150–day period were more severe than normal SHU conditions.[FN19] As a result, Plaintiff's substantive due process claim is dismissed.

> FN19. *See* *Spence v. Senkowski,* 91–CV–0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (finding that 180 days that plaintiff spent in SHU, where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord,* *Husbands v. McClellan,* 990 F.Supp. 214, 217–19 (W.D.N.Y.1998) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353–56 (W.D.N.Y.1997) (161 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96–CV–2003, 1997 WL 137448, at *4–6 (S.D.N.Y.1997) (192 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116–17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94–CV–4094, 1996 WL 487951, at *4–5 (S.D.N.Y. Aug.27, 1996) (210 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103–04 (W.D.N.Y.1995) (270 days in SHU under numerous conditions of confinement that

were more restrictive than those in general population).

**D. Defendants' Defense of Qualified Immunity**

As stated above in Part I.C. of this Decision and Order, Defendants seek dismissal of Plaintiff's claims on the alternative ground that they are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances.

**1. Retaliation**

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 [1982] ). Here, even assuming that Plaintiff's statement that he would contact an attorney regarding the use of force he experienced constitutes engagement in protected activity, and even also assuming that the only reason Defendant Norton and/or Duckett issued Plaintiff a misbehavior report was because he made this statement, these Defendants are, under the circumstances, entitled to qualified immunity. This is because the Court finds that the right to make this statement (without experiencing any resulting adverse action) was not a clearly established during the time in question (January 2009), based on a review of the relevant case law. *See, supra,* notes 12 and 13 of this Decision and Order.

As a result, Plaintiff's retaliation claim is dismissed on the alternate ground of qualified immunity.

**2. Excessive Force**

There is no doubt that the right to be free from the use of excessive force was "clearly established" at the time of the incidents giving rise to Plaintiff's claims. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Moreover, with regard to whether it was objectively reasonable for Defendants to use the alleged amount of force that they used, the Second Circuit has made clear that, "[w]here the circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." *Mickle v. Morin,* 297 F.3d 114, 122 (2d Cir.2002) [internal quotation marks omitted].

**\*11** Here, after carefully reviewing the record, and construing it in the light most favorable to Plaintiff, the Court finds that, even if Defendants Dinelle, DeLuca and Duckett genuinely feared being assaulted by Plaintiff, and even if those three Defendants genuinely perceived Plaintiff's words and movements to constitute an attempt to resist a frisk, admissible record evidence exists from which a rational jury could conclude that those perceptions were not objectively reasonable under the circumstances. As the Second Circuit has observed, it is impossible to "determine whether [Defendants] reasonably believed that [their] force was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded." *Thomas v. Roach,* 165 F.3d 137, 144 (2d Cir.1999).[FN20] For these reasons, the Court rejects Defendants' argument that Plaintiff's excessive-force claim should be dismissed on the ground of qualified immunity as it relates to Defendants Dinelle, DeLuca and Duckett.

> FN20. *See also* *Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987) ( "[T]he parties have provided conflicting accounts as to [who] initiated the use of force, how much force was used by each, and whether [the arrestee] was reaching toward [a weapon]. Resolution of credibility conflicts and the choice between these conflicting versions are matters for the jury and [should not be] decided by the district court on summary judgment.").

However, the Court reaches a different conclusion with regard to Plaintiff's failure-to-intervene claim against Defendant Broekema: the Court finds that, at the very least, officers of reasonable competence could disagree on the legality of Defendant Broekema's actions, based on the current record. As a result, Plaintiff's failure-to-intervene claim against Defendant Broekema is dismissed on this alternative ground.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for partial

summary judgment (Dkt. No. 24) is ***GRANTED*** in part and ***DENIED*** in part in the following respects:

(1) Defendants' motion for summary judgment on Plaintiff's First Amendment claim is ***GRANTED;***

(2) Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment substantive due process claim is ***GRANTED;***

(3) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton is ***GRANTED;***

(4) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema is ***GRANTED;*** and

(5) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca is ***DENIED;*** and it is further

**ORDERED** that the following claims are ***DISMISSED*** **with prejudice** from this action:

(1) Plaintiff's First Amendment claim;

(2) Plaintiff's Fourteenth Amendment substantive due process claim;

(3) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton; and

(4) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema; and it is further

**ORDERED** that Defendants Norton and Broekema are ***DISMISSED*** from this action; and it is further

**ORDERED** that, following this Decision and Order, the following claims remain pending in this action: Plaintiff's Eighth Amendment excessive-force claim against Defendants DeLuca, Dinnelle and Duckett; and it is further

**\*12 ORDERED** that counsel are directed to appear

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

on **JANUARY 4, 2012 at 2:00 p.m.** in chambers in Syracuse, N.Y. for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **DECEMBER 16, 2011,** and the parties are directed to engage in meaningful settlement negotiations prior to the 1/4/12 conference.

N.D.N.Y.,2011.

Henry v. Dinelle
Slip Copy, 2011 WL 5975027 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.